ACCEPTED
04-15-00097-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
12/29/2015 8:55:56 PM
KEITH HOTTLE
CLERK

## NO. 04-15-00097-CV

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
12/29/2015 8:55:56 PM
KEITH E. HOTTLE
Clerk

**IN THE COURT OF APPEALS**
**FOR THE FOURTH JUDICIAL DISTRICT OF TEXAS**
**AT SAN ANTONIO**

**BRIAN McENERY,**

*Appellant,*

**v.**

**CITY OF SAN ANTONIO AND CHIEF CHARLES N. HOOD,**

*Appellees.*

ON APPEAL FROM THE 285th JUDICIAL DISTRICT COURT
BEXAR COUNTY, TEXAS, TRIAL COURT NO. 2011-CI-06603
THE HONORABLE JUDGE CATHLEEN STRYKER PRESIDING

## APPELLANT BRIAN McENERY'S REPLY BRIEF

RONALD B. PRINCE
State Bar No. 16329300
ron@princecontreras.com
FLOYD STEVEN CONTRERAS
State Bar No. 24075339
floyd@princecontreras.com
PRINCE CONTRERAS PLLC
417 San Pedro Avenue
San Antonio, Texas 78212
Tel: (210) 227-7821
Fax: (210) 225-4469
info@princecontreras.com
ATTORNEYS FOR APPELLANT

# TABLE OF CONTENTS

**Page**

Index of Authorities ……………………………………………................. ii

Reply Argument & Authorities ……………………………………….... 1

    I.      Appellant Brian McEnery did not waive any issues raised on Appeal …………………………………………….……… 1

    II.     The court below erred if the court below rejected Appellant Brian McEnery's challenges to the award of Arbitrator Leroy Bartman...… 4

    II.A   Challenge based on absence of feedback …………………………… 4

    II.B   Challenge based on Tex. Loc. Gov. Code Chapter 143 …………….. 7

    II.B.1 Challenge requires application of Tex. Loc. Gov. Code Chapter 174.. 7

    II.B.2 Challenge not barred by res judicata or collateral estoppel ……….… 9

    II.C   Challenge based on failure of the tactical exercise ………………… 13

    II.D   Challenge based on deficiencies in decision and award …………… 16

    III.    Appellant Brian McEnery's appeal is not moot …………….…… 18

    IV.    Appellant Brian McEnery timely filed his notice of appeal ……….. 21

    IV.A  Request for Findings of Fact and Conclusions of Law was proper..... 22

    IV.B  Motion for New Trial was proper …………………………..… 24

Prayer ……...…………………………………………….......… 28

Certificate of Compliance …...………………………………… 29

Certificate of Service ………...………………………………… 30

i

# INDEX OF AUTHORITIES

**Cases**

*Amstadt v. United States Brass Corp.,*
919 S.W.2d 644
(Tex. 1996) …………………………………………………….….. 10, 12

*Barr v. Resolution Trust Corp.,*
837 S.W.2d 627
(Tex. 1992) …………………………………………………………. 10

*City of San Antonio v. Bullock,*
34 S.W.3d 650
(Tex. App.—San Antonio 2000, pet. denied) ………………………………….. 9, 20

*Eagle Properties, Ltd. v. Scharbauer,*
807 S.W.2d 714
(Tex. 1990) …………………………………………………...…… 10, 12

*Harrison v. City of San Antonio,*
695 S.W.2d 271
(Tex. App.—San Antonio 1985, no writ) …………………………………...…… 8

*Kopplow Dev., Inc. v. City of San Antonio,*
399 S.W.3d 532
(Tex. 2013) …………………………………………………........ 2, 17

*Moreno v. State,*
No. 04-15-00085-CR
(Tex. App.—San Antonio April 15, 2015, no pet.)
(mem. op., not designated for publication) ………………...……………... 25 n. 2

*Old Republic Ins. v. Scott,*
846 S.W.2d 832
(Tex. 1993) ……………………………………………...…….. 27

*Public Utility Commission of Texas v. Gulf States Utilities Company,*
809 S.W.2d 201
(Tex. 1991) …………………………………………………..… 15

*Swain v. State*,
319 S.W.3d 878
(Tex. App. – Fort Worth 2010, no pet.) (per curiam) …………….……… 25 n. 2

*Tex. Dep't of Pub. Safety v. Fecci*,
989 S.W.2d 135
(Tex. App.—San Antonio 1999, pet. denied) ………………………. 21, 25, 26, 27

*Thomley v. Southwood-Driftwood Apts., Ltd.,*
961 S.W.2d 6
(Tex. App.—Amarillo 1996, order) ……………………………...…………. 27

**Rules and Statutes**

Tex. Loc. Gov. Code Chapter 143 ……………………..………… i, 7, 8, 9, 13

Tex. Loc. Gov. Code §143.001 ………………………………….……… 8

Tex. Loc. Gov. Code §143.032 ………………………………….……… 7

Tex. Loc. Gov. Code §143.033 ………………………………….……… 7

Tex. Loc. Gov. Code §143.034 ……………………………………....... 7

Tex. Loc. Gov. Code §143.034(a) ………………………………..…… 4, 5, 7

Tex. Loc. Gov. Code Chapter 174 …………………………………….… i, 7, 9

Tex. Loc. Gov. Code §174.006 …………………………...……….. 7, 9

Texas Rule of Appellate Procedure 6.3 …………………....………….. 30

Texas Rule of Appellate Procedure 9.4(i)(1) …………………………..… 29

Texas Rule of Appellate Procedure 9.4(i)(3) ………………………………. 29

Texas Rule of Appellate Procedure 9.5 …………………………………… 30

Texas Rule of Appellate Procedure 26.1(a) ………………………….... 21

Texas Rule of Appellate Procedure 26.1(a)(1) …………………………...……….. 27

Texas Rule of Appellate Procedure 26.1(a)(4) …………………………….……… 24

Texas Rule of Appellate Procedure 33.1 ………………………………….....….. 24

Texas Rule of Appellate Procedure 49.1 …………………………….……… 26

Tex. R. Civ. P. 2 …………………………………………………………….. 26

Tex. R. Civ. P. 45(b) ……………………………………………..…… 2, 17

Tex. R. Civ. P. 47(a) ………………………………………………… 2, 17

Tex. R. Civ. P. 166a(c) …………………………………………………….... 23

Tex. R. Civ. P. 166a(i) …………………………………………………… 23

Tex. R. Civ. P. 296 …………………………………………………….. 23

Tex. R. Civ. P. 329b ……………………………………………………… 24, 26

**REPLY ARGUMENT & AUTHORITIES**

**I. Appellant Brian McEnery did not waive any issues raised on Appeal**

Appellees assert that Appellant did not raise the issues concerning absence of feedback and his failure of the tactical exercise timely before the arbitrator by not specifically including those issues in his grievance. *See* Appellees' Brief at 25.

However, Appellant grieved that he failed the assessment center and could not determine why he failed the assessment center. V R.R. at 236-237. These statements alone presented in his grievance satisfied the provisions of Article 32, Section 8, Paragraph B of the CBA requiring that Appellant "state in particular and with specifics" his objection to the assessment center process and its result. V R.R. at 227.

Appellant could not be any more specific in his grievance because, as the grievance states, Appellant could not determine why he failed, or which component of the assessment center examination he failed, at the time of filing his grievance. V R.R. at 235-237. In addition, Appellant could not determine why he failed because he did not receive feedback. *See* V R.R. at 109 (95:2-5) and 114-116 (114:2 – 122:22).

Appellant did not realize that feedback was given in previous assessment centers prior to 2009—the only other assessment center examination to which he had knowledge—until the arbitration and the testimony of Dr. Booth. *See Id.* At the arbitration, Appellant made the absence of feedback a component of his larger

1

objection to the assessment center process concerning his inability to determine why he failed. *See* V R.R. at 140 (219:12 – 220:24).

In addition, Appellant at the time of his grievance did not realize that he failed the tactical exercise of the assessment center examination—he did not have that information yet. *See* Appellant's Brief at 4; V R.R. at 80 (285:1-12); V R.R. at 235-237. Nevertheless, Appellant had that information at the arbitration, and Appellant specifically challenged his failure of the tactical exercise at the arbitration. V R.R. at 72-78 (255:13 – 278:25).

As concerns the court below, Appellant in his Second Amended Petition did complain about the fact that he failed the assessment center examination and did not receive feedback. I C.R. at 34-45 (paragraphs 14 and 44). It is not apparent whether Appellees contend that Appellant was subject to a higher pleading standard in the court below as Appellant satisfied the requirements of notice pleading in his Second Amended Petition. Tex. R. Civ. P. 45(b) and 47(a); *Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 536 (Tex. 2013).

Similarly, Appellant asserted his challenge to the decision of the Arbitrator based on his failure of the tactical exercise and the absence of feedback when responding to the motion for summary judgment brought by Appellees. II C.R. at 329-346. Appellant filed his response to the motion for summary judgment on

August 11, 2014, over a month before the beginning of the trial on September 22, 2014. II C.R. at 3-4.

Consequently, Appellant did not waive the issues concerning his failure of the tactical exercise and the absence of feedback.

In a footnote, Appellees indicate that Appellant could not make a challenge based on Article 9 of the CBA and the "Maintenance of Standards" without using the grievance procedure outlined in Article 30 of the CBA. *See* Appellees' Brief at 25. However, Appellees neglected to recall that Article 32, Section 8 of the CBA provides the only mechanism to challenge the assessment center process. V R.R. at 227.

If Appellant is correct that feedback is a standard maintained under Article 9 of the CBA concerning the assessment center process, then Article 32, Section 8 provided the only method for Appellant to raise the feedback issue as those provisions precluded Appellant from raising that issue under any other portion of the CBA.

Appellant requests that the Court determine that feedback is a standard under the ambit of Article 9 of the CBA, and determine that Appellant did raise that standard properly before the arbitrator under the procedure of Article 32, Section 8 of the CBA.

**II. The court below erred if the court below rejected Appellant Brian McEnery's challenges to the award of Arbitrator Leroy Bartman**

**II.A Challenge based on absence of feedback**

Appellees appear to utilize a straw man argument in arguing that the decision of the Arbitrator cannot be disturbed based on lack of feedback, characterizing feedback as "trivial" and coupling feedback with other "trivial complaints." Appellees' Brief at 29.

However, Tex. Loc. Gov. Code §143.034(a) provides for feedback in the form of "the person's promotional examination and answers, the examination grading, and the source material for the examination." Consequently, feedback in this form, or any other form, concerning a promotional examination is rather important, not trivial.

Appellant requested the information delineated in Tex. Loc. Gov. Code §143.034(a) in his grievance, but at the arbitration, Dr. Booth testified that there are no "correct answers" to the assessment center. V R.R. at 235-237; V R.R. at 99 (54:12-23).

Although Appellant disputes the premise that no correct answers existed for the assessment center examination, assuming the premise was correct, another mechanism existed to determine the performance of those taking the assessment center examination in the form of a different kind of feedback than that provided by

4

Tex. Loc. Gov. Code §143.034(a): direct feedback from the assessors. V R.R. at 114-116 (114:2 – 122:22).

As an important component of the assessment center process, though not specifically mentioned in the CBA, the past practice of providing feedback was a standard, privilege, or working condition enjoyed by Fire Fighters as a result of the assessors providing feedback to candidates at each assessment center prior to 2010. V R.R. at 116 (121:17-25). Because the existence of feedback persisted at the time of the effective date of the CBA on October 1, 2009, feedback also became a standard, privilege, or working condition under Article 9 of the CBA. *Id.;* V R.R. at 157 and 171; *see also* V R.R. at 458 (2009 assessment center occurred on or about March 2009).

Appellees contend that, even if feedback was provided, the feedback would "come after the test… and… could have no impact on… placement on the promotional exam." Appellees' Brief at 30. Therefore, Appellees contend that evidence concerning feedback would not show whether "the test itself was faulty or flawed." *Id.*

However, the assessment center dispute resolution procedure does not limit itself to the "test" itself, but rather lends itself to challenges concerning the entire assessment center *process.* V R.R. at 227 (Article 32, Section 8, Paragraph A of the

5

CBA). The process necessarily included the grading process conducted after the conclusion of the test.

Consequently, Appellant, as specified in his grievance, could not determine why he failed, in part, because he did not receive the feedback required under Article 9 of the CBA. By not receiving feedback, Appellant could not thoroughly challenge the grading of his performance on the assessment center because he did not know exactly why he failed.

Had Appellant had feedback, Appellant would have had the opportunity to thoroughly challenge the grading of his performance on the assessment center such that a different promotional eligibility list might generate from a finding by the arbitrator that the assessment center process was faulty or flawed because of the grading itself. Without such feedback, Appellant lost this opportunity, which was reason enough for the Arbitrator to determine that the assessment center process was faulty or flawed.

Appellees are incorrect when they state that Appellant "failed to frame any issue for the [A]rbitrator regarding whether lack of feedback prevented him from grieving his failure of the tactical exam." Appellees' Brief at 31. Appellant did frame this issue for the arbitrator, and Appellant specified in his grievance that, because he could not determine why he failed, he was "unable to fully grieve" his failure. V R.R. at 140 (219:12 – 220:24); V R.R. at 236.

Appellant requests that the Court determine that the evidence presented at the arbitration does not reasonably support the decision of the Arbitrator because the decision of the Arbitrator failed to take into account the evidence concerning the absence of feedback, in violation of Article 9 of the CBA, and the inability of Appellant to fully grieve his failure of the assessment center because of the lack of feedback.

## II.B Challenge based on Tex. Loc. Gov. Code Chapter 143

## II.B.1 Challenge requires application of Tex. Loc. Gov. Code Chapter 174

Appellees indicate that the CBA expressly preempted the application of Tex. Loc. Gov. Code Chapter 143, citing Tex. Loc. Gov. Code §174.006 and Article 37 of the CBA. *See* Appellees' Brief at 33-34. However, Appellees neglect to address how the CBA makes no provision regarding the process of grading the assessment center examination and access by those taking the assessment center to that grading process. *See* Appellant's Brief at 41.

On the contrary, Tex. Loc. Gov. Code §143.032, 143.033, and 143.034 make provisions for the grading process of a promotional examination and access to that grading process. These provisions coincide with the notion of "transparency" argued by Appellant to exist within the requirements of Tex. Loc. Gov. Code Chapter 143. In other words, access to the grading process, as delineated especially in Tex. Loc. Gov. Code §143.034(a), provides a mechanism to achieve a goal of Tex. Loc. Gov.

Code §143.001: "to secure efficient fire and police departments composed of capable personnel who are free from political influence."

The Arbitrator himself pointed out how the provisions concerning the assessment center in Article 32 of the CBA are silent as to access to the assessment center grading process. V R.R. at 154. Without express provision concerning access to the grading process contrary to Tex. Loc. Gov. Code Chapter 143 in the CBA, then the provisions regarding access to the promotional examination grading process from Tex. Loc. Gov. Code Chapter 143 applied in this case. *See Harrison v. City of San Antonio,* 695 S.W.2d 271, 277 (Tex. App.—San Antonio 1985, no writ).

If, however, Appellees are correct that the CBA expressly preempted the application of Tex. Loc. Gov. Code Chapter 143, then the question arises as to what governed the process for grading, and what governed access to the grading process by those that took the assessment center.

If that is the case, Appellant asserts that past practice controls under Article 9 of the CBA, specifically the past practice of providing feedback to the candidates of the assessment center examination. *See* Appellant's Brief at 19-29.

Absent control by Tex. Loc. Gov. Code Chapter 143 or the CBA under the doctrine of past practice, then nothing governs the grading process and access to the grading process because the provisions concerning the assessment center under Article 32 of the CBA do not address those issues. This cannot be the case because

8

Tex. Loc. Gov. Code Chapter 174 makes express provision for the application of either Tex. Loc. Gov. Code Chapter 143 or the CBA, with the latter controlling only if it provides express provision to the contrary of the former. Tex. Loc. Gov. Code §174.006; *City of San Antonio v. Bullock*, 34 S.W.3d 650, 653 (Tex. App.—San Antonio 2000, pet. denied). In other words, one or the other must control.

Appellant requests that the Court determine that the challenge raised by Appellant concerning the application of Tex. Loc. Gov. Code Chapter 143, Tex. Loc. Gov. Code Chapter 174, and the CBA as regards the grading process shows how the decision of the Arbitrator was not supported by the record made at the arbitration because the assessment center process was flawed and contrary to the requirements of Tex. Loc. Gov. Chapter 143 by not providing a grading process and access to that grading process in accordance with the provisions of the statute, or if expressly preempted, then contrary to the past practice of providing feedback under Article 9 of the CBA, which did not occur in the 2010 assessment center.

**II.B.2 Challenge not barred by res judicata or collateral estoppel**

Appellees discuss the doctrines of res judicata and collateral estoppel in their briefing regarding Appellant's challenge to the assessment center based on Tex. Loc. Gov. Code Chapter 143, alleging that the decision in federal district court made by the Honorable Judge Fred Biery concerning the 2009 assessment center barred Appellant's challenge in this action. *See* Appellees' Brief at 38-41.

9

However, these doctrines do not apply because the issues raised by Appellant concerning the 2010 assessment center could not have been raised in the litigation decided by Judge Biery. Furthermore, the decision of the Arbitrator on August 2, 2010, came before the decision of Judge Biery on September 28, 2011, making the doctrines inapplicable to this case. *See* IV R.R. at 65:15 – 67:15 (discussion in argument concerning timing of decisions).

The standard for invoking res judicata, or claim preclusion, involves a showing that the instant action is based on the same claims that were raised or could have been raised in the first action. *Amstadt v. United States Brass Corp.,* 919 S.W.2d 644, 652 (Tex. 1996).

The standard for invoking collateral estoppel, or issue preclusion, involves a showing that the facts sought to be litigated in the instant action were fully and fairly litigated in the prior action. *Eagle Properties, Ltd. v. Scharbauer,* 807 S.W.2d 714, 721 (Tex. 1990).

The claims and issues raised by Appellant concerning the 2010 assessment center could not have been raised in the action brought in federal district court because the claims and issues did not exist until long after the 2009 assessment center, making the two assessment centers different transactions for the purposes of res judicata and collateral estoppel. *See Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 631 (Tex. 1992) (discussing transactional approach to claim preclusion); *see*

*also* IV R.R. 70:14 – 72:10 (argument specifying how transactional approach prohibits application of claim preclusion to this case).

In this action, Appellant challenged the assessment center process that occurred from May 12-14, 2010, while the action before Judge Biery concerned the assessment center that occurred on March 17-20, 2009. V R.R. at 92 (27:22-24); V R.R. at 235; V R.R. at 458. In addition, the assessment center that forms the basis of this action was procedurally different than the assessment center that formed the basis of the action before Judge Biery, including the very exercises that comprised each assessment center. *See* V R.R. at 405 (in basket, tactical exercise, and oral presentation); V R.R. at 468 (in basket, oral presentation, and oral resume).

In addition, the assessment center that forms the basis of this action raised different issues than that in the action before Judge Biery, including the issues that Appellant failed the assessment center and could not determine why he failed at the time of his 2010 grievance. *See* V R.R. at 235-237; V R.R. at 455-468. In fact, the decision of Judge Biery only addressed the procedure for the assessment center test itself and not the procedure for the grading of the assessment center and access to that grading process, which are issues raised by Appellant here concerning the 2010 assessment center. *See* V R.R. 235-237; V R.R. 496-497.

Notwithstanding the differences in the 2009 and 2010 assessment centers themselves, the CBAs in effect during the respective time periods of the two

11

assessment centers were different. The CBA, and the provisions related to assessment centers within it, serving as the basis of this action concerning the 2010 assessment center became effective on October 1, 2009, well after the 2009 assessment center took place, making the provisions of the former CBA effective prior to October 1, 2009, applicable to the 2009 assessment center. *See* V R.R. at 157; V R.R. at 502 (CBA in effect for 2009 assessment center).

Because the assessment centers in this suit and in the action before Judge Biery were procedurally different, because the issues raised by each assessment center were different, and because the CBAs controlling during the respective time periods were different, Appellees cannot invoke claim preclusion and issue preclusion. Appellant could not have brought a claim related to the 2010 assessment center in this action in the previous action before Judge Biery. In addition, the issues sought to be litigated in this action, initially before Arbitrator Leroy Bartman, could not have been fully and fairly litigated in the action before Judge Biery because of the differences between the 2009 assessment center and the 2010 assessment center. *See Amstadt*, 919 S.W.2d at 652; *Eagle Properties*, 807 S.W.2d at 714.

Because Appellees cannot meet the requirements for invoking claim preclusion and issue preclusion, Appellant requests that the Court determine that these affirmative defenses raised by Appellees did not bar Appellant from raising

his challenges concerning Tex. Loc. Gov. Code Chapter 143 as applied to the 2010 assessment center.

**II.C Challenge based on failure of the tactical exercise**

Appellees assert that Appellant ignored the provisions of Article 32, Section 4, Paragraph B.5 of the CBA concerning Appellant's ability to grieve or arbitrate his failure of the assessment center examination, including his failure of the tactical exercise. *See* Appellees' Brief at 42.

However, Appellant directly addressed those provisions, indicating that they do not prohibit grieving or arbitrating his failure of the assessment center examination, but they rather prohibit the use of the grievance procedure outlined in Article 30 of the CBA concerning the result of the assessment center. *See* Appellants' Brief at 43. Consequently, the assessment center grievance procedure in Article 32, Section 8 of the CBA was the *only* mechanism by which Appellant could grieve or arbitrate his failure of the assessment center examination. *Id.*

More pointedly, the assessment center promotional dispute resolution procedure specifically states that a Fire Fighter can make an objection in a grievance to the results of the examination process under Article 32, Section 8, Paragraph B. V. R.R. at 227 ("grievance must state… Fire Fighter's objection to said process *and/or results*") (emphasis added).

It serves well to note that another provision of the CBA bolsters the position of Appellant concerning his ability to grieve and arbitrate his failure of the assessment center examination. Article 32, Section 4, Paragraph D provides, in part:

> The District Chief eligibility list shall be valid for a period of one (1) year from the day after the date of the written examination unless exhausted, *notwithstanding any pending disputes, appeals or litigation concerning an applicant's score or right to promotion*.

> V R.R. at 227 (emphasis added).

The foregoing provisions indicate the possibility of a dispute concerning the score of an applicant, and because Article 32, Section 8 of the CBA provides the sole mechanism to dispute the assessment center process, Article 32, Section 8 of the CBA also authorized a grievance concerning the score of Appellant on the assessment center. *See* V R.R. at 227.

Appellant requests that the Court determine that the CBA authorized Appellant to grieve his failure of the assessment center examination. *See* V R.R. at 235-237; *see also* V R.R. at 227 (Article 32, Section 8, Paragraph B of the CBA).

In addressing the failure of Appellant to pass the assessment center examination, Appellees cite evidence in the arbitration record concerning comments made by the assessors regarding the presentation made by Appellant for the tactical exercise. *See* Appellees' Brief at 43; V R.R. at 313-316. However, the comments cited, including comments about "eye contact," perhaps may be reasons to give Appellant a relatively low score on the tactical exercise, but those comments alone

14

should not and cannot justify failing Appellant. *See* IV R.R. at 78:12-22 (argument concerning lack of eye contact).

In addition, Appellees misquote the particular note of an assessor by placing the comments in the wrong order, perhaps in an attempt to make the comments seem more egregious. *See* Appellees' Brief at 43*;* V R.R. at 313. Nevertheless, the misquoting illustrates a problem in relying on the notes generated by the assessors without more: the notes can be misinterpreted. *See* Appellant's Brief at 34.

Consequently, the notes themselves, as well as the grading sheets, do not substantiate the failure of Appellant on the tactical exercise because they do not mean anything absent direct feedback from the assessors as to their import, making any such evidence "conclusory." *See Id.*

Appellees dispute the use of the case cited by Appellant concerning "conclusory" evidence for purposes of substantial evidence review in this case: *Public Utility Commission of Texas v. Gulf States Utilities Company,* 809 S.W.2d 201, 211-212 (Tex. 1991). However, Appellees agree that the Texas Supreme Court in that case determined that more than conclusory testimony was necessary to resolve a complicated issue. *See* Appellees' Brief at 45.

Appellant disagrees with Appellees that the issue of his failure of the tactical exercise of the assessment center is not a complicated one. If it was not complicated, then Dr. Booth, the creator of the assessment center, would not have testified at the

arbitration that there was no way to determine why Appellant failed the tactical exercise absent direct feedback to Appellant. V R.R. at 114 (116:7-20). Therefore, more than just the notes from the assessors, and the grading sheets, were necessary for the Arbitrator to uphold the failure of Appellant of the tactical exercise.

Appellant requests that the Court determine that there is no reasonable basis to support the decision of the Arbitrator to permit a failing score on the tactical exercise for Appellant. *See* Appellant's Brief at 29-36.

## II.D Challenge based on deficiencies in decision and award

Appellees assert that Appellant waived for review the issues raised in the last section of his brief. Appellees' Brief at 47-48; *see* Appellant's Brief at 37-44.

However, as noted for a similar issue in section I above, Appellant did not waive the issues raised in the last section of his brief.

Notably, Appellant raised these issues in his response to the motion for summary judgment brought by Appellees in the court below over a month before the beginning of trial. II C.R. at 329-346 (*see, e.g.* paragraph 44); II C.R. at 3-4.

In addition, Appellant in his Second Amended Petition did indicate as a cause of action a request for the court below to require the arbitrator to withdraw his decision to the extent it was capricious or not supported in whole or in part by the evidence presented at the arbitration. I C.R. at 34-45 (paragraph 57). The additional allegations in the Second Amended Petition concerning the fact that Appellant failed

the assessment center examination and did not receive feedback allude to the issues raised at trial concerning whether the Arbitrator did not decide all of the issues presented to him. *Id.* (paragraphs 14 and 44). Again, Appellant met his burden of notice pleading. Tex. R. Civ. P. 45(b) and 47(a); *Kopplow*, 399 S.W.3d at 536.

Consequently, Appellant did not waive the issues raised concerning the apparent failure of the Arbitrator to decide all issues presented at the arbitration by Appellant, including why Appellant failed the assessment center, whether the assessment center process made adequate provision to determine why he failed, and whether the lack of feedback violated the CBA and prohibited Appellant from being able to grieve thoroughly his failure of the assessment center examination because he could not determine why he failed. Each of these issues was properly before the arbitrator. *See* V R.R. at 235-237; V R.R. at 140 (219:12 – 220:24).

As for the challenge based on lack of due process, Appellant does not make a constitutional challenge to any part of these proceedings. However, Appellant does make a "due process" challenge as that term describes the process available through the assessment center dispute resolution procedure to determine disputes concerning the assessment center process, including the result of the assessment center. *See* Appellants' Brief at 42-44.

Notably, the decision of the Arbitrator does not specify whether the Arbitrator considered all issues presented to him, including Appellant raising the issue of his

17

failing the assessment center. As specified in section II.C above, Appellant could and did appeal the result of the assessment center under Article 32, Section 8 of the CBA. Without any indication from the Arbitrator that he considered the grievance made by Appellant concerning the result of the assessment center, it is not clear whether the Arbitrator afforded the process provided by the CBA in allowing Appellant to challenge the result of the assessment center.

Appellant requests that the Court determine that the Arbitrator acted capriciously by not determining all issues and problems presented to him, failing to provide Appellant with the opportunity, and "due process," to challenge the assessment center under the CBA. *See* Appellant's Brief at 44.

### III. Appellant Brian McEnery's appeal is not moot

Appellant in his grievance requested that the results of the assessment center be set aside and a new assessment center be conducted. V R.R. at 237. Appellant at the arbitration also requested that the Arbitrator make him a district chief, or in the alternative, set aside the results of the 2010 assessment center. V R.R. at 141 (223:22 – 224:14). In addition, Appellant requested alternatively that the Arbitrator promote everyone who took the 2010 assessment center or change Appellant's scores to reflect a much higher score on the tactical exercise. V R.R. at 142 (225: 11-22).

However, Appellees mischaracterize the relief requested by Appellant because their characterization does not take into account that any relief requested by

18

Appellant was necessarily limited to the 2010 promotional examination to district chief and any relief the Arbitrator could provide concerning promotion to district chief in 2010.

Appellees do not address how Appellant was promoted in 2011 based on a completely different assessment center examination unrelated to the 2010 promotional examination and unrelated to the grievance made by Appellant in 2010. *See* III R.R. at 15:5-14; 37:24 – 38:6.[1]

In other words, because Appellant failed the assessment center in 2010, Appellant could only be promoted off a promotional eligibility list generated after the promotional eligibility list at issue in Appellant's grievance and at the arbitration for 2010 expired. *See* V R.R. at 226-227 (Article 32, Section 4, Paragraph D of the CBA) (quoted *supra*); *see also* V R.R. at 226 (Article 32, Section 4, Paragraph B.5 of the CBA) ("Failure of an applicant to obtain a passing score on the assessment center shall disqualify the applicant from further consideration for one (1) year from the date the written examination was administered…").

Absent relief from the Arbitrator, the court below, or this Court, Appellant could not and cannot be promoted to district chief in connection with the assessment center that took place in 2010 and the promotional eligibility list generated from it.

---

[1] The record reflects incorrect month of August of 2011 when Appellant was actually promoted in October of 2011.

19

Should the Court overturn the decision of the court below, in effect determining that the 2010 assessment process was flawed, and remand this case to determine the relief necessary to afford Appellant, then it is possible for Appellant to have a much earlier promotion date to district chief stemming from a different assessment center examination for 2010 leading to a different 2010 promotional eligibility list for the vacancies available at the time of the 2010 district chief promotional examination, should such relief be provided. *Cf. Bullock*, 34 S.W.3d at 652, 654 (discussing duration and expiration of promotional eligibility lists to fill vacancies in the rank of captain in the San Antonio Fire Department).

Consequently, this appeal is not moot because there continues to exist a justiciable controversy as to whether the 2010 assessment center process was flawed, and the effect a flawed assessment center had on Appellant's opportunity for placement on a promotional eligibility list in 2010 from a properly conducted assessment center. Appellant, then, continues to have an interest in the outcome of this case as any relief afforded to Appellant may result in a different promotional date for Appellant much earlier than October of 2011.

Appellant requests that the Court determine that his appeal is not moot and determine his appeal on its merits.

**IV. Appellant Brian McEnery timely filed his notice of appeal**

On April 27, 2015, Appellees filed their motion to dismiss appeal for lack of jurisdiction in this Court, asserting that Appellant's request for findings of fact and conclusions of law and Appellant's motion for new trial were nullities and did not extend the time for Appellant to file his notice of appeal.

On May 4, 2015, the Honorable Chief Justice Sandee Bryan Marion signed an order denying the motion to dismiss appeal for lack of jurisdiction, citing *Tex. Dep't of Pub. Safety v. Fecci*, 989 S.W.2d 135, 137-138 (Tex. App.—San Antonio 1999, pet. denied).

Appellees in their brief assert the same arguments they made in their motion to dismiss appeal for lack of jurisdiction that Justice Marion denied, and Appellees now request that this panel of the Court do what Justice Marion did not and dismiss this appeal.

Appellant requests that the Court adhere to the decision made by Justice Marion and find that Appellant timely filed his notice of appeal because his request for findings of fact and conclusions of law and his motion for new trial were proper and did extend the deadline to file his notice of appeal. *See* Texas Rule of Appellate Procedure 26.1(a).

**IV.A  Request for Findings of Fact and Conclusions of Law was proper**

Appellees are incorrect in asserting that the standard of review in the court below of the arbitration decision was merely substantial evidence standard of review as described in the cases cited by them.

Rather, the standard of review of the arbitration decision provided by the CBA states:

> The decision and award of the arbitrator or "neutral" must be upheld, unless the Fire Fighter/grievant can establish by clear and convincing evidence said award was not supported in whole or in part by substantial evidence and/or that the award of the arbitrator of "neutral" was capricious.
>
> V R.R. at 228 (Article 32, Section 8, Paragraph G.1).

None of the cases cited by Appellees directly address the specific standard of review provided by the CBA of a decision by an Arbitrator, and none of the cases address the propriety of a request for findings of fact and conclusions of law on review of a decision by an Arbitrator.

Appellees in making their argument that findings of fact and conclusions of law are not appropriate in this case cite to cases discussing substantial evidence review of administrative and other proceedings, none of which include review of an arbitration decision with the specific contractually created standard of review as in this case. Furthermore, none of the cases cited by Appellees address the unique "clear and convincing evidence" burden included in Article 32, Section 8, Paragraph G.1 of the CBA, delineated above.

22

Consequently, the review process created by the CBA contains an evidentiary burden distinguishable from each case cited by Appellees, and that burden necessarily required the court below to admit relevant evidence and make fact findings based on that evidence.

In that regard, Appellees filed traditional and no evidence motions for summary judgment in the court below, which the court below denied. I C.R. at 53; II C.R. at 636-637.

Tex. R. Civ. P. 166a(c) and 166a(i) required the court below to grant summary judgment if there was "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law" or if there was "no evidence of one or more essential elements of a claim or defense."

Because the court below denied the motions, the court below determined from the points raised in the motions and response and the evidence presented that a genuine issue of material fact did exist and that there was some evidence to support the elements of the claims brought by Appellant raised in the motions. *See* Tex. R. Civ. P. 166a(c) and 166a(i).

Consequently, the court below at the *trial stage* of these proceedings needed to make findings of fact and conclusions of law concerning the issues of material fact and the evidence presented for the claims of Appellant that justified denial of the motions for summary judgment. *See* Tex. R. Civ. P. 296.

For the foregoing reasons, the request for findings of fact and conclusions of law made by Appellant to the court below was proper, and the proper request extended the time to file the notice of appeal accordingly. Texas Rule of Appellate Procedure 26.1(a)(4).

Appellant requests that the Court determine that it has jurisdiction over this appeal.

## IV.B  Motion for New Trial was proper

Appellant disagrees with Appellees that the court below did not hold a trial in this case because of the process by which the parties had to follow to hold a trial before the court below provided by the Texas Rules of Civil Procedure and the Bexar County Civil District Court Rules. *See* II C.R. at 3 (Order Setting *Non-Jury Trial* on Jury Trial Docket).

In addition, the Final Judgment made by the court below contains the language "this cause came on for trial," and Appellees filed no motion to modify, correct, or reform the Final Judgment to assert that the court below did not conduct a trial, waiving any error to the contents of the Final Judgment including that a trial occurred. III C.R. at 112; *see* Tex. R. Civ. P. 329b; Texas Rule of Appellate Procedure 33.1.

Notwithstanding whether the court below actually conducted a trial or merely acted in an appellate capacity as Appellees contend, Appellant followed the Texas Rules of Civil Procedure in making his motion for new trial.

Specifically, Appellant made a timely motion for new trial by filing his motion within thirty (30) days of the court below signing the Final Judgment. III C.R. at 117.

As this Court held in *Fecci*:

The Texas Rules of Appellate Procedure govern procedure in appellate courts. Rule 3.1(b) defines an appellate court as the courts of appeals, the Court of Criminal Appeals, and the Supreme Court. Consequently, even though the county court at law may have been acting in an appellate or reviewing capacity, the Texas Rules of Appellate Procedure are not applicable. *The Texas Rules of Civil Procedure control procedure in the county courts.*

989 S.W.2d at 137-138 (emphasis added).

Although Appellees acknowledge the holding of this Court in *Fecci,* Appellees misrepresent the holding of this Court in their argument.[2]

---

[2] Appellees also cite *Swain v. State*, 319 S.W.3d 878, 878-879 (Tex. App. – Fort Worth 2010, no pet.) (per curiam) as an analogous circumstance to this one. However, the holding in *Swain* applies in the very specific circumstances presented in that case—the filing of a motion for new trial in a county court on an appeal of a municipal court conviction. This Court limited the application of *Swain* to those specific circumstances in *Moreno v. State*, stating, "A motion for new trial filed *after an appeal from a municipal court of record to a county court* does not extend the deadline to file the notice of appeal." No. 04-15-00085-CR at *2 (Tex. App.—San Antonio April 15, 2015, no pet.) (mem. op., not designated for publication) (emphasis added). Consequently, *Swain* does not apply and does not provide a useful analogy for the Court as this case does not involve an appeal of a conviction from a municipal court of record.

25

The appellant in *Fecci* filed a "Motion for New Trial/Motion for Rehearing," making the very motion at issue in that case a motion for new trial and not merely a motion for rehearing as Appellees indicated. *Fecci,* 989 S.W.2d at 138.

Although Texas Rule of Appellate Procedure 49.1 provides for a motion for rehearing, the Texas Rules of Civil Procedure do not specifically provide for a motion for rehearing, making such a motion inapplicable in the court below. *Id.* at 138; *see* Tex. R. Civ. P. 2 ("These rules shall govern the procedure in the justice, county, and *district courts* of the State of Texas in all actions of a civil nature…") (emphasis added).

Nevertheless, this Court in *Fecci* indicated that the purpose of a motion for new trial in the trial court "to give the trial judge an opportunity to cure any errors by granting a new trial" is similar to the purpose of a motion for rehearing in the appellate court to provide "an opportunity to correct any errors on issues already presented and decided." 989 S.W.2d at 138.

This Court further indicated that the "Motion for New Trial/Motion for Rehearing" brought by the appellant in *Fecci* "was, for purposes of filing deadlines, a post-judgment motion" in compliance with Tex. R. Civ. P. 329b. *Id.*

Similarly, the motion for new trial brought by Appellant in this case complied with the requirements of Tex. R. Civ. P. 329b as a post-judgment motion. *See* III C.R. at 117.

Because Appellant made a proper post-judgment motion in accordance with the Texas Rules of Civil Procedure, the Texas Rules of Appellate Procedure then bind this Court "when determining timetables applicable to this [C]ourt" in connection with any proper post-judgment motions. *Fecci,* 989 S.W.3d at 138.

Under Texas Rule of Appellate Procedure 26.1(a)(1), the motion for new trial brought by Appellant extended the time to file a notice of appeal from thirty (30) to ninety (90) days. *Id.; see also Old Republic Ins. v. Scott,* 846 S.W.2d 832, 833 (Tex. 1993) ("The filing of a motion for new trial in order to extend the appellate timetable is a matter of right..."); *cf. Thomley v. Southwood-Driftwood Apts., Ltd.,* 961 S.W.2d 6, 8 (Tex. App.—Amarillo 1996, order) (Motion for new trial after granting a motion for summary judgment extended appellate timetable even though the granting of a summary judgment "is not a 'trial'".).

As Appellant filed his notice of appeal within ninety (90) days of the signing of the Final Judgment, this Court has jurisdiction over this case. III C.R. at 121; *Fecci,* 989 S.W.2d at 138; Texas Rule of Appellate Procedure 26.1(a)(1).

Because the motion for new trial by Appellant was proper and rightly extended the time for Appellant to file his notice of appeal, Appellant requests that the Court determine that the Court has jurisdiction over this appeal.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Appellant Brian McEnery respectfully requests that the Court grant the relief requested in his initial brief, including:

1) finding that the court below erred by confirming the award of Arbitrator Leroy Bartman;

2) reversing the judgment made by the court below confirming the decision and award of Arbitrator Leroy Bartman;

3) rendering judgment vacating the decision and award of Arbitrator Leroy Bartman; and

4) remanding this case to the court below, or in the alternative, to Arbitrator Leroy Bartman, with further instructions to conduct proceedings to determine the relief to be awarded to Appellant.

Appellant further prays for such other relief to which he may be entitled.

Respectfully submitted,

PRINCE CONTRERAS PLLC
417 San Pedro Avenue
San Antonio, Texas 78212
Tel: (210) 227-7821
Fax: (210) 225-4469
info@princecontreras.com
ATTORNEYS FOR APPELLANT

_/s/ Floyd Steven Contreras_____
RONALD B. PRINCE
State Bar No. 16329300
ron@princecontreras.com
FLOYD STEVEN CONTRERAS
State Bar No. 24075339
floyd@princecontreras.com

## **CERTIFICATE OF COMPLIANCE**

As required by Texas Rule of Appellate Procedure 9.4(i)(3), the undersigned counsel for Appellant Brian McEnery certifies that the number of words in this document, excluding those properly excluded under Texas Rule of Appellate Procedure 9.4(i)(1), is 6,474.

_/s/ Floyd Steven Contreras_____
RONALD B. PRINCE
FLOYD STEVEN CONTRERAS

## CERTIFICATE OF SERVICE

As required by Texas Rules of Appellate Procedure 6.3 and 9.5, I certify that on the 29th day of December, 2015, a true and correct copy of the foregoing Appellant Brian McEnery's Reply Brief was served on the following counsel of record electronically through the electronic filing manager:

Ms. Jacqueline M. Stroh
THE LAW OFFICE OF JACQUELINE M. STROH, P.C.
10101 Reunion Place, Suite 600
San Antonio, Texas 78216
Tel: (210) 477-7416
Fax: (210) 477-7466
jackie@strohappellate.com                    *Attorney for Appellees*

Ms. Deborah Lynne Klein
OFFICE OF THE CITY ATTORNEY, LITIGATION DIVISION
Frost Bank Tower
100 West Houston Street, 18th Floor
San Antonio, Texas 78205
Tel: (210) 207-8919 and (210) 207-2015
Fax: (210) 207-4357
deborah.klein@sanantonio.gov                 *Attorney for Appellees*

Mr. Mark Kosanovich
FITPATRICK & KOSANOVICH, P.C.
P.O. Box 831121
San Antonio, Texas 78283-1121
Tel: (210) 207-7259
Fax: (210) 207-8997
mark.kosanovich@sanantonio.gov               *Attorney for Appellees*

Mr. Ricky J. Poole
LAW OFFICES OF RICKY J. POOLE
The Forum Building
8000 IH-10 West, Suite 600
San Antonio, Texas 78230
Tel: (210) 525-7988
Fax: (210) 525-7987
rpoole@alamocityattorney.com                 *Attorney for Intervenor*

    /s/ Floyd Steven Contreras_____
RONALD B. PRINCE
FLOYD STEVEN CONTRERAS

30

919 S.W.2d 644 (Tex. 1996), 94-0008, Amstadt v. United State Brass Corp.

**919 S.W.2d 644 (Tex. 1996)**

**Robert and Toni AMSTADT et al., Petitioners,**

**v.**

**UNITED STATES BRASS CORPORATION, Respondent.**

**UNITED STATES BRASS CORPORATION et al., Petitioners,**

**v.**

**Emery H. and Susan KOCHIE et al., Respondents.**

**UNITED STATES BRASS CORPORATION, Shell Oil Company d/b/a Shell Chemical Company, and Hoechst Celanese Corporation, Petitioners,**

**v.**

**Nabeel ANDRAUS et al., Respondents.**

**Nos. 94-0008, 94-0023 & 94-0123.**

**Supreme Court of Texas.**

**March 7, 1996**

Argued Feb. 21, 1995.

Rehearing Overruled May 10, 1996.

[Copyrighted Material Omitted]

Appealed from Houston Court of Appeals, First Judicial District, Sam Bass, Justice.

George M. Fleming, Mark A. Hovenkamp, James R. Moriarty, Michael O'Brien, Houston, for petitioners.

Kurt T. Nelson, Loreta H. Rea, Mark R. Zeidman, Houston, William Powers, Jr., Austin, for respondents.

Kevin H. Dubose, Michael Samford, Houston, Marc Kasowitz, Daniel R. Benson, Susan M. Lee, New York City, Kurt T. Nelson, Loreta H. Rea, Houston, for petitioners.

Michael O'Brien, James R. Moriarty, George M. Fleming, Mark A. Hovenkamp, Houston, for respondents.

Michael Samford, Kevin H. Dubose, Houston, Marc Kasowitz, Daniel R. Benson, Susan M. Lee, Peter T. Shapiro, Hector Torres, New York City, Robert D. Daniel, Jerry L. Mitchell, Jr., Marjorie C. Bell, Daniel A. Hyde, D. Ferguson McNeil, Mary Lou Strange, Jack W. Tucker, Jr., Stephanie K. Crain, Marie R. Yeates, Houston, Robbi B. Hull, Austin, Kurt T. Nelson, Loreta H. Rea, Houston, for petitioners.

James R. Moriarty, Mark A. Hovenkamp, Michael O'Brien, George M. Fleming, Houston, for respondent.

CORNYN, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and HECHT, ENOCH, BAKER and ABBOTT, Justices, join.

In these three cases, homeowners have sued the manufacturers of a polybutylene plumbing system for negligence and violations of the Deceptive Trade Practices-Consumer Protection Act.

The common issue is whether the Legislature intended that upstream suppliers of raw materials and component parts be liable under the DTPA when none of their misrepresentations reached the consumers. This precise issue, which to our knowledge has never before been raised in the twenty-three-year history of the DTPA, animates the appeals in Barrett v. United States Brass Corp., Knowlton/Kochie v. United States Brass Corp., and United States Brass Corp. v. Andraus. In Knowlton/Kochie we also consider a res judicata issue; in Barrett, a comparative liability issue.

We hold that, although the homeowners who obtained a jury finding of negligence may recover on that theory, no homeowner may recover from Celanese, Shell, or U.S. Brass under the DTPA because these manufacturers' alleged DTPA violations did not occur in connection with the homeowners' purchase of their homes. We accordingly reverse the judgments of the courts of appeals with regard to DTPA liability in all three causes. We remand Andraus and Kochie to the trial courts for rendition of judgment in favor of those homeowners who received favorable jury findings on their negligence claims. We reverse the court of appeals' judgment in Knowlton on res judicata grounds and render judgment that the Knowlton households take nothing, and reverse and remand Barrett to the trial court to resolve the comparative liability issue in accordance with this opinion.

I. FACTS

U.S. Brass, Shell, and Celanese v. Andraus

In Andraus, the owners of approximately 95 homes in the Fairmont Park West subdivision in La Porte, Texas, sued General Homes Corporation (the developer and homebuilder), U.S. Brass, Shell Oil Company, and Hoechst Celanese Corporation after experiencing problems with their plumbing. U.S. Brass designed and manufactured the plumbing system.

The plumbing system used flexible plastic pipes made of polybutylene resin connected by fittings made of a plastic compound called Celcon. The pipes and fittings were joined together by a copper or aluminum crimp ring placed around the outside of the pipe at the point where the pipe and fitting were connected. The ring, fitting, and pipe were then compressed using a large wrench-like tool designed by U.S. Brass. The pressure from the crimp ring deformed the pipe and fitting, creating a water-tight seal.

Celanese manufactured Celcon and supplied Celcon pellets to U.S. Brass to be molded into fittings. Celanese promoted the use of Celcon in plumbing applications to U.S. Brass and other manufacturers, and knew that U.S. Brass used Celcon to make the fittings. Shell produced the polybutylene resin and provided it in raw form to U.S. Brass. U.S. Brass formed the resin into the pipe used in the plumbing system.

In the early 1980s, U.S. Brass and Shell promoted the plumbing system to municipal officials in La Porte in order to obtain building code approval of the system for residential use. U.S. Brass and Shell also marketed the system to homebuilders, including General Homes. General Homes installed U.S. Brass' plumbing system in homes it built in 1980, 1981, and 1982.

In 1982, some of these systems began to fail. Cracks developed in the Celcon fittings that eventually caused leaks. At trial, the parties vigorously disputed what caused the fittings to fail.

Some of the experts testified that degradation of the Celcon from exposure to the households' chlorinated water caused the cracks in the fittings. Others testified that inadequate design, defective manufacture, and improper installation, or a combination of these problems along with chemical degradation created excessive stress, which caused the fittings to crack.

The homeowners [1] sued General Homes, U.S. Brass, Shell, Celanese, and Vanguard

Plastics, Inc. (a competitor of U.S. Brass, later dismissed from the suit). General Homes is not a party to this appeal. The homeowners alleged that the plumbing system's failure caused property damage and mental anguish. They sought damages based on negligence, fraud, and violations of the DTPA.

A jury found that U.S. Brass, Shell, and Celanese had made misrepresentations under the DTPA and were negligent. The jury also found that U.S. Brass had acted unconscionably and was grossly negligent. The trial court ruled that the statute of limitations barred the negligence claims of fifty-six households, and rendered a take-nothing judgment against five households for unspecified reasons. Three households elected to recover on the negligence findings, and the trial court rendered judgment accordingly. The trial court also rendered judgment for the eighty-six households that elected recovery under the DTPA.

Celanese, Shell, and U.S. Brass appealed. The court of appeals reversed the trial court's judgment in part and affirmed it in part. 1993 WL 313208. Specifically, the court of appeals affirmed DTPA liability because it concluded that "there was a link between the representations made and the use of the plumbing system in the plaintiffs' homes, which ultimately caused damage." Id. at * 17.

Knowlton v. U.S. Brass, Shell, and Celanese; Kochie v. U.S. Brass.

In Knowlton/Kochie, homeowners sued General Homes, Buckner Boulevard Plumbing Company (a plumbing contractor), Celanese, Shell, U.S. Brass, and Vanguard. They asserted claims for negligence, strict liability, and misrepresentation and unconscionability under the DTPA based on the defendants' representations about the characteristics of the plumbing systems to homebuilders. They claimed that absent such representations, General Homes would not have installed the defective systems.

Celanese, Shell, U.S. Brass, and General Homes moved for summary judgment based on res judicata and the statute of limitations. The trial court granted the motion with respect to five households, led by the Knowltons, without specifying the grounds. The Knowlton households had bought their homes from people who had previously sued and recovered damages caused by the plumbing systems.

The remaining households, led by the Kochies, dismissed their claims against General Homes, Buckner, Celanese, and Shell, and proceeded to trial against U.S. Brass and Vanguard. After closing argument but before the jury returned a verdict, they also settled with Vanguard. The jury returned a verdict in favor of sixty-nine households. Forty-eight households elected recovery under the DTPA and twenty-one elected recovery for negligence. The trial court rendered judgment accordingly against U.S. Brass.

U.S. Brass appealed, complaining that the Kochie homeowners were not consumers under

the DTPA. The court of appeals rejected that complaint. 864 S.W.2d 585, 592-93. The Knowlton homeowners also appealed. The court of appeals reversed the summary judgment rendered against them, holding that neither res judicata nor the statute of limitations barred their actions. Id. at 605-06.

Barrett v. U.S. Brass

In Barrett, several hundred homeowners sued nine companies, including U.S. Brass, alleging negligence, strict liability, and violations of the DTPA. The trial court put thirty-six homeowners to trial as a test group. The group settled with all defendants except U.S. Brass.

The trial proceeded against U.S. Brass. The trial court directed a verdict against nine households because U.S. Brass' products were not used in their homes. These nine did not appeal. The jury found in favor of twenty-three households for negligence and DTPA violations, but found against four

Page 649

households. The trial court rendered judgment against the four latter households, who were also unsuccessful at the court of appeals. The twenty-three households that obtained favorable jury findings elected to recover under the DTPA. The trial court, however, granted U.S. Brass' motion to disregard the jury's answers under the DTPA and rendered judgment based solely on negligence.

The court of appeals reversed the judgment in part, holding that all the homeowners were consumers under the DTPA, but that only seven of the twenty-three homeowners had produced sufficient evidence that U.S. Brass' misrepresentations were a producing cause of their injuries. 864 S.W.2d 606. The court also held that there was no evidence of producing cause with regard to the sixteen other households. Id.

II. DTPA

A.

The DTPA grants consumers a cause of action for false, misleading, or deceptive acts or practices. TEX.BUS. & COM.CODE § 17.50(a)(1); *Riverside Nat'l Bank v. Lewis,* 603 S.W.2d 169, 173 (Tex.1980). The DTPA defines a "consumer" as "an individual ... who seeks or acquires by purchase or lease, any goods or services." TEX.BUS. & COM.CODE § 17.45(4). Privity of contract with a defendant is not required for the plaintiff to be a consumer. *E.g., Home Sav. Ass'n v. Guerra,* 733 S.W.2d 134, 136 (Tex.1987); *Kennedy v. Sale,* 689 S.W.2d 890, 892-93 (Tex.1985); *Flenniken v. Longview Bank & Trust Co.,* 661 S.W.2d 705, 707 (Tex.1983); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 540-41 (Tex.1981). A consumer must, in order to prevail on a DTPA claim, also establish that each defendant violated a specific provision of the Act, and that the violation was a producing cause of the claimant's injury. TEX.BUS. & COM.CODE § 17.50(a); *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995).

The manufacturers argue that DTPA liability, while not limited to those in contractual privity with the consumer, cannot extend to all entities in the chain of production or distribution when none of those entities' alleged misrepresentations ever reached the consumer. The homeowners, on the other hand, argue that a misrepresentation by any entity in the chain of distribution that is the cause-in-fact of actual damages entitles them to recover under the DTPA. We do not agree

with the homeowners' contention. To accept the homeowners' argument would extend DTPA liability to upstream manufacturers or suppliers to an extent not intended by the Legislature when it enacted the DTPA.

The purpose of the DTPA is to "protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." TEX.BUS. & COM.CODE § 17.44. As we have explained, that purpose is, in part, to encourage consumers to litigate claims that would not otherwise be economically feasible and to deter the conduct the DTPA forbids. See *Smith v. Baldwin,* 611 S.W.2d 611, 616 (Tex.1980); *Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex.1980); *Woods v. Littleton,* 554 S.W.2d 662, 670 (Tex.1977); see also Montford et al., 1989 Texas DTPA Reform: Closing the DTPA Loophole in the 1987 Tort Reform Laws and the Ongoing Quest for Fairer DTPA Laws, 21 ST. MARY'S L.J. 525, 576 (1990).

Although the DTPA was designed to supplement common-law causes of action, we are not persuaded that the Legislature intended the DTPA to reach upstream manufacturers and suppliers when their misrepresentations are not communicated to the consumer. Despite its broad, overlapping prohibitions, we must keep in mind why the Legislature created this simple, nontechnical cause of action: to protect consumers in consumer transactions. Consistent with that intent, we hold that the defendant's deceptive conduct must occur in connection with a consumer transaction, as we explain below.

In Cameron v. Terrell & Garrett, Inc., we said: "The Act is designed to protect consumers from any deceptive trade practices made in connection with the purchase or lease of any goods or services." 618 S.W.2d 535, 541 (Tex.1981) (emphasis added). The
Page 650
in-connection-with requirement imposes a limitation on liability that is consistent with the underlying purposes of the DTPA. Without this limitation, we would merely substitute the defendant's introduction of a particular product into the stream of commerce for the conduct that was found to have violated the DTPA. We find no authority for shifting the focus of a DTPA claim from whether the defendant committed a deceptive act to whether a product that was sold caused an injury.

Requiring a connection between the plaintiffs, their transactions, and the defendants' conduct enunciates a limitation we have alluded to, but not fully articulated, in prior cases. See, e.g., *Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 305 (Tex.1988) (noting that deceptive conduct may be actionable under the DTPA if it is "inextricably intertwined" with a consumer transaction) (quoting *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382 (Tex.1982); *Birchfield v. Texarkana Memorial Hosp.,* 747 S.W.2d 361, 368 (Tex.1987) (stating that a plaintiff establishes standing to sue under the DTPA in terms of her relationship to a transaction); Guerra, 733 S.W.2d at 136 (stating that a defendant creditor "must be shown to have some connection either with the actual sales transaction or with a deceptive act related to" it) (emphasis added); Flenniken, 661 S.W.2d at 707 (holding that a bank may be subject to DTPA liability because its actions occurred "in the context of " the consumer's purchase of a home) (emphasis added); *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 388-89 (Tex.1982)

(concluding that a consumer had a DTPA claim for the defendant's deceptive acts "connected with" a sale); Cameron, 618 S.W.2d at 541 (ruling that the DTPA protects "consumers from any deceptive trade practice made in connection with the purchase or lease of any goods or services") (emphasis added); see also *Southwestern Bell Tel. Co. v. Boyce Iron Works, Inc.,* 726 S.W.2d 182, 187 (Tex.App.--Austin 1987) (holding that "neither the telephone company's representations asserted in the agency hearing nor its course of conduct were the producing cause of Boyce's actual damages" given the absence of "proof that any representation or any course of conduct by the telephone company influenced Boyce's purchase of the alarm company's protective services"), rev'd on other grounds, 747 S.W.2d 785 (Tex.1988); *Taylor v. Burk,* 722 S.W.2d 226, 229 (Tex.App.--Amarillo 1986, writ ref'd n.r.e.) (affirming the trial court's judgment notwithstanding the verdict in favor of Burk on a DTPA claim because Taylor presented no evidence that Burk "was connected with the real estate transaction between Taylor and the Millers"). While our words have varied, the concept has been consistent: the defendant's deceptive trade act or practice is not actionable under the DTPA unless it was committed in connection with the plaintiff's transaction in goods or services.

In the three cases before us today, the homeowners purchased homes equipped with polybutylene plumbing systems. These systems are goods, and they form the basis of the homeowners' complaints. The homeowners are therefore consumers under the DTPA. TEX.BUS. & COM.CODE § 17.45(4). To determine whether the defendants may be liable under the DTPA, we must examine whether their conduct occurred in connection with the plaintiffs' purchase of their homes.

B. Celanese

Celanese manufactured the polybutylene compound, Celcon, and supplied Celcon pellets to U.S. Brass for its use in molding the plumbing system fittings. Celanese promoted the use of Celcon in plumbing applications to U.S. Brass and other manufacturers, and knew that U.S. Brass used Celcon to make fittings for its plumbing systems. Celanese did not control U.S. Brass' selection of raw materials, did not design the parts or tools, and did not instruct or train the homebuilders' plumbers. Celanese told U.S. Brass that it should mold prototype components from Celcon and subject them to the most severe anticipated end-use conditions. Celanese also informed U.S. Brass of Celcon's potential limitations in high-chlorine conditions. Celanese's marketing efforts were limited to promoting its material to the manufacturers of the plumbing systems. It did not market the systems to homebuilders or building code officials, or market the finished

Page 651

homes to the consumers. The manufacturers of the plumbing systems and the building code officials, and to a lesser degree the homebuilders, were intermediaries capable of assessing the suitability of Celcon for use in the systems.

None of these facts supports the conclusion that Celanese's misrepresentations were made in connection with the plaintiffs' purchase of their homes. Celanese exercised little or no control over the manufacture and installation of the finished plumbing systems, much less the manufacture and sale of the homes. Celanese had no influence over the terms of the sales to the homeowners. At

most, Celanese enjoyed the benefit of selling a raw material to a downstream manufacturer.

We hold that, under these circumstances, Celanese's conduct did not occur in connection with the plaintiffs' purchase of their homes; consequently, that conduct cannot support DTPA liability. Therefore, we reverse the court of appeals' judgment in Andraus permitting recovery under the DTPA against Celanese. (Celanese had no judgment rendered against it in either Knowlton/Kochie or Barrett.)

## C. Shell

Shell produced the polybutylene resin from which U.S. Brass manufactured the pipes used in the plumbing system. As with Celanese, Shell did not control U.S. Brass' selection of raw materials, did not design the parts or tools, and did not instruct or train the homebuilders' plumbers. However, Shell played a substantial role in marketing U.S. Brass' entire system for new homes in the early 1980s. It undertook a marketing campaign and directly contacted homebuilders to promote the system and increase the market for polybutylene resin. Several homebuilders testified that they learned about U.S. Brass' plumbing system from Shell at trade shows and from Shell salespeople who visited them. The record contains some evidence that La Porte building officials would not have approved the plumbing system for residential use absent Shell's representations about its quality, reliability, and longevity. Finally, there is some evidence that the homebuilders installed the systems in reliance on the same representations.

As was the case with Celanese, these facts do not support the conclusion that Shell's misrepresentations were made in connection with the relevant consumer transactions, the purchase of the homes. Shell had no control over the manufacture or installation of the plumbing systems, or of the homes ultimately purchased by the consumers. Shell had no influence over the terms of the consumers' purchases. Although Shell actively promoted use of the plumbing systems in residential homes, there is no evidence that the information provided to homebuilders or building code officials was intended to be or actually was passed on to consumers. Importantly, Shell's marketing efforts were not incorporated into the efforts to market homes to the plaintiffs in this case. Also, any information provided by Shell was subject to independent evaluation by building code officials and by homebuilders.

We therefore conclude that Shell's conduct was not sufficiently connected with the plaintiffs' purchase of their homes to support DTPA liability. We therefore render judgment in Andraus that plaintiffs take nothing from Shell on their DTPA claims. (No judgment was rendered against Shell in Knowlton/Kochie or Barrett.)

## D. U.S. Brass

U.S. Brass designed and manufactured the plumbing system at issue. It selected the raw materials, designed and manufactured the parts and tools, and trained the homebuilders' plumbers. In the late 1970s and early 1980s, U.S. Brass sought approval of the system for residential use from building code officials. Together with Shell it conducted a sales campaign aimed at the new home market and targeted individual builders. U.S. Brass represented to builders that the polybutylene plumbing system was durable and would last twenty-five years, was easy to install, required fewer joints, and was a quality product with characteristics superior to copper, galvanized steel, and PVC plumbing systems. U.S. Brass' and Shell's representatives met

with homebuilders many times. U.S. Brass also provided homebuilders

with a catalog on the plumbing system representing that the pipes and fittings would not corrode and that the pipes would not freeze or experience mineral build-up.

Although the conduct of U.S. Brass comes closer to being in connection with the plaintiffs' purchase of their homes than the conduct of Shell or Celanese, it also falls short of meeting the nexus required for DTPA liability. U.S. Brass exercised significant control over the design and installation of the plumbing systems, but as with Shell and Celanese, U.S. Brass had no role in the sale of the homes to the plaintiffs. As with Shell, U.S. Brass' marketing efforts were not intended to, nor were they, incorporated into the marketing of the homes to the plaintiffs. Finally, U.S. Brass' products were subject to independent evaluation by building code officials, homebuilders, and the plumbing contractors who installed the materials. Viewed in this context, we conclude that U.S. Brass' actions were not connected with the plaintiffs' transactions, that is, the sale of the homes, in a way that justifies liability under the DTPA.

Our analysis of U.S. Brass' connection with the consumer transactions applies with equal force to allegations based on misrepresentations and unconscionable acts. The subject matter of the misrepresentations and the conduct found to be unconscionable is virtually identical. Because we conclude that the totality of U.S. Brass' involvement in the consumer transaction is insufficient to support DTPA liability, we reverse the judgments against U.S. Brass under both theories of DTPA liability.

Although we have concluded that the homeowners have no DTPA cause of action against Celanese, Shell, and U.S. Brass, no one disputes that they have a DTPA cause of action against General Homes, their seller. Given this recourse under the DTPA against the seller, and the contribution and indemnity provision of the DTPA, see TEX.BUS. & COM.CODE § 17.555, we think that rather than permit limitless upstream DTPA liability under these circumstances, the Legislature more likely intended for consumers to seek DTPA recourse against those with whom they have engaged in a consumer transaction. Then, to the extent that the seller's DTPA liability is caused or contributed to by the otherwise actionable misconduct of upstream manufacturers or suppliers, the seller may seek contribution or indemnity against them. Additionally, homeowners may obtain direct relief for foreseeable injuries due to the negligence of these parties.

## III. KNOWLTON --RES JUDICATA

Under our holding today, the Knowlton homeowners are not entitled to maintain DTPA causes of action against the manufacturers because the manufacturers' conduct did not occur in connection with their consumer transactions. Therefore, the court of appeals erred in reversing the take-nothing judgment in favor of Celanese, Shell, and U.S. Brass as to the DTPA claims. We turn to the question of whether res judicata bars the Knowlton homeowners' negligence and strict liability claims.

### A.

Res judicata precludes relitigation of claims that have been finally adjudicated, or that arise out of the same subject matter and that could have been litigated in the prior action. *Barr v. Resolution Trust Corp.,* 837 S.W.2d 627, 628 (Tex.1992). It requires proof of the following

elements: (1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action. See *Texas Water Rights Comm'n v. Crow Iron Works,* 582 S.W.2d 768, 771-72 (Tex.1979). The question presented in this case is whether the Knowlton homeowners are in privity with prior owners of their homes who sued for damages allegedly caused by the defective plumbing systems in Michael Diehl v. General Homes Corp., No. 87-21479 (141st Dist. Ct., Harris County, Tex., Mar. 3, 1989).

Generally people are not bound by a judgment in a suit to which they were not parties. See TEX.CIV.PRAC. & REM.CODE § 37.006(a). The doctrine of res judicata creates an exception to this rule by forbidding a second suit arising out of the same

Page 653

subject matter of an earlier suit by those in privity with the parties to the original suit. See Crow Iron Works, 582 S.W.2d at 771-72. The purposes of the exception are to ensure that a defendant is not twice vexed for the same acts, and to achieve judicial economy by precluding those who have had a fair trial from relitigating claims. *Benson v. Wanda Petroleum Co.,* 468 S.W.2d 361, 363 (Tex.1971).

People can be in privity in at least three ways: (1) they can control an action even if they are not parties to it; (2) their interests can be represented by a party to the action; or (3) they can be successors in interest, deriving their claims through a party to the prior action. *Getty Oil Co. v. Insurance Co. of N. Am.,* 845 S.W.2d 794, 800 (Tex.1992); Benson, 468 S.W.2d at 363.

To determine whether subsequent plaintiffs are in privity with prior plaintiffs, we examine the interests the parties shared. See *Texas Real Estate Comm'n v. Nagle,* 767 S.W.2d 691, 694 (Tex.1989). Privity exists if the parties share an identity of interests in the basic legal right that is the subject of litigation. Id. To determine whether a prior and later lawsuit involve the same basic subject matter, we focus on the factual basis of the complaint. Barr, 837 S.W.2d at 630. If the second plaintiffs seek to relitigate the matter which was the subject of the earlier litigation, res judicata bars the suit even if the second plaintiffs do not allege causes of action identical to those asserted by the first. See id. at 630; Crow Iron Works, 582 S.W.2d at 771-72. Res judicata also precludes a second action on claims that arise out of the same subject matter and which might have been litigated in the first suit. Crow Iron Works, 582 S.W.2d at 772; *Cain v. Balcom,* 130 Tex. 497, 109 S.W.2d 1044, 1045-46 (1937). Under the foregoing standards, we consider whether the Knowlton plaintiffs were in privity with the Diehl plaintiffs, so that res judicata bars the Knowltons' suit.

B.

U.S. Brass and Celanese argue that the Knowlton plaintiffs were in privity with the Diehl plaintiffs because the Knowlton plaintiffs were successors in interest who derived their rights in property from the Diehl plaintiffs. We agree. " '[A]ll persons are privy to a judgment whose succession to the rights of property therein adjudicated are derived through or under one or the other of the parties to the action, and which accrued subsequent to the commencement of the action.' " *Kirby Lumber Corp. v. Southern Lumber Co.,* 145 Tex. 151, 196 S.W.2d 387, 388 (1946) (quoting Cain, 109 S.W.2d at 1046). As a matter of law, the Knowlton plaintiffs were in privity with

the Diehl plaintiffs because they succeeded to the rights of property in the homes. See id. (" 'Privity, in this connection, means the mutual or successive relationship to the same rights of property.' "). Although the rule that res judicata bars the claims of successors in title arose in the context of land and property rights disputes, see, e.g., *Freeman v. McAninch,* 87 Tex. 132, 27 S.W. 97, 98-100 (1894), it applies here as well. As we stated in a water rights dispute, "one acquiring an interest in the property involved in a lawsuit takes the interest subject to the parties' rights as finally determined by the court." Crow Iron Works, 582 S.W.2d at 771.

For both the Diehl and Knowlton plaintiffs, the right at issue was the right to be compensated for injuries caused by the defective plumbing systems. The two lawsuits involved the same subject matter, the same houses, and the same plumbing systems. The negligence, gross negligence, products liability, and DTPA claims were virtually identical. Because the Knowlton plaintiffs are the Diehl plaintiffs' successors in interest and because they brought virtually identical claims concerning the same subject matter, we hold that res judicata bars the Knowlton plaintiffs' suit.

## IV. BARRETT --COMPARATIVE LIABILITY

Finally, we turn to the issue of comparative liability when the negligence of several defendants causes an indivisible injury. The court of appeals held that for certain plaintiffs in Barrett, "there is no evidence from which the jury could have allocated the liability as it did between U.S. Brass and

Page 654

Vanguard," and that accordingly, "there was no evidence of causation of damage to the homes and personal property" of those plaintiffs. 864 S.W.2d at 633.

If, however, there was evidence that U.S. Brass' negligence was a proximate cause of the plaintiffs' damages, U.S. Brass' responsibility for that damage did not evaporate if the jury erred in apportioning liability between U.S. Brass and Vanguard. If the injuries arising from the plumbing system could not be apportioned with reasonable certainty, then the plaintiffs' injuries were indivisible, and the defendants are jointly and severally liable for the whole. See *Landers v. East Tex. Salt Water Disposal Co.,* 151 Tex. 251, 248 S.W.2d 731, 734 (1952). Because the plaintiffs established the elements of their negligence claims, they are entitled to recover from U.S. Brass for its negligence. We accordingly reverse the court of appeals' take-nothing judgment as to the plaintiffs' negligence claims, and remand those claims to the trial court. At retrial, U.S. Brass will have the burden of apportioning its liability for the plaintiffs' injuries. If U.S. Brass cannot establish its percentage of liability, and thus remains liable for the whole, the trial court should credit U.S. Brass for the amounts the plaintiffs received in settlement from the other joint tortfeasors. See *Riley v. Industrial Fin. Serv. Co.,* 302 S.W.2d 652, 656 (Tex.1957). [2]

## V. CONCLUSION

A defendant's acts must be in connection with the plaintiff's consumer transaction to support liability under the DTPA. As explained above, the homeowners presented no evidence that the conduct of Celanese, Shell, or U.S. Brass was in connection with the purchase of their homes.

We therefore affirm in part and reverse in part the judgments of the courts of appeals. We reverse the courts of appeals' judgments in favor of the plaintiffs on their DTPA claims, and render judgment that these plaintiffs take nothing against Celanese, Shell, or U.S. Brass under the DTPA. We remand Andraus and Kochie to the trial courts for rendition of judgment for those homeowners

who received favorable jury findings on their negligence claims. We reverse the judgment of the court of appeals with respect to res judicata in Knowlton, and render judgment in favor of the defendants. We reverse the judgment of the court of appeals with respect to the apportionment of negligence damages in Barrett, and remand to the trial court for reapportionment in accordance with the standards described in this opinion.

Except to the extent reversed or modified by this opinion, we affirm the judgments of the courts of appeals.

GONZALEZ and SPECTOR, JJ., concur in part and dissent in part.

OWEN, J., not sitting.

GONZALEZ, Justice, joined by SPECTOR, Justice, concurring in part and dissenting in part.

I concur in the Court's judgment with respect to the plaintiffs' misrepresentation claims under the Deceptive Trade Practices--Consumer Protection Act (DTPA). However, I cannot join the Court's opinion because legally sufficient evidence supports the juries' findings that U.S. Brass engaged in unconscionable conduct. Thus, I would affirm in part and reverse in part the judgments of the court of appeals.

The Legislature has expressed a policy that the DTPA be liberally construed to protect consumers in their dealings with merchants and tradesmen. See TEX.BUS. & COM.CODE § 17.44. Consumers are authorized to bring suit not merely for false, misleading, or deceptive acts or practices, see id. § 17.50(a)(1), but also for "any unconscionable ... course of action by any person." Id. § 17.50(a)(3). An unconscionable course of action includes "tak[ing] advantage of the
Page 655
lack of knowledge, ability, experience, or capacity of a person to a grossly unfair degree." Id. § 17.45(5)(A). To be actionable, the resulting unfairness must be "glaringly noticeable, flagrant, complete and unmitigated." *Kennemore v. Bennett,* 755 S.W.2d 89, 92 (Tex.1988). Whether the defendant commits a misrepresentation or engages in unconscionable conduct, its actions must be taken "in connection with" the transaction forming the basis of the plaintiff's claim. See, e.g., *Home Sav. Ass'n v. Guerra,* 733 S.W.2d 134, 136 (Tex.1987); *Knight v. International Harvester Credit Corp.,* 627 S.W.2d 382, 388-89 (Tex.1982); *Cameron v. Terrell & Garrett, Inc.,* 618 S.W.2d 535, 541 (Tex.1981).

The "in connection with" requirement properly focuses our view of the evidence on producing cause. A plaintiff must prove the defendant's acts were the producing cause of his damages, but need not establish the existence of privity between the parties. See *Qantel Business Sys., Inc. v. Custom Controls Co.,* 761 S.W.2d 302, 305 (Tex.1988); Guerra, 733 S.W.2d at 136. The first component of producing-cause analysis is a purely fact-based examination, considering whether, but for the defendant's conduct, the plaintiff's injuries would not have occurred. See *Prudential Ins. Co. v. Jefferson Assocs., Ltd.,* 896 S.W.2d 156, 161 (Tex.1995). Under the DTPA, a defendant's acts cannot be the producing cause of a plaintiff's injuries unless the injuries flowed from the defendant's misconduct in connection with a consumer transaction. In this instance, there can be no dispute that the plaintiffs' damages flow from the deceptive or unconscionable conduct, satisfying the "but for" component of producing cause.

Producing-cause analysis further includes an inquiry into whether the defendants' conduct

was the "legal cause" of the plaintiffs' injuries; that is, whether it was such a substantial factor in causing the plaintiffs' injuries that liability should be imposed. See Prudential, 896 S.W.2d at 161. See generally Union Pump Co. v. Allbritton, 898 S.W.2d 773, 779-84 (Tex.1995) (Cornyn, J., concurring) (describing development and current status of producing-cause analysis). Policy-based considerations and "common-sense notions of responsibility" should guide the determination of whether the causal connection between the defendant's acts and the plaintiffs' injuries merits the imposition of DTPA liability. See WILLIAM POWERS, JR., TEXAS PRODUCTS LIABILITY LAW § 6.022, at 6-4, 6-20 (2d ed. 1992).

The analysis of legal cause also must be confined to the facts of the particular case, but courts should consider factors deemed significant in other DTPA cases. A non-exclusive list can be distilled from this Court's prior decisions. Such a list would include the following:

(1) the extent to which the defendant benefitted from the overall transaction, see Flenniken v. Longview Bank & Trust Co., 661 S.W.2d 705, 707 (Tex.1983); Knight, 627 S.W.2d at 389;

(2) the defendant's control over a product's manufacture, repair, or installation, see Guerra, 733 S.W.2d at 136-37; International Armament Corp. v. King, 686 S.W.2d 595, 599 (Tex.1985); Hurst v. Sears, Roebuck & Co., 647 S.W.2d 249, 251-52 (Tex.1983);

(3) the defendant's knowledge of and ability to influence the terms of a sale of a product or service to consumers, see Knight, 627 S.W.2d at 389; Cameron, 618 S.W.2d at 537-39; Ozuna v. Delaney Realty, Inc., 600 S.W.2d 780, 781-82 (Tex.1980);

(4) the defendant's control over the marketing of goods or services, including its intent that its representations be passed on to consumers, and whether they were passed on to them, see Kennemore, 755 S.W.2d at 92; Brown v. Galleria Area Ford, Inc., 752 S.W.2d 114, 115-16 (Tex.1988); Kennedy v. Sale, 689 S.W.2d 890, 891-93 (Tex.1985); and

(5) the extent to which intermediaries or the consumer can reasonably make an independent assessment of the characteristics of goods or services, and the extent to which they did, see Doe v. Boys Clubs of Greater Dallas, Inc., 907 S.W.2d 472, 481-82 (Tex.1995); Prudential, 896 S.W.2d at 161; Dubow v.

Page 656

Dragon, 746 S.W.2d 857, 860-61 (Tex.App.--Dallas 1988, no writ).

With these factors in mind, I consider the evidence under the appropriate standard of review, examining it in the light most favorable to the jury verdicts and disregarding all contrary evidence. See Davis v. City of San Antonio, 752 S.W.2d 518, 522 (Tex.1988); W. Wendell Hall, Revisiting Standards of Review in Civil Appeals, 24 ST. MARY'S L.J. 1045, 1133 (1993). My review of the record reveals significant distinctions between U.S. Brass's conduct and that of Celanese and Shell, which merely supplied some of the materials U.S. Brass used to manufacture the plumbing system. The record shows that U.S. Brass did the following:

(1) designed and exclusively manufactured the plumbing system at issue;

(2) selected the raw materials used in fabricating the system, including polybutylene resin for the pipe and Celcon compound for the fittings;

(3) ignored Celanese's recommendations that it test fittings made from Celcon in the severest anticipated end-use conditions;

(4) designed and produced the crimping tool used to install the system and the accompanying crimp rings;

(5) made representations to building code officials about the system's suitability despite its failure to test the system's fitness and durability for use under ordinary conditions present in LaPorte homes;

(6) conducted an aggressive sales campaign aimed at the new home market and targeted individual builders for sales of the system;

(7) represented to builders that the polybutylene plumbing system was durable and would last twenty-five years;

(8) depicted the system as easy to install, requiring fewer joints, and as a quality product with characteristics superior to copper, galvanized steel, and PVC plumbing systems;

(9) met with home builders numerous times, touting its system;

(10) provided a catalog on the plumbing system to home builders, which represented that the pipe would not corrode, freeze, or allow mineral build-up and that the fittings would not corrode;

(11) prepared the installation instructions for the system and trained the builders' plumbers and subcontractors on how to install it;

(12) suppressed a report from one of its product development specialists indicating that "enormous problems still needed to be overcome" regarding the system;

(13) ignored the specialist's recommendation that "a serious research and development program" was needed to fix continuing problems with leaks and excessive failure rates in the pipes and fittings, see 864 S.W.2d 606, 624; and

(14) rather than acting on these suggestions to mitigate the system's failure rate, told the specialist to destroy the most damming portions of his report, id.

Furthermore, but for U.S. Brass's aggressive promotion of its plumbing system, building officials would not have approved its use in subdivision homes and new home builders would not have installed it.

Under the factors I have listed, particularly whether the plaintiffs could reasonably evaluate the product, U.S. Brass's conduct clearly meets the "substantial factor" element of producing cause. The plaintiffs believed the plumbing system installed in their homes was a quality product that at least met building code standards for performance and longevity. They could not have known of, nor did they have the ability, experience, or capacity to detect, the micro-fine cracks in the pipes that would eventually split and burst or the cumulative degradation of the insert fittings that ultimately gave way because of chlorine exposure and stress. See Kennemore, 755 S.W.2d at 92 (ruling that defendant acted unconscionably in flagrantly taking advantage of consumers' "lack of knowledge" and inability to correct specific problems). U.S. Brass's conduct caused the

installation of systems that failed miserably, resulting in property damage, diminution in the value of homes, and personal distress to the plaintiff-homeowners. I conclude that more than a scintilla of evidence supports the juries' findings that U.S. Brass took advantage of the new homeowners' lack of knowledge and capacity to evaluate the reliability of their plumbing systems and did so to a grossly unfair degree. See Brown, 752 S.W.2d at 116 (holding that defendant "took advantage" of

plaintiffs "to a grossly unfair degree" by exploiting their lack of knowledge). In light of the policies animating the DTPA and common-sense notions of responsibility, the jury verdicts imposing liability upon U.S. Brass for unconscionable conduct toward new home buyers should stand.

On the other hand, some purchasers acquired their homes from prior owners by private sale or through foreclosure. U.S. Brass represented the plumbing system's characteristics to the home builders and to building code inspectors, anticipating that it would expand the new-home market for its plumbing system by doing so. However, U.S. Brass's role in connection with the acquisition of homes by subsequent purchasers was far less pronounced. Assuming that U.S. Brass's unconscionable conduct factually caused the presence of the defective plumbing systems in used homes, this connection is too attenuated to merit the imposition of DTPA liability. See Boys Clubs, 907 S.W.2d at 481-82.

In summary, more than a scintilla of evidence supports the juries' findings that U.S. Brass acted unconscionably and that its acts were a producing cause of the damages to new homeowners. Therefore, under the facts of these three cases, I would affirm the judgments of the court of appeals to the extent they approved the imposition of DTPA liability upon U.S. Brass for its unconscionable conduct toward new home buyers. See TEX.BUS. & COM.CODE §§ 17.45(5)(A), 17.50(a)(3). However, I would reverse the lower court's judgments, as specified by the Court, and render judgment that the plaintiffs take nothing against Celanese, Shell, and U.S. Brass for any alleged DTPA misrepresentations.

---------

Notes:

[1] Most of the homes were owned by married couples, but some were owned by individuals. During discovery and trial, the members of each household were treated as one plaintiff. For example, one set of jury questions was asked for each couple. In this opinion, the words "homeowner," "household," and "plaintiff" are used interchangeably, and may refer to more than one person.

[2] We note that David and Tammie Love have also brought a point of error complaining of the court of appeals' holding that the statute of limitations barred their negligence claim. Because they did not reurge that complaint in their motion for rehearing before the court of appeals, we cannot consider it. Smith v. Baldwin, 611 S.W.2d 611, 618 (Tex.1981); see TEX.R.APP.P. 131(e).

---------

837 S.W.2d 627 (Tex. 1992), D-2082, Barr v. Resolution Trust Corp. ex rel. Sunbelt Federal Sav.

Page 627

**837 S.W.2d 627 (Tex. 1992)**

**George J. BARR, Petitioner,**

**v.**

**RESOLUTION TRUST CORP., ex rel. SUNBELT FEDERAL SAVINGS, Respondent.**

**No. D-2082.**

**Supreme Court of Texas.**

**September 23, 1992**

Albert B. Greco, Jr., Barbara L. Wohlrabe, Dallas, for petitioner.

Jack N. Ross, II, Dallas, for respondent.

OPINION

GONZALEZ, Justice.

The issue in this case is whether a claim by Sunbelt Federal Savings against George Barr based on a partnership promissory note and guarantee agreement is barred by the doctrine of res judicata. The trial court granted Barr's motion for summary judgment based on res judicata. The court of appeals, with one Justice dissenting, reversed the trial court's judgment, holding that the doctrine did not apply. 824 S.W.2d 600. We reverse the judgment of the court

Page 628

of appeals and affirm the trial court's judgment.

In 1985, Barr and Ron Knott were partners in the Bar III Venture. On March 14, 1985 Bar III executed a promissory note for $369,750 in favor of Sunbelt's predecessor in interest. The same day, Barr and Knott executed a personal guarantee of the note. In March 1987, Bar III defaulted on the note.

On May 24, 1988, Sunbelt filed two separate lawsuits on the note. In one suit, Sunbelt alleged liability against the partnership as maker of the note and against Knott as guarantor of the note. In the other, Sunbelt alleged that Barr was personally liable because of his unconditional guarantee of the note.

Barr moved for summary judgment in the latter lawsuit on the grounds that the terms of the guaranty agreement were too uncertain to be enforceable. Barr argued that the agreement, a standard form containing a number of options to choose and blanks to complete, was not sufficiently completed to ascertain his liability. The trial court granted the motion, and rendered a final take-nothing judgment. Sunbelt did not appeal the judgment.

Thereafter, Sunbelt amended its pleadings in the suit against the partnership and Knott by adding Barr as a defendant, alleging that his status as a partner created liability for the note. Barr's answer asserted res judicata, among other defenses.

Barr moved for summary judgment on the grounds that the take-nothing judgment in the first lawsuit barred litigation of the claims against him in the second lawsuit. Sunbelt also moved for summary judgment, requesting a judgment on the note. The trial court granted Barr's motion and denied Sunbelt's. This interlocutory judgment became final when the court rendered judgment for Sunbelt on its claims against the partnership and Knott for the full amount of the note.

Sunbelt appealed, arguing that the trial court should have granted its summary judgment instead of Barr's. The court of appeals, with one justice dissenting, determined that the first suit did not bar the second. However, the court concluded that questions of fact prevented rendition in Sunbelt's favor, and thus remanded the case to the trial court. Both Barr and Sunbelt sought review in our court.

Much of the difficulty associated with the doctrine of res judicata is due to the confusion of several related theories. Broadly speaking, res judicata is the generic term for a group of related concepts concerning the conclusive effects given final judgments. *Puga v. Donna Fruit Co.,* 634 S.W.2d 677, 679 (Tex.1982). Within this general doctrine, there are two principal categories: (1) claim preclusion (also known as res judicata); and (2) issue preclusion (also known as collateral estoppel). [1] Res judicata, or claims preclusion, prevents the relitigation of a claim or cause of action that has been finally adjudicated, as well as related matters that, with the use of diligence, should have been litigated in the prior suit. *Gracia v. RC Cola-7-Up Bottling Co.,* 667 S.W.2d 517, 519 (Tex.1984); *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984). Issue preclusion, or collateral estoppel, prevents relitigation of particular issues already resolved in a prior suit. [2] Bonniwell, 663

Page 629

S.W.2d at 818. Barr's argument, that Sunbelt should have brought all theories of liability in one suit, is the defense of claim preclusion.

Claim preclusion prevents splitting a cause of action. *Jeanes v. Henderson,* 688 S.W.2d 100, 103 (Tex.1985). The policies behind the doctrine reflect the need to bring all litigation to an end, prevent vexatious litigation, maintain stability of court decisions, promote judicial economy, and prevent double recovery. Zollie Steakley & Weldon U. Howell, Jr., Ruminations on Res Judicata, 28 Sw.L.J. 355, 358-59 (1974).

The question that has given courts the most difficulty is determining what claims should have been litigated in the prior suit. Early on, this Court held that res judicata "is not only final as to the matter actually determined, but as to every other matter which the parties might litigate in the cause, and which they might have decided." *Foster v. Wells,* 4 Tex. 101, 104 (1849). We have never repudiated this definition of claim preclusion, and it appears in some form in most definitions of res judicata. See, e.g., *Jeanes v. Henderson,* 688 S.W.2d 100, 103 (Tex.1985) (res judicata bars not only what was actually litigated but also claims that could have been litigated in the original cause of action). If taken literally, this definition of the rule would require that all disputes existing between parties be joined, regardless of whether the disputes have anything in common. This court has resorted to a wide variety of theories and tests to give res judicata a more restrictive application. [3] See generally 5 WILLIAM V. DORSANEO III, TEXAS LITIGATION GUIDE § 131.06[b][ii] (1991); Steakley, 28 Sw.L.J. 355.

Even if only cases from more recent times are considered, our holdings with respect to res judicata are difficult to reconcile. In *Griffin v. Holiday Inns of America,* 496 S.W.2d 535 (Tex.1973) the court determined that a take-nothing judgment in a suit to recover in contract for services and materials did not preclude a subsequent suit to be compensated in quantum meruit. The court rejected the view that a judgment as to one claim is res judicata of all claims or causes of action

arising out of the same transaction, and stated that, "[a]s a general rule a judgment on the merits in a suit on one cause of action is not conclusive of a subsequent suit on a different cause of action except as to issues of fact actually litigated and determined in the first suit." Id. at 538. The court acknowledged, however, that alternative theories of recovery for the same "claim" may not be brought in different lawsuits. [4]

Page 630

Thus, in Griffin, the court determined that a "cause of action" for res judicata purposes is something more than the set of facts necessary to establish a single theory of recovery but not necessarily the entire transaction between the parties. Id. at 537-38. The court gave no guidance on the question of how to make this fine distinction between a mere alternative theory of recovery and a different cause of action. Every theory of recovery has its unique elements of proof. As the Griffin case illustrates, only slight variations of the facts to support different theories of the same incident can result in a court finding different causes of action, thus thwarting the purposes of res judicata. See Steakley, 28 Sw.L.J. at 361-62.

The court took an entirely different approach in *Westinghouse Credit Corp. v. Kownslar,* 496 S.W.2d 531 (Tex.1973). In that case Kownslar had guaranteed all promissory notes by the maker. The issue was whether res judicata required that Westinghouse bring in one suit its claims for all notes guaranteed by Kownslar that were then in default. Rather than decide whether there was more than one cause of action involved, the court decided the case solely on whether it appeared that the policies of res judicata required such a result. [5]

This pure policy approach as exemplified by Westinghouse makes it virtually impossible to determine in advance what policy will win out in any given case. Without any objective standards, each case is decided ad hoc, and therefore the doctrine is "inherently unpredictable" and "affords little basis for consistency and formulation of precedent." Steakley, 28 Sw.L.J. at 362-63. Westinghouse is the only case we have decided solely on policy grounds.

Then, in Texas Water Rights Comm. v. Crow Iron Works, 582 S.W.2d 768 (Tex.1979), the court shifted the focus from the cause of action to the subject matter of the litigation. The question was whether a major lawsuit instigated to sort out water rights to the lower Rio Grande river precluded a subsequent suit based on the claim that during the pendency of that suit the plaintiff had purchased additional rights. The court concluded that the subsequent claim was barred, noting that:

The scope of res judicata is not limited to matters actually litigated; the judgment in the first suit precludes a second action by the parties and their privies not only on matters actually litigated, but also on causes of action or defenses which arise out of the same subject matter and which might have been litigated in the first suit.

Id. at 771-72 (emphasis added). Accord, Gracia, 667 S.W.2d at 519. Thus this definition is not consistent with earlier formulations of the rule, such as in Griffin, that only issues related to a single cause of action are barred in a subsequent suit. While we did not expressly overrule the Griffin test in either Crow Iron Works or Gracia we do so now.

A determination of what constitutes the subject matter of a suit necessarily requires an examination of the factual basis of the claim or claims in the prior litigation. It requires an analysis

of the factual matters that make up the gist of the complaint, without regard to the form of action. Any cause of action which arises out of those same facts should, if practicable, be litigated in the same lawsuit. Gracia, 667 S.W.2d at 519; Crow Iron Works, 582 S.W.2d at 772.

The definition of res judicata in Gracia and Crow Iron Works is substantially similar to the rule of compulsory counterclaims embodied in the rules of civil procedure. A party defending a claim must bring as a counterclaim any claim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim...." Tex.R.Civ.P. 97.

Page 631

The Restatement of Judgments also takes the transactional approach to claims preclusion. It provides that a final judgment on an action extinguishes the right to bring suit on the transaction, or series of connected transactions, out of which the action arose. Restatement of Judgments § 24(1). A "transaction" under the Restatement is not equivalent to a sequence of events, however; the determination is to be made pragmatically, "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage." [6] Id. § 24(2).

We conclude that the transactional approach to claims preclusion of the Restatement effectuates the policy of res judicata with no more hardship than encountered under rule 97(a) of the rules of civil procedure. Modern rules of procedure obviate the need to give parties two bites at the apple, as was done in Griffin, to ensure that a claim receives full adjudication. Discovery should put a claimant on notice of any need for alternative pleading. Moreover, if success on one theory becomes doubtful because of developments during trial, a party is free to seek a trial amendment.

In the case now before us, there is no valid reason to subject Barr to two different lawsuits. In the suit brought previously against Barr, the bank alleged that he executed the guarantee on the same day and as part of the "same transaction" as the promissory note. In both suits Sunbelt seeks to hold Barr primarily liable for payment of the note and seeks the same amount of damages. Both suits require proof establishing the notes of the partnership, that the notes are due, and that the partnership has defaulted. The only factual allegation that Sunbelt pleaded in the second suit that was not in the first is that Barr is a general partner of Bar III Venture.

It is clear that in this case the execution of the partnership note and Barr's guarantee of it were related in time and space and motivation, and the parties considered it as a single transaction. The issues of both claims form a convenient trial unit, whereas separate lawsuits would require significant duplication of effort of the court and the parties involved. With due diligence, the claim that Barr was liable because he is a partner could have been joined in the suit on his guarantee of the partnership note.

We reaffirm the "transactional" approach to res judicata. A subsequent suit will be barred if it arises out of the same subject matter of a previous suit and which through the exercise of diligence, could have been litigated in a prior suit. For these reasons, the judgment of the court of appeals is reversed and that of the trial court is affirmed.

---------

Notes:

[1] Res judicata may be further categorized into merger and bar, because the doctrine has different applications depending on which party is successful in the prior suit. If the party asserting a claim prevails, the cause of action is merged into the judgment, and the cause of action as such ceases to exist. *Jeanes v. Henderson,* 688 S.W.2d 100, 103 (Tex.1985). If the party defending a claim prevails in the prior suit, the judgment acts as a bar to matters which could have been litigated in the original suit. Id.

[2] An example of the confusion concerning collateral estoppel is the court of appeals' holding that "res judicata does not preclude relitigation of issues that the first court did not actually try and determine, unless a determination of those issues was essential to the judgment in the first suit." 824 S.W.2d at 602. The court relied on RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982), which is entitled "Issue Preclusion--General Rule", i.e., collateral estoppel. See Id. § 17(3), and comment (c). We disapprove similar language in the case cited by the court, Faour v. Faour, 762 S.W.2d 361 (Tex.App.--Houston [1st Dist.] 1988, writ denied).

Our own recent holdings have contributed to the confusion by holding without elaboration that res judicata requires an "identity of issues" between the prior and subsequent suits. See, e.g., Coalition of Cities for Affordable Utility Rates v. Public Utilities Commission, 798 S.W.2d 560, 563 (Tex.1990); Byrom v. Pendley, 717 S.W.2d 602, 606 (Tex.1986); *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984). If an identity of issues is strictly required, then there is no basis for precluding issues that should have been raised in the prior suit but were not, and there is no distinction between claim preclusion and issue preclusion. See Flores v. Edinburg Consolidated Indep. School Dist., 741 F.2d 773, 776 (5th Cir.1984).

[3] See, e.g., Philipowski v. Spencer, 63 Tex. 604, 607 (1885) ("cause of action", being the grievance and wrong complained of, must be identical in both the earlier and subsequent suit, regardless of form of action); Hanrick v. Gurley, 93 Tex. 458, 56 S.W. 330, 330 (1900), (all matters that could support the "claim or demand in controversy" in the prior suit would be precluded in a succeeding suit); Freeman v. McAninch, 87 Tex. 132, 27 S.W. 97, 100 (1894) (pleader must use diligence in pleading all claims concerning the same "subject matter" of the suit); Moore v. Snowball, 98 Tex. 16, 81 S.W. 5, 8-10 (1904) (proof of legal title is sufficiently different from proof of equitable title so as to be different "cause of action" for res judicata purposes); Ogletree v. Crates, 363 S.W.2d 431, 436 (Tex.1963) (while suit to modify a divorce decree and suit to set it aside for fraud are technically different causes of action, they are the same "broad cause of action," and public policy requires all complaints concerning custody could and should have been brought in the same suit).

[4] The court did not attempt to apply any test for res judicata to the facts in Griffin. Ultimately, the Court based its decision on stare decisis, because other courts had held that quantum meruit is not barred by a judgment on the contract. Griffin, 496 S.W.2d at 538. The court did so without discussion of the reasoning in the cases upon which it relied.

[5] The court announced a two-step analysis. First the court looked to see if stare decisis decided the case, and determined that there was no controlling case. Second, the court looked to see "whether the factual situation presented is such that the purposes of the doctrine of merger shall

be frustrated absent enforcement of the bar." 496 S.W.2d at 532.

[6] In Jeanes v. Henderson, 688 S.W.2d 100, 103 (Tex.1985), we cited section 24(2) of the Restatement as authority for the definition of claims preclusion. We did not clearly adopt the Restatement in that case, however.

---------

**34 S.W.3d 650 (Tex.App. —San Antonio 2000)**

**CITY OF SAN ANTONIO, Appellant,**

**v.**

**Thomas M. BULLOCK, et al., Appellees.**

**No. 04-99-00906-CV.**

**Court of Appeals of Texas, Fourth District, San Antonio**

**November 22, 2000**

Page 651

[Copyrighted Material Omitted]

Page 652

David W. Strickler, Ruben D. Campos, Wickliff & Hall, P.C., San Antonio, for Appellant.

B. Craig Deats, Deats & Levy, P.C., Austin, for Appellee.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice, KAREN ANGELINI, Justice.

**OPINION**

Opinion by KAREN ANGELINI, Justice.

A group of San Antonio Firefighters brought suit against the City of San Antonio, alleging the City failed to fill vacant positions in violation of the Civil Service Act. The Firefighters moved for summary judgment, and the trial court granted their motion. The City appeals in seven issues. We disagree with its assertions, however, and affirm the trial court's judgment.

**Factual and Procedural Background**

On June 24, 1997, the City took personnel action which it characterized as a reclassification of four captain positions to four district fire chief positions. The City claimed that the reclassification's effect was to decrease the number of captain positions by four and increase the number of district fire chief positions by four.

Thomas Bullock, along with several other San Antonio Firefighters (collectively referred to as "the Firefighters,") viewed the reclassification's effect quite differently than the City. Specifically, the Firefighters believed that the reclassification created four vacancies in the district fire chief s' positions. Four captains were then promoted into those vacancies, leaving four vacancies in the captains' rank. No one, however, was promoted to fill the vacancies in the captains' positions.

The Firefighters brought suit seeking declaratory, injunctive, and equitable relief, along with back pay and benefits. In their petition, the Firefighters claimed that the City's failure to fill the alleged vacancies violated its obligation to do so and their rights under the Civil Service Act. Tex. Loc. Gov't Code Ann. §§ 143.028-.037 (Vernon 1999). Specifically, this reclassification of the captains' positions, according to the Firefighters, effectively abolished those positions in violation of the Civil Service Act. And, where a classified position is not abolished by ordinance, the position is vacant and must be filled. See *Duckett v. City of Houston,* 495 S.W.2d 883, 886 (Tex.1973); International Ass'n of Firefighters, Local 624 v. City of San Antonio, 822 S.W.2d 122, 131 (Tex.App.--San Antonio 1991, writ denied). The Firefighters argued that those firefighters on the

eligibility lists at the time the vacancies arose were entitled to promotion into the vacancies. The vacancies were never filled, and the eligibility lists expired. The Firefighters, therefore, claimed they lost their positions on the lists, and, potentially, the opportunity to be promoted.

The Firefighters moved for summary judgment, and the trial court granted the motion in its entirety. The City appeals the summary judgment in seven issues.

**Standard of Review**

The underlying purpose of Texas' summary judgment rule is to eliminate unmeritorious claims. *Casso v. Brand,* 776 S.W.2d 551, 556 (Tex.1989). To this end, Texas Rule of Civil Procedure 166a(c) provides that where there is no genuine issue

Page 653

as to any material fact, the movant is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c). [1] In a summary judgment proceeding, the burden is on the moving party. *Roskey v. Texas Health Facilities Comm'n,* 639 S.W.2d 302, 303 (Tex.1982). When the plaintiff moves for summary judgment, he or she must show that he or she is entitled to prevail on each element of the cause of action, except for damages. *MMP, Ltd. v. Jones,* 710 S.W.2d 59, 60 (Tex.1986); *Ortiz v. State Farm Mut. Auto. Ins. Co.,* 955 S.W.2d 353, 355 (Tex.App.--San Antonio 1997, pet. denied). Once the movant establishes its right to summary judgment, the burden then shifts to the nonmovant to present issues that preclude summary judgment. *Garcia v. John Hancock Variable Life Ins. Co.,* 859 S.W.2d 427, 430 (Tex.App.--San Antonio 1993, writ denied).

This court reviews a summary judgment de novo. *Valores Corporativos, S.A. de C.V. v. McLane Co., Inc.,* 945 S.W.2d 160, 162 (Tex.App.--San Antonio 1997, writ denied). In deciding whether a fact issue was raised to preclude summary judgment, this court takes evidence favorable to the nonmovant as true. We also indulge every reasonable inference in favor of the nonmovant, and resolve all doubts in the nonmovant's favor. *Nixon v. Mr. Property Management Co., Inc.,* 690 S.W.2d 546, 548-49 (Tex.1985); *Montgomery v. Kennedy,* 669 S.W.2d 309, 310-11 (Tex.1984).

**The Civil Service Act**

The City is a municipality governed by the Firefighter and Police Civil Service Act, chapter 143 of the Local Government Code. Tex. Loc. Gov't Code Ann. §§ 143.001-.002 (Vernon 1999). All promotions and reclassifications must, therefore, comply with the Act's provisions. The Civil Service Act provides that the City's governing body shall, by ordinance, establish firefighter classifications, as well as the number of positions in each class. Tex. Loc. Gov't Code Ann. § 143.021(a) (Vernon 1999).

The Civil Service Act, in addition to granting the San Antonio City Council the power to regulate the classifications and numbers of firefighters in each class, prescribes the procedure for promoting firefighters from one class to another. Generally Tex. Loc. Gov't Code §§ 143.028-.037 (Vernon 1999). This procedure uses scores from a competitive written examination, as well as seniority points, to create an eligibility list for any possible promotions. Id. §§ 143.032(c), 143.033(b). An eligibility list is valid for one year from the date the written examination is administered. Id. § 143.036(h). If a vacancy occurs, and such an eligibility list exists, the names of the persons having the top three grades on the list are certified to the department for

consideration. Id. § 143.036(b).

The Civil Service Act allows for collective bargaining between the City and a Union. Tex. Local Gov't Code Ann. § 174.006(a) (Vernon 1999); *City of San Antonio v. Scott,* 16 S.W.3d 372, 376 (Tex.App.--San Antonio 1999, pet. denied). A collective bargaining agreement may vary any provision in the Act. Tex. Local Gov't Code Ann. § 174.006(a) (Vernon 1999); Scott, 16 S.W.3d at 376. Any variance, however, must be specifically provided for in the collective bargaining agreement. Tex. Local Gov't Code Ann. § 174.006(a) (Vernon 1999); Scott, 16 S.W.3d at 376.

**Collecting Bargaining Agreement**

The City argues that the collective bargaining agreement between the City and the International Association of Firefighters Local 624 (the Union) supersedes

Page 654

the Civil Service Act. Tex. Loc. Gov't Code Ann. § 143.001 et seq. (Vernon 1999). [2] Specifically, the City claims that the management rights clause contained in the collective bargaining agreement includes "an extremely broad reservation of power" and reserves the power to reclassify firefighter positions to the City in the manner in which it was done here. The clause reads, in part:

Management rights

**Section 1.** The Union recognizes the management of the City of San Antonio and the direction of the Fire Department are vested exclusively in the City, subject to the terms of this Agreement, and nothing in this Agreement is intended to circumscribe or modify the existing rights of the City. These rights include:

B. Hire, promote, demote, transfer, assign, and retain employees in positions within the City, subject to Civil Service regulations and/or terms of this Agreement ...

D. Maintain the efficiency of governmental operations ...

H. Determine the methods, processes, means, and personnel by which operations are to be carried out.

According to the City, by giving effect to all the provisions in the collective bargaining agreement, it is readily apparent that the City reserved to itself the power to reclassify the captain positions without creating any vacancies. And, because the method of reclassifications at issue here is not mentioned in the Civil Service Act it is not subject to any statutory provisions.

This court faced an issue similar to that presented in this case in *City of San Antonio v. Scott,* 16 S.W.3d 372 (Tex.App.--San Antonio 1999, pet. denied). In that case, Scott was ranked twenty-first on the captains' eligibility list. Id. at 373. Before that list expired in February, 1995, twenty vacancies occurred in the captain positions, leaving Scott first on the eligibility list. Id.

In July, 1994, an assistant fire chief retired. Id. The vacancy created by the chief's retirement could be filled only by a deputy chief or a captain. Id. The vacancy was filled in May, 1995, after Scott's eligibility list expired. Id.

Scott sued the City, alleging that it violated the Civil Service Act, which requires that vacancies in the assistant fire chief position be filled within ninety days of their creation. Id. Scott claimed that if the ninety-day requirement had been met, the appointment to the assistant fire chief vacancy would have been made on October 27, 1994, and a vacancy in a captain's position would

have been created that he would have received. Id.

Scott moved for summary judgment, claiming that the Civil Service Act controls over the terms of the collective bargaining agreement. Id. The trial court granted his motion. Id. However, this court reversed and remanded the case, finding that Scott had failed to prove that the San Antonio City Council approved the statutory appointment procedure that included the ninety-day requirement by ordinance. Id. Scott prevailed on remand, and the City appealed. Id. at 374.

The City, on appeal, noted that the appointment procedure contained in the collective bargaining agreement was different from the Civil Service Act's appointment procedure and in no way mentioned the ninety-day requirement. Id. at 375. The City argued that, because the appointment procedure contained in the agreement was inconsistent with the statutory provisions, the City's approval of the agreement was not an approval of the statutory procedure; therefore the ninety-day requirement was not applicable. Id.

Scott, however, argued that because the ninety-day requirement was not inconsistent with any provision in the collective

Page 655

bargain agreement, it was applicable. Id. This court agreed. Id. at 376. We held that "[t]he collective bargaining agreement as to when to appoint [was] silent; therefore the Civil Service Act's ninety day requirement prevails because the collective bargaining agreement did not specifically provide otherwise." Id. (citing Tex. Local Gov't Code Ann. § 174.006(a) (Vernon 1999)). Essentially, then, the collective bargaining agreement controls to the extent that it specifically conflicts with the Civil Service Act.

The City's argument that the collective bargaining agreement supersedes the Civil Service Act in this case is flawed. First, the collective bargaining agreement here does not conflict with the Civil Service Act. To conflict with the Act, the agreement here would have had to expressly provide for reclassification. Without the simultaneous creation of a vacancy, it does not. And, the City's argument that the broad reservation of power supersedes the Civil Service Act is inconsistent with the Act's specificity requirement. The broad reservation of power in the management clause would, under the City's argument, render the Civil Service Act virtually meaningless.

The City also claims that because a reclassification is not contemplated by the Civil Service Act, any reclassification would not be subject to statutory protection. This assertion, however, is unreasonable in light of the Civil Service Act's stated purpose: "to secure efficient fire ... departments composed of capable personnel who are free from political influence and who have permanent employment tenure as public servants." Tex. Loc. Gov't Code Ann. § 143.001(a) (Vernon 1999). If a city were permitted to reclassify positions without acting inside the boundaries set by the Civil Service Act, then every personnel decision could be made under the guise of a reclassification, allowing the city to circumvent the Act's hiring and promotion procedures. We, accordingly, overrule the City's issue.

**Reclassification: Does it Create a Vacancy**?

Alternatively, the City argues that if the collective bargaining agreement does not supersede the Civil Service Act in this situation, the City did not violate the Act because a "reclassification" does not necessarily result in the "creation" or "abolishment" of a position. The City points out that

the Legislature addressed only two types of personnel actions that can be taken in the civil service context: creation and abolishment of a position. The City argues that even though the Civil Service Act mentions only two personnel acts, a reclassification may still be effected without creating a vacancy. And, it claims that interpreting position reclassifications in this case so as to create new positions under the Civil Service Act would produce absurd results by creating "twelve superfluous ranked positions."

**The Civil Service Act:**

The City's contention that the Civil Service Act contemplates only creation and abolishment of positions is incorrect. Section 143.021 contains language that is broad enough to encompass a reclassification. Whether section 143.021(c)'s language contemplates a "reclassification" is a question of statutory interpretation. A fundamental rule of statutory construction is that a court should first ascertain the Legislature's intent in enacting the statute as expressed in its plain language. *Schorp v. Baptist Mem'l Health Sys.,* 5 S.W.3d 727, 734 (Tex.App.--San Antonio 1999, no pet. h)(citing *St. Luke's Episcopal Hosp. v. Agbor,* 952 S.W.2d 503, 505 (Tex.1997)). However, where an application of a statute's plain language leads to absurd results, courts do not enforce the statute under a literal interpretation. See *City of Amarillo v. Martin,* 971 S.W.2d 426, 428 n. 1 (Tex.1998).

Section 143.021 addresses a reclassification in mandating that new positions must be filled from an eligibility list. Specifically, section 143.021(c) states:

Page 656

[A]n existing position or classification or a position or classification created in the future by name or by increase in salary may be filled only from an eligibility list that results from an examination held in accordance with this chapter.

Tex. Gov't Code Ann. § 143.021(c) (Vernon 1999) (emphasis added). The Civil Service Act's plain language expressly states that a new position or classification may be created "by name or by increase in salary." [3] This court has held that a vacancy occurs when a newly created position is established by ordinance. *City of San Antonio v. Edwards,* 974 S.W.2d 148, 151 (Tex.App.--San Antonio 1998, no pet.); International Ass'n of Firefighters Local 624 v. City of San Antonio, 822 S.W.2d 122, 131 (Tex.App.--San Antonio 1991, writ denied). Therefore, when a new position is created by name, a vacancy arises. When the City, here, reclassified the fire captain positions as district chief positions, it created new district chief positions by name and thus vacancies in those positions. The captains were then promoted into the newly created positions, leaving vacancies in their former rank.

**Case Law:**

To support its argument that no vacancies arose as a result of the reclassifications, the City cites a number of cases involving promotions and draws distinctions between those cases and the one before us. [4] It concedes, however, that most of those cases offer little help in making that determination. Those cases each assume a vacancy. There are, however, two other cases that are helpful to the issue of whether the "reclassification" here resulted in a vacancy. The first is *Nichols v. Houston Police Officers Pension Bd.,* 335 S.W.2d 261 (Tex.Civ.App.--Waco 1960, writ ref'd n.r.e.). In Nichols, the central issue was computation of retirement benefits. Id. at 262. A

collateral issue, however, was whether an ordinance that purported to "create and recreate ... positions, classes, classifications and base pay" actually did create new classifications, requiring the City to fill those new classifications by competitive examination. Id.

In Nichols, the City, by ordinance, "creat[ed] and recreat[ed]" six positions in the Grade VI, Inspector of Police Classification. Id. The ordinance paid first-year Inspectors $625 per month, second and third-years $650 per month, fourth and fifth-years $700 per month, and those with over five years of service $750 per month. Id. Daut became an inspector in 1953. After the passage of the ordinance in 1957, Daut drew a $700 monthly salary as an inspector with four years experience. Id. at 263. Then in 1958, Daut retired as an inspector with over five years' experience, earning $750 per month in salary. Id.

The City argued that Daut's retirement benefits should be computed on the base pay amount of $625. Id. Its argument was premised on an older version of the Civil Service Act which provided that retirement benefits shall be 30% of the "base salary provided for the classified position in the police department." Id. Another section specified that all persons in each classification be paid the same salary plus any longevity pay they may be entitled to. Id. The statute also provided, like today, that "no classification now in existence, or that may be hereafter created shall ever be filled except by examination and that the City shall set up classifications, specifying the salaries for each classification." Id. The City argued that if the ordinance creates a

Page 657

new classification by increase in salary without filling such new classified positions by competitive examination, then the ordinance is void because it conflicts with the Civil Service Act. Id.

The court held that the ordinance did not contravene the Civil Service Act. Id. The court declared that "[t]he grade, position and classification remain the same ... The 'classification' here involved is clear: It is 'Inspector of Police, Grade VII.' That classification is retained notwithstanding expiration of time or the fact length of tenure is compensated." Id. at 263-64. In Nichols, the fact that Daut's actual classification, Inspector, did not change was the controlling factor in determining whether a new class, and thus a vacancy, arose, which was required to be filled through competitive examination procedures. Because the class rank did not change, the court reasoned, there was no new position to be filled. Id. at 263. In this case, however, the firefighters' classifications did change from captain to district fire chief. Under the reasoning in Nichols, the classification here did create a vacancy in the district chief rank that must be filled according to the statute's direction.

*City of Houston v. Reyes,* 527 S.W.2d 489 (Tex.Civ.App.--Houston [1st Dist.] 1975, writ ref'd n.r.e.) is another case that is instructive on the issue of whether the reclassification here created a vacancy. In Reyes, the City of Houston enacted an ordinance that changed the title of Emergency Medical Technicians (EMT) to Chauffeurs. Id. at 492. The ordinance specifically said that the change would not affect the status, classification, salary or tenure of the persons holding the EMT positions. Id. at 493. The issue in Reyes was whether the ordinance created new positions that were required to be filled from the eligibility lists. The Houston court considered Vernon's Civil Statutes Annotated, Article 1269m, section G (today Tex. Gov't Code Ann. § 143.021), which states: "[i]n the event any new classification is established either by name or by increase of salary,

the same shall be filled by competitive examination in accordance with this law." Id. at 494. The court held that no new classification was established, finding that

"[t]he effect of the ordinance was to merge the two formerly separate classifications. The transfer of a position from one classification to another within the same grade level constitutes neither a promotion, demotion, nor a suspension of that person occupying such position. No new classification was created, but positions in one classification were transferred to another classification within the same grade level. Such a transfer did not create a new position."

Id. at 495-96 (emphasis added).

The court in Reyes appears to have relied on the same principles that the court in Nichols relied upon. In both cases, the courts hinged their decisions on the fact that there was no change in the positions' grades or classifications. Here, because there was an upward change in classification from captain to district fire chief, there would logically be a promotion, leaving a vacancy in the captain positions. See *City of Fort Worth v. Nyborg,* 999 S.W.2d 451, 454 (Tex.App.--Fort Worth 1999, pet. denied). Accordingly, we find the reclassification, here, created vacancies in the district chief positions.

**Whether a Vacancy is Absurd Under These Facts:**

The City argues that holding that the reclassification created a vacancy would produce absurd results. As support for its position, the City attempts to distinguish this case from *City of Fort Worth v. Nyborg,* 999 S.W.2d 451 (Tex.App.--Fort Worth 1999, pet. denied). The City asserts that if Nyborg is read in such a way as to find that a reclassification results in the creation of new positions, we should not follow the result reached in that case because that result is absurd.
Page 658

In Nyborg, the Fort Worth City Council adopted an ordinance that created one additional captain's position and deleted one lieutenant's position. Id. at 453. Kneblick was promoted to fill the new position. Id. Nyborg pointed out to the City that Kneblick's promotion created a vacancy in her lieutenant's position and that he was entitled to a promotion to lieutenant because he ranked first on the lieutenant's eligibility list. Id. The City and, later, the Fort Worth Firefighters and Police Officers Civil Service Commission rejected his claim. Id. at 453-54. Nyborg then filed suit in district court, asking that the Commission's decision be set aside. Id. at 454. Both parties moved for summary judgment on the sole issue of whether the ordinance created a vacancy in the lieutenant's position during the period Nyborg was eligible for promotion to lieutenant. Id. The trial court granted Nyborg's motion, finding that a vacancy arose in the lieutenant classification upon Kneblick's promotion to captain. Id.

On appeal, the Fort Worth court first defined the term "vacancy." "A vacancy occurs when an existing position is vacated or a newly created position is established by ordinance." Id. at 455 (citing *City of San Antonio v. Edwards,* 974 S.W.2d 148, 151 (Tex.App.--San Antonio 1998, no pet.) and International Ass'n of Firefighters Local 624 v. City of San Antonio, 822 S.W.2d 122, 131 (Tex.App.--San Antonio 1991, writ denied)). The court, accordingly, found that the ordinance created a new captain's position, and therefore created a vacancy in the captain's position. Id. When Kneblick was promoted into the captain's position, she vacated her position as lieutenant, leaving a vacancy in the lieutenant's position. Id.

The court then went on to discuss whether the City was required to fill the vacant lieutenant's position. The City argued that it was not because the ordinance abolished the lieutenant's position before Nyborg was entitled to be promoted. The court, however, disagreed. In doing so, the court relied on the plain language of the Civil Service Act:

If a municipality's governing body adopts an ordinance that vacates or abolishes a fire or police department position, the fire fighter or police officer who holds that position shall be demoted to the position immediately below the vacated or abolished position. If one or more positions of equal rank are vacated or abolished, the fire fighters or police officers who have the least seniority in a position shall be demoted to the position immediately below the vacated or abolished position. If a fire fighter or police officer is demoted under this subsection without charges being filed against the person for violation of civil service rules, the fire fighter or police officer shall be placed on a position reinstatement list in order of seniority. If the vacated or abolished position is filled or recreated within one year after the date it was vacated or abolished, the position must be filled from the reinstatement list. Appointments from the reinstatement list shall be made in order of seniority. A person who is not on the list may not be appointed to the position during the one-year period until the reinstatement list is exhausted.

Id. at 456 (citing Tex. Loc. Gov't.Code Ann. § 143.085(a)).

The City argued that section 143.085 was inapplicable to the case because the lieutenant's position was abolished before Nyborg was entitled to be promoted. Id. at 455. The court concluded, however, that when an ordinance abolishes a position, the officer with the least seniority in that position must be demoted to the position immediately below the abolished position and placed on a reinstatement list. Id. at 456. The ordinance at issue stated, "[U]pon the promotion of a Lieutenant into the newly created Captain's position, said Lieutenant's position shall be considered to be contemporaneously abolished." Id. at 455, 456.

Page 659

The court found that, based on this language, the lieutenant's position was not abolished until Kneblick was promoted to captain, at which point Nyborg was entitled to be promoted to lieutenant. Id. at 456. The court, therefore, held that the proper procedure in the case would have been to promote Nyborg to lieutenant, then demote him back to sergeant, and place him on the lieutenant's reinstatement list. Id.

The City, here, argues that applying the holding in Nyborg to the facts in this case would "[yield] a construction of the Civil Service Act and a result that is both foolish and absurd." The City emphasizes that no one here suffered any "negative ramifications" and that the "promotion/demotion construct is simply a useless drill and a waste of taxpayer dollars." This argument, however, is based on an improper understanding of the Civil Service Act.

The City here argues that to comply with Nyborg, it must have done the following:

"(a) promote Flores, Ibarra, Elizondo and George to District Chief; (b) promote the next four individuals on the Captain promotion eligibility list; (c) promote the next four individuals on the Lieutenant promotion eligibility list; (d) promote the next four individuals on the FAO eligibility list; then (e) demote the four individuals who were just promoted to Captain and place them back on the promotion eligibility list; (f) demote the four individuals who were just promoted to Lieutenant

and place them back on the promotion eligibility list; and (g) demote the four individuals who were just promoted to FAO and place them back on the promotion eligibility list."

The problem with this construction is that the statute does not require that the demoted firefighters be placed back on the promotion eligibility list. Rather, the statute dictates they be placed on a position reinstatement list. If a vacated or abolished position is filled or re-created within one year, the position must be filled from the reinstatement list, in order of seniority. Tex. Loc. Gov't Code Ann. § 143.085(a) (Vernon 1999). Only after the reinstatement list is exhausted, may other firefighters be considered for the vacancy. Id. Clearly, the firefighters here will receive a benefit by following the construct of the Civil Service Act as dictated in Nyborg, by being eligible first for any vacancy in a position they previously lost. Further, this construction is in line with the Civil Service Act's purpose. Tex. Gov't Code Ann. § 143.001(a) (Vernon 1999); see also *Klinger v. City of San Angelo,* 902 S.W.2d 669, 676 (Tex.App.--Austin 1995, writ denied) (overall intent of the Civil Service Act is to secure efficient, capable, non-politicized fire and police department personnel by means of civil service system that establishes promotions based upon demonstrated merit and fitness). We, therefore, find the result reached in Nyborg, and as applied here, is not absurd. By following Nyborg, the firefighters' rights under the Civil Service Act would be protected and the City would not be required to create twelve new classified positions. Unfortunately, however, by failing to follow the Nyborg procedure, in order to protect firefighters' rights under the Civil Service Act, the City is required to create and fill the twelve new positions.

**Was the City Required to Fill the Vacancy?**

The Civil Service Act requires that any vacancy be filled through certain promotional procedures. Section 143.036 requires that when a vacancy occurs, the vacancy must be filled according to the procedures outlined in the Civil Service Act. The Act mandates that the person next in line on the promotional list has the primary right to fill the vacancy. See Tex. Gov't Code Ann. § 143.036(e) (Vernon 1999); International Ass'n of Firefighters Local 624 v. City of San Antonio, 822 S.W.2d 122, 131 (Tex.App.--San Antonio 1991, writ denied). Accordingly, because we find that the reclassification resulted in

Page 660.

a vacancy in the captain positions, then those positions must be filled according to the procedure outlined in the Civil Service Act.

**Did the City Adopt the Reclassification by Ordinance**

The City additionally claims it complied with the Civil Service Act by establishing the new classifications in the budget ordinance. As summary judgment proof, the City offers a copy of a Comprehensive Fire FB-1 Report. The FB-1 is a document that is prepared before the budget ordinance's adoption. Other programs and their costs are added to the costs included in the FB-1 to form the following year's budget.

There are two problems with this document. First, the FB-1 is not the actual budget, but is simply a form used to calculate and define the following year's budget. Second, and most problematic, is that the reclassification took place on June 24, 1997. The budget, which the City asserts provided for the reclassifications, did not become effective until October 1, 1997, and accordingly could not have effectuated the reclassification.

**Should the Reclassification Be Declared Void Ab Initio?**

The City finally requests that if the court finds that the reclassifications were in violation of the Civil Service Act, then the reclassifications should be declared void ab initio. The City suggests that doing so is the "truly equitable solution."

The Civil Service Act protects firefighters from losing their positions when the governing body wrongfully created those positions. The Civil Service Act provides that "[t]he failure of the governing body to establish a position by ordinance does not result in the loss of civil service benefits by a person entitled to civil service protection or appointed to the position in substantial compliance with this chapter." Tex. Gov't Code Ann. § 143.021(b) (Vernon 1999).

The City failed to establish the new district fire chief positions by ordinance. That failure, however, is irrelevant. The captains promoted to the district fire chief positions were next in line on the promotion eligibility list for those positions. They were, therefore, promoted in "substantial compliance" with the Civil Service Act provisions that outline promotional procedures. Thus, we refuse to declare the creation of the positions and the resulting promotions, as benefits to the former captains, void ab initio.

**Conclusion**

We find the City's reclassification of captain positions to district fire chief positions created vacancies in the chief positions. And, because the collective bargaining agreement between the City and the Union is not specific enough to allow for a reclassification without following the Civil Service Act's requirements, the City must fill those vacancies in accordance with the Act. We, accordingly, overrule the City's issues and affirm the trial court's judgment.

---------

Notes:

[1] In its brief, the City states it is unsure of the standard of review to apply in this case. Specifically, in its first issue, it requests the court to assess the nature of the firefighters' motion for summary judgment to determine whether it is a traditional or a no-evidence motion for summary judgment. The firefighters respond that their motion was a traditional summary judgment motion. We will review the case under the traditional summary judgment standard. See TEX. R. CIV. P. 166a(c).

[2] To provide a more logical explanation of our disposition in this case, we address the City's issues in an order different than that presented in its brief.

[3] The Captains who were reclassified as District Chiefs, received both rank/position name changes, and received an increase in salary.

[4] The cases the City attempts to distinguish from this case are Lee v. Downey, 842 S.W.2d 646 (Tex.1992), Duckett v. City of Houston, 495 S.W.2d 883 (Tex.1973), International Ass'n of Firefighters Local 624 v. City of San Antonio, 822 S.W.2d 122 (Tex.App.--San Antonio 1992, writ denied), City of San Antonio v. Edwards, 974 S.W.2d 148 (Tex.App.--San Antonio 1998, no writ), and McGregor v. City of Houston, 528 S.W.2d 620 (Tex.Civ.App.--Houston [14th Dist.] 1975, writ ref'd n.r.e.).

---------

**807 S.W.2d 714 (Tex. 1990)**

**EAGLE PROPERTIES, LTD. et al., Petitioners,**

**v.**

**Clarence SCHARBAUER, Jr. et al., Respondents.**

**No. C-8203.**

**Supreme Court of Texas.**

**December 19, 1990**

Opinion Delivered March 27, 1991.

James E. Ingram, San Antonio, and Clinard J. Hanby and W. James Kronzer, Houston, for petitioners.

James W. Paulsen, Houston, John H. McElhaney, Morris Harrell, Donald Colleluori and Bruce A. Budner, Dallas, John E. O'Neill and David T. Hedges, Houston, W.B. Browder, Jr., Midland, David C. Holmes, Houston, and Michael V. Powell, Dallas, for respondents.

OPINION

COOK, Justice.

This court's opinion of December 19, 1990, is withdrawn and the following is

substituted in its place. Petitioners' and Respondents' motions for rehearing are overruled.

This is a single cause which originated from two related cases. The first case presents us with the question of whether the doctrines of res judicata and collateral estoppel preclude a state action following the settlement of a federal court case that involved different parties but the same subject matter. The second case presents similar questions of res judicata and collateral estoppel but also addresses whether the statute of limitations for causes of action in fraud is two years or four years. We hold that the statute of limitations does not bar the claims for fraud in the second case, that res judicata does not bar the claims in either case, and that collateral estoppel bars only some of the claims presented in both cases. Therefore, we reverse the judgment of the court of appeals in part and affirm in part, 758 S.W.2d 911, and remand this cause to the court of appeals for further consideration of whether Branum's claims other than fraud against TCB, First Republic, and Peat Marwick are barred by the relevant statutes of limitations.

In 1982, First National Bank of Midland (First Midland) was experiencing financial problems due to a large portfolio of energy-related loans. To improve the financial position of First Midland, Eagle Properties, Ltd., was formed to purchase First Midland's twenty-four story office building, ten-story parking garage, and drive-in banking facilities for $75 million. M.W. Branum and Thomas C. Brown were the general partners of Eagle. Charles Fraser, the president and chairman of the board of First Midland, hand-picked the Eagle partners and solicited their participation. The consideration consisted of $25 million in unsecured promissory notes from Eagle and two unfunded letters of credit, each for $25 million, provided by Texas Commerce Bank (TCB) and

InterFirst Bank Dallas. Eagle agreed to lease the premises back to First Midland for three years and to allow First Midland to manage the properties.

The financial condition of First Midland continued to deteriorate, and in June 1983 Eagle agreed to the funding of the letters of credit six months before they were scheduled to be funded. On October 14, 1983, First Midland was declared insolvent, and the Federal Deposit Insurance Corporation (FDIC) was appointed receiver. The FDIC accelerated payment on the notes and filed suit in federal court in February 1984 to collect on them. Eagle counterclaimed for declaratory judgment on grounds of common law fraud, violations of the Securities Exchange Act, failure of consideration, violations of the Bank Holding Company Act, and the operation of two subordination agreements. In a non-jury trial, the federal court held for the FDIC. In particular, the federal court held that First Midland did not fraudulently induce Eagle to enter into the transaction, execute the promissory notes, or agree to the early funding of the letters of credit. *FDIC v. Eagle Properties, Ltd.,* 664 F.Supp. 1027 (W.D.Tex.1985).

Eagle filed an appeal to the United States Court of Appeals for the Fifth Circuit. While the case was on appeal, the parties entered into a settlement agreement which explicitly preserved Eagle's right to file claims against the officers and directors of First Midland. The settlement did not call for the judgment of the trial court to be vacated. At one point during the negotiations, however, Eagle offered the FDIC an additional one million dollars in settlement if it would move the Fifth Circuit to reverse or vacate and remand the judgment of the district court for a take-nothing judgment, and if these events in fact occurred. The FDIC declined this offer.

Subsequent to the settlement agreement, two suits were filed in state court. In the first suit, Eagle Properties, Ltd. v. Mays, Eagle and the individual partners sued certain officers and directors of First Midland (the Directors), alleging common law and statutory fraud, violations of the Deceptive Trade Practices Act, and negligence/breach of fiduciary duties. The second suit, Branum v. Scharbauer, was originally filed by M.W. Branum alone, but

Page 718

Eagle and the remaining partners, except Thomas C. Brown, subsequently intervened as additional plaintiffs. This suit was brought against the Directors, TCB, InterFirst Bank Dallas (now First Republic Dallas), and Main Hurdman (now Peat Marwick). The suit alleged common law and statutory fraud and violations of the Deceptive Trade Practices Act against all defendants, breach of contract/promissory estoppel against TCB and InterFirst, and negligence by TCB, InterFirst (hereinafter "First Republic"), and Main Hurdman (hereinafter "Peat Marwick").

Each of the defendants moved for summary judgment in the trial court, with the exception of two of the Directors, Joel T. Mays and John P. Butler. The trial court consolidated the two causes, and severed plaintiffs' claims against Joel T. Mays and John P. Butler, the claims between Thomas C. Brown and the other plaintiffs, and the counterclaims filed by some of the Directors, TCB, and First Republic. These claims were made the subject of a separate action, Eagle Properties, Ltd. v. Fraser. The trial court then entered final judgment with respect to the remaining claims in favor of the Directors, TCB, First Republic, and Peat Marwick. The summary judgment in Mays was based upon res judicata, collateral estoppel, and plaintiffs' lack of standing to bring the negligent mismanagement claims. The summary judgment in Branum was based on res judicata,

collateral estoppel, and the relevant statute of limitations.

Eagle Properties and its two general partners, Branum and Brown, appealed from the judgment of the trial court. The court of appeals affirmed the judgment of the trial court.

Petitioners challenge the judgment of the court of appeals and the trial court's granting of both summary judgments. We agree in part with petitioners' contentions, and we reverse the judgment of the court of appeals in part, affirm in part, and remand to the court of appeals for further consideration of whether Branum's claims other than fraud against TCB, First Republic, and Peat Marwick are barred by the relevant statutes of limitations.

Res Judicata

We begin with the issue of res judicata with respect to both Eagle's suit and Branum's suit. Since the first suit, FDIC v. Eagle, was decided in federal court, federal law controls the determination of whether res judicata will bar a later state court proceeding. *Aerojet-General Corp. v. Askew,* 511 F.2d 710, 715 (5th Cir.), cert. denied, 423 U.S. 908, 96 S.Ct. 210, 46 L.Ed.2d 137 (1975); *Jeanes v. Henderson,* 688 S.W.2d 100, 103 (Tex.1985). Under federal law, the doctrine of res judicata will apply if: (1) the parties are identical in both suits; [1] (2) the prior judgment is rendered by a court of competent jurisdiction; (3) there is a final judgment on the merits; and (4) the same cause of action is involved in both cases. *Nilsen v. City of Moss Point,* 701 F.2d 556, 559 (5th Cir.1983). As a general rule, when a cause of action is brought in federal court and there is no jurisdictional obstacle to advancing claims arising from both federal and state law, and only federal claims are asserted, the state claims cannot be brought in a subsequent cause of action in state court. The subsequent action based on the state claims will not be precluded, however, if the federal court did not possess jurisdiction over the omitted state claims or, having jurisdiction, would clearly have declined to exercise that jurisdiction as a matter of discretion. Jeanes, 688 S.W.2d at 104. Restatement (Second) of Judgments § 25, comment (e) (1982).

There is no independent basis of federal jurisdiction over the state court causes of action brought by Eagle and Branum. These claims do not give rise to federal question jurisdiction, and diversity of citizenship did not exist between Eagle's partners

Page 719

and the Directors, TCB, InterFirst and Main Hurdman as required by 28 U.S.C. § 1332(a)(1). [2] Therefore, the federal court in FDIC v. Eagle could have decided the state law claims brought by Eagle and Branum in Mays and Branum only if those claims fell within the court's ancillary or pendent-party jurisdiction. [3]

Last year, in Finley v. United States, 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), the U.S. Supreme Court enunciated the test for determining the existence of pendent-party jurisdiction, that is, "jurisdiction over parties not named in any claim that is independently cognizable by the federal court." Finley, 109 S.Ct. at 2006. Where such jurisdiction is sought, it is not sufficient that the federal and nonfederal claims "derive from a common nucleus of operative fact" and are such that a plaintiff "would ordinarily be expected to try them in one judicial proceeding," as required for pendent claim jurisdiction under *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Finley, 109 S.Ct. at 2006-07. Rather, there must also be "an examination of the posture in which the nonfederal claim is asserted and of

the specific statute that confers jurisdiction over the federal claim." Finley, 109 S.Ct. at 2007, quoting *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978).

The U.S. Supreme Court held in Finley that the Federal Tort Claims Act does not permit the exercise of pendent-party jurisdiction over additional parties to whom no independent basis for federal jurisdiction exists. The Court found that the most significant element of "posture" was the fact that the added claims involved added parties over whom there was no independent basis for jurisdiction. The Court then read the jurisdiction statute narrowly and found that it did not permit the exercise of jurisdiction over actions against parties other than the United States. The Court emphasized the rule expressed in precedent that "a grant of jurisdiction over claims involving particular parties does not itself confer jurisdiction over additional claims by or against different parties." Finley, 109 S.Ct. at 2010. Therefore, pendent-party jurisdiction may not be exercised unless the text of a jurisdiction statute explicitly grants, or manifests an intent to grant, jurisdiction over additional parties.

Since Finley, the trend among federal courts has been to read jurisdiction-granting statutes narrowly, which has frequently resulted in finding a lack of pendent-party

Page 720

jurisdiction. [4] It has even been suggested that pendent-party jurisdiction is no longer a viable concept in any context. See *Staffer v. Bouchard Transp. Co.,* 878 F.2d 638, 643 n. 5 (2d Cir.1989).

Since there is no independent basis of federal jurisdiction over the state court causes of action brought by Eagle and Branum, we must examine the governing jurisdiction statute, 12 U.S.C. § 1819, and determine whether this statute affirmatively grants federal jurisdiction over Eagle and Branum's state law claims. In 1985, this statute provided in relevant part:

All suits of a civil nature at common law or in equity to which the [FDIC] shall be a party shall be deemed to arise under the laws of the United States, and the United States district courts shall have original jurisdiction thereof, without regard to the amount in controversy.

12 U.S.C. § 1819 (Fourth) (1988).

The U.S. district court in *Federal Deposit Ins. Corp. v. Israel,* 739 F.Supp. 1411, 1413 (C.D.Cal.1990), interpreted nearly identical language in the current version of 12 U.S.C. § 1819, which reads in part,

Except as provided in subparagraph (D), all suits of a civil nature at common law or in equity to which the [FDIC], in any capacity, is a party shall be deemed to arise under the laws of the United States.

12 U.S.C.A. § 1819(b)(2) (West 1989). In that case, the FDIC was the plaintiff and certain defendants filed cross-claims against new parties which were exclusively state-law claims for indemnification. Applying Finley, the court squarely addressed the question of whether 12 U.S.C. § 1819 affirmatively grants jurisdiction over cross-claims of this nature, permitting the federal court to adjudicate those claims on the merits. After carefully examining the language of the statute and federal decisions interpreting other jurisdiction statutes, the court held that the terms "civil actions" or "civil suits" refer to specific claims, not just "the general theme of the suit." Israel, 739 F.Supp.

at 1414. Therefore, 12 U.S.C. § 1819 explicitly grants jurisdiction only over claims to which the FDIC is a party. The court concluded that it had no subject matter jurisdiction over the defendants' third-party claims. The court found its decision consistent with the canon that a Congressional grant of jurisdiction should be read narrowly. Id. at 1413-14. [5]

In a similar case involving the FSLIC, the Ninth Circuit Court found that jurisdiction existed over a third-party complaint. In *California Union Ins. v. American Diversified Sav.,* 914 F.2d 1271 (9th Cir.1990), the FSLIC brought claims against directors of a collapsed thrift institution. One of the directors filed a third-party complaint against an insurer. The court found that 12 U.S.C. § 1730(k)(1) granted jurisdiction over the third-party claim. This differs from the present case in two respects. First, 12 U.S.C. § 1730(k)(1) contains broader language than 12 U.S.C. § 1819, referring to "any civil action, suit, or proceeding to which the [FSLIC] shall be a party" (emphasis added), as opposed to "all suits ... to which the FDIC shall be a party."

Page 721

Second, the court in California Union based its decision in part on the fact that the FSLIC had a "clear stake" in the director's claim against the insurer and even joined the director in his motion for summary judgment. The FDIC's stake in Eagle's and Branum's claims is not as clear.

We find Federal Deposit Ins. Corp. v. Israel persuasive. Based on our reading of the relevant jurisdiction statute, 12 U.S.C. § 1819, and Finley v. U.S., we find that the federal court in FDIC v. Eagle would not have had jurisdiction over the state law claims subsequently brought by Eagle and Branum. Therefore, res judicata does not preclude Eagle and Branum from bringing their state law claims in this case.

Collateral Estoppel

Next, we address the issue of collateral estoppel. The threshold question is what law governs collateral estoppel. In this case, the same result will be reached whether federal or state law is applied to the issue of collateral estoppel. Therefore, we do not decide the choice of law question.

In order to invoke the doctrine of collateral estoppel, a party must establish "(1) the facts sought to be litigated in the first action were fully and fairly litigated in the prior action; (2) those facts were essential to the judgment in the first action; and (3) the parties were cast as adversaries in the first action." *Bonniwell v. Beech Aircraft Corp.,* 663 S.W.2d 816, 818 (Tex.1984). See *Allen v. McCurry,* 449 U.S. 90, 94-95, 101 S.Ct. 411, 414-15, 66 L.Ed.2d 308 (1980); *Hicks v. Quaker Oats Co.,* 662 F.2d 1158, 1166 (5th Cir.1981).

A. No Requirement of Mutuality

In *Benson v. Wanda Petroleum Co.,* 468 S.W.2d 361 (Tex.1971), this Court stated,

The rule [of collateral estoppel] is generally stated as binding a party and those in privity with him.... Due process requires that the rule of collateral estoppel operate only against persons who have had their day in court either as a party to the prior suit or as a privy, and, where not so, that, at the least, the presently asserted interest was actually and adequately represented in the prior trial.

Id. at 363. This definition does not require mutuality for the invocation of collateral estoppel; rather, it is only necessary that the party against whom the plea of collateral estoppel is being asserted be a party or in privity with a party in the prior litigation. *Myrick v. Moody Nat'l Bank,* 590

S.W.2d 766, 769 (Tex.Civ.App.--Houston [14th Dist.] 1979, writ ref'd n.r.e.); *Hardy v. Fleming,* 553 S.W.2d 790, 792-93 (Tex.Civ.App.--El Paso 1977, writ ref'd n.r.e.). As this Court stated in Tarter v. Metropolitan Sav. & Loan Ass'n, "The doctrine applies when the party against whom collateral estoppel is asserted had a full and fair opportunity to litigate the issue in the prior suit" (emphasis added). 744 S.W.2d 926, 927 (Tex.1988) (citing Bonniwell ). Although Eagle cites several cases for the proposition that a party cannot avail himself of the doctrine of collateral estoppel unless he was a party or in privity with a party in the prior litigation, in each of those cases we held only that collateral estoppel cannot be asserted against a party who was not a party or in privity with a party in the prior litigation. See *Employers Casualty Co. v. Block,* 744 S.W.2d 940 (Tex.1988); Bonniwell, 663 S.W.2d 816; *Wilhite v. Adams,* 640 S.W.2d 875 (Tex.1982); Benson, 468 S.W.2d 361. Similarly, the U.S. Supreme Court abandoned the requirement of mutuality in applying collateral estoppel in *Blonder-Tongue v. Univ. of Illinois Foundation,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Therefore, the Directors, TCB, First Republic and Peat Marwick are not barred from asserting collateral estoppel by a requirement of mutuality; it is sufficient that Eagle and Branum were both parties in FDIC v. Eagle.

B. Issues Essential to the Federal Judgment

Next, we must address the question of whether the federal court's findings regarding fraud in the transaction were essential to its judgment. Under state law, collateral estoppel only precludes the relitigation of identical issues of fact or law

Page 722

which were actually litigated and essential to the prior judgment. Tarter, 744 S.W.2d at 927; *Van Dyke v. Boswell, O'Toole, Davis & Pickering,* 697 S.W.2d 381, 384 (Tex.1985). The Restatement (Second) of Judgments § 27, comment (i) (1982) provides in part, "If a judgment of a court of first instance is based on determinations of two issues, either of which standing independently would be sufficient to support the result, the judgment is not conclusive with respect to either issue standing alone." The rationale for this rule is that a determination in the alternative may not have been as rigorously considered as it would have been if necessary to the result, and the losing party may be dissuaded from appealing one determination because of the likelihood that the other will be upheld. Id.

In FDIC v. Eagle, the court found that neither First Midland nor its president, Charles Fraser, fraudulently induced Eagle and its partners to enter into the sale-leaseback transaction or execute the promissory notes in issue. 664 F.Supp. at 1045. The court also indicated, however, that the FDIC had a defense to these fraud claims because the FDIC did not have actual knowledge of the fraud at the time it entered into the purchase and assumption agreement. Id. at 1037. The court stated, "[I]f the Court had to, the Court would find that the FDIC did not have actual knowledge of conduct or communications that would give rise to a finding of fraud." Id. at 1045-46. [6]

The statement of the federal court regarding FDIC's knowledge of any fraud, viewed in the context of the entire opinion, does not constitute an alternative holding so as to prevent its holding on the fraud claims from having preclusive effect. While this alternative reasoning may have had some adverse effect on defendants' desire to appeal the judgment, it is clear that the federal court "rigorously considered" defendants' claims of fraudulent inducement, carefully reviewing each

contention. Id. at 1037-45. Therefore, applying state law to the circumstances of this case, we hold that the defendants' claims of fraudulent inducement were "actually tried" in the federal court and that the court's findings on fraudulent inducement were "essential" to its judgment for the purposes of preclusion by collateral estoppel.

The same result would be reached under federal law. For collateral estoppel to bar relitigation of an issue, that issue must have been "necessarily determined" in the prior litigation. *United States v. Garza,* 754 F.2d 1202, 1209 (5th Cir.1985); Hicks, 662 F.2d at 1168. Nevertheless, except in very unusual cases, the abandonment of estoppel for the reason that a prior judgment rests on multiple grounds is inconsistent with the general rule in federal courts that a party is only entitled to one full and fair opportunity to litigate an issue. 1B Moore's Federal Practice p 0.443[5.-2] (1988). While the Fifth Circuit has adopted the reasoning of the Restatement (Second) of Judgments § 27 comment (i), it did so only in the context of offensive collateral estoppel. Hicks, 662 F.2d at 1169-70. Because this case only involves the defensive use of collateral estoppel, and because we have found the findings of the federal court in FDIC v. Eagle to be "essential" to that judgment and rigorously considered by that court, we hold that under federal law the alternative "findings" of the federal court do not preclude the application of collateral estoppel in the present litigation.

C. Preclusion of Eagle's Claims

We now turn to the question of whether any of the issues in Eagle's case, Mays, were litigated in the prior action, thereby estopping Eagle from asserting the claims in this action.

1. Common Law and Statutory Fraud

Eagle's first cause of action against the Directors is for common law

Page 723

fraud. The elements of actionable fraud are that: (1) a material representation was made; (2) the representation was false; (3) when the representation was made the speaker knew it was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it should be acted upon by the party; (5) the party acted in reliance upon the representation; and (6) the party thereby suffered injury. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 930 (Tex.1983); *Stone v. Lawyers Title Ins. Corp.,* 554 S.W.2d 183, 185 (Tex.1977).

Eagle bases its actions for common law and statutory fraud [7] on the grounds that the Directors made false representations or material omissions with the intent of inducing Eagle to enter into the sales-leaseback transaction and agree to early funding of the letters of credit. First, Eagle alleges that the Directors misrepresented the bank's financial condition. The court in FDIC v. Eagle found that a fiduciary relationship did not exist between Charles Fraser and the individual defendants, that Fraser's disclosures and representations were adequate to inform Eagle and its partners of the bank's financial position and the reasons for selling the building, that Fraser had represented to each Eagle partner that an unfavorable financial report had been received from bank examiners, and that each defendant knew the bank had definite financial problems. *FDIC v. Eagle,* 664 F.Supp. at 1043-44.

Second, Eagle alleges that the Directors misrepresented that Eagle could depreciate the

property and that the completed sale would occur in 1982. The federal court found that these representations were only expressions of opinion with legal implications. Generally, misrepresentations as to matters of law are not actionable fraud. *Sawyer v. Pierce,* 580 S.W.2d 117, 125 (Tex.Civ.App.--Corpus Christi 1979, writ ref'd n.r.e.). Such misrepresentations may be actionable between fiduciaries or where the representor has superior knowledge or information and uses it unfairly. The court found, however, that there was no fiduciary relationship between Fraser and First Midland and the individual defendants and that Fraser did not have a decided advantage over them. *FDIC v. Eagle,* 664 F.Supp. at 1042.

Eagle also alleges that the Directors misrepresented the fair market value of the property and the existence of an appraisal in the amount of $75 million. The federal court found that the representation of such an appraisal was false and material, but that none of the defendants who heard the representation relied upon it, in that they did not request to view the appraisal and did not condition their participation on reviewing the appraisal. Furthermore, the court found that the defendants should have taken the precaution of reviewing an appraisal and informing themselves of the value of the properties. *FDIC v. Eagle,* 664 F.Supp. at 1042-43.

Finally, Eagle alleges that the Directors failed to inform them that the SEC and the Office of the Comptroller of the Currency had concerns about the validity of the original transaction. The federal court found, however, that Fraser accurately represented that the OCC viewed the sale as a positive step for the bank. *FDIC v. Eagle,* 664 F.Supp. at 1044.

The court in FDIC v. Eagle held, following its extensive review of the facts surrounding the transaction, that neither Fraser nor First Midland fraudulently induced the defendants to enter into the sale-leaseback transaction, execute the promissory notes, or agree to early funding of the letters of credit. *FDIC v. Eagle,* 664 F.Supp. at 1045, 1048. We hold that the findings of the federal court collaterally estop Eagle's actions for common law and statutory fraud in Mays.

2. Deceptive Trade Practices Act

Eagle also brings claims under the Deceptive Trade Practices Act (DTPA). Based on the same allegations underlying its fraud claims, Eagle alleges that the

Page 724

foregoing representations and omissions violate TEX.BUS. & COM.CODE § 17.46(b) because they constitute representations or omissions that (1) the real property has characteristics, uses or benefits which it does not have, § 17.46(b)(5); (2) the real property is of a particular standard, quality or grade when it is another, § 17.46(b)(7); and (3) an agreement confers or involves rights, remedies or obligations which it does not have or involve, or which are prohibited by law, § 17.46(b)(12).

A defendant may be held liable for the deceptive trade practices described in § 17.46(b)(5), (7) and (12) even if the defendant did not know that the representations made were false or did not intend to deceive anyone. *Pennington v. Singleton,* 606 S.W.2d 682, 690 (Tex.1980). Subdivisions (5) and (7) are designed to ensure the accuracy of descriptions of goods and services, and covers both general and specific descriptions. Id. Thus, misrepresentations which do not necessarily constitute common law fraud may be actionable under the DTPA. See *Smith v. Baldwin,* 611 S.W.2d 611, 616 (Tex.1980) (noting that a primary purpose of the DTPA was "to provide

consumers a cause of action for deceptive trade practices without the burden of proof and numerous defenses encountered in a common law fraud or breach of warranty suit"). To the extent that the federal court found that Charles Fraser and First Midland did not misrepresent the bank's financial condition and the position of the OCC regarding the transaction, DTPA claims may not be brought on this basis. However, Eagle is not collaterally estopped from bringing causes of action under § 17.46(b)(5) or (7) based on other allegations, including representations that there was an appraisal justifying the asking price of $75 million, which the federal court found to be false.

Eagle also alleges that the failure to disclose certain information about the real estate was intended to induce it into a transaction into which it would not have otherwise entered, § 17.46(b)(23). This subdivision includes an element of intent, and the court in FDIC v. Eagle held that neither Fraser nor the Bank fraudulently induced the defendants to enter into the sale-leaseback transaction, execute the promissory notes, or agree to early funding of the letters of credit. *FDIC v. Eagle,* 664 F.Supp. at 1045, 1048. Eagle is therefore estopped from bringing a claim under § 17.46(b)(23) of the DTPA. Therefore, summary judgment was proper on the basis of collateral estoppel on the DTPA claims brought under § 17.46(b)(23).

3. Negligent Mismanagement

Eagle's final cause of action against the Directors is for negligent conduct in the performance of their duties, thereby breaching a fiduciary duty owed to Eagle. In FDIC v. Eagle, the federal court held that a fiduciary relationship did not exist between Charles Fraser and First Midland and Eagle's partners. *FDIC v. Eagle,* 664 F.Supp. at 1043-44. Since the Directors did not owe a fiduciary duty to Eagle's partners, and Eagle suing on its own behalf as a creditor cannot maintain a personal action against the Directors of the corporation for breaching their duty to the corporation, see *Sutton v. Reagan & Gee,* 405 S.W.2d 828, 834-35 (Tex.Civ.App.--San Antonio 1966, writ ref'd n.r.e.), summary judgment was properly granted for the Directors on Eagle's negligent management cause of action.

D. Preclusion of Branum's claims

Finally, we turn to the question of whether Branum is collaterally estopped from bringing his claims in Branum. Branum is collaterally estopped to the same extent as Eagle from bringing claims of fraud against the Directors and DTPA claims against the Directors under TEX. BUS. & COM.CODE § 17.46(b)(5), (7), (12) & (23).

In addition to the DTPA claims that parallel Eagle's DTPA claims, Branum has brought a claim under TEX.BUS. & COM.CODE § 17.50(a)(3), alleging that the Directors' actions constitute an unconscionable course of conduct. An act or practice that "results in a gross disparity between the value received and consideration paid,

Page 725

in a transaction involving transfer of consideration," is considered unconscionable conduct under the DTPA. TEX.BUS. & COM.CODE § 17.45(5) (Vernon 1987). In this case, the consideration received by First Midland in the sale-leaseback transaction was $75 million. The transaction was entered into on December 31, 1982. The record shows that the bank property was appraised at $35 million as of November 23, 1982. Collateral estoppel does not bar Branum from bringing a

DTPA claim on this basis.

As part of his suit, Branum also alleges that TCB and First Republic owed him a fiduciary duty, and has brought claims of fraud, negligence, and breach of contract/promissory estoppel against TCB and First Republic with respect to their participation in the sale of the First Midland property, a rehabilitation funding program following the sale, and the funding of the $50 million letters of credit. These claims include allegations that Branum would not have agreed to the early funding of the $50 million letters of credit if he had known that TCB and First Republic were not going to fund First Midland with $200 million under the rehabilitation program. Branum has also presented claims against Peat Marwick for fraud, negligence, gross negligence, and accounting malpractice with respect to the sale-leaseback transaction. Branum's suit also includes DTPA claims against these parties.

In FDIC v. Eagle, the federal court only held that Charles Fraser and First Midland did not fraudulently induce Eagle into the sale-leaseback transaction, the execution of the promissory notes, and the early funding of the letters of credit. The issues which were actually litigated and essential to that judgment are different from the issues presented in Branum's suit against TCB, First Republic, and Peat Marwick. Therefore, Branum is not collaterally estopped from bringing his claims against these parties.

Statute of Limitations

With respect to the suit filed by Branum, the summary judgment in favor of TCB, First Republic, and Peat Marwick was based in part on the grounds that Branum's claims were barred by the relevant statute of limitations. Branum's claims which are based on fraud are governed by a four-year statute of limitations, *Williams v. Khalaf,* 802 S.W.2d 651 (1990), not a two-year statute of limitations as held by the court of appeals. Branum's original petition was filed on October 11, 1985. Therefore, the summary judgment on Branum's fraud claims cannot be upheld on the statute of limitations grounds. Branum's other claims against TCB, First Republic, and Peat Marwick may be barred by the relevant statutes of limitations. We therefore remand this cause to the court of appeals to determine which, if any, of Branum's claims other than fraud against TCB, First Republic, and Peat Marwick are barred by the relevant statutes of limitations, and whether fact questions existed, sufficient to withstand summary judgment, regarding the date Branum knew or should have known of the actionable conduct, where necessary for determination of the statute of limitations questions. Tex.R.App.P. 90(a).

Conclusion

We hold that res judicata does not preclude Eagle and Branum from bringing their state law claims in this case. Collateral estoppel bars Eagle and Branum from bringing claims of common law and statutory fraud against the Directors, some of the DTPA claims against the Directors, and Eagle's negligent mismanagement claim against the Directors. The remaining DTPA claims brought against the Directors and the claims brought by Branum against TCB, First Republic, and Peat Marwick are not collaterally estopped by the federal judgment. Finally, Branum's fraud claims are not barred by the relevant statute of limitations. Accordingly, we reverse the judgment of the court of appeals in part, affirm in part, and remand this cause to the court of appeals for further consideration of whether Branum's claims other than fraud against TCB, First Republic, and

Peat Marwick are barred by the relevant statutes of limitations.

---------

Notes:

[1] We note, however, that the "identity of parties" rule has seen significant erosion in the federal courts in recent years. In most jurisdictions today, the requirement only applies to the party against whom the effect of the prior judgment is being asserted. 1B Moore's Federal Practice p 0.441 (1988).

[2] Diversity must have existed at the time the federal action was commenced to confer jurisdiction upon the federal court. Koenigsberger v. Richmond Silver Mining Co., 158 U.S. 41, 49-50, 15 S.Ct. 751, 755, 39 L.Ed. 889 (1895).

[3] Ancillary jurisdiction generally involves claims asserted defensively, i.e., "claims by a defending party hailed into court against his will," or by a party "whose rights might be irretrievably lost unless he could assert them in an ongoing action in a federal court." Owen Equip. & Erection Co. v. Kroger, 437 U.S. 365, 376, 98 S.Ct. 2396, 2404, 57 L.Ed.2d 274 (1987); W.R. Grace & Co. v. Continental Cas. Co., 896 F.2d 865, 871 (5th Cir.1990). Pendent-party jurisdiction represents an amalgamation of pendent-claim jurisdiction and ancillary jurisdiction, and involves jurisdiction over parties not named in claims properly before the federal court and over whom there is no independent basis of federal jurisdiction. Note, Pendent Party Jurisdiction After Finley v. United States: A Trend Toward Its Abolition, 24 Ga.L.Rev. 447, 453-54 (1990); A. Miller, Ancillary and Pendent Jurisdiction, 26 S.Tex.L.J. 1, 5-11 (1985). The U.S. Supreme Court has failed to definitively distinguish between pendent-party jurisdiction and ancillary jurisdiction. D. Roth, Finley v. United States: Is Pendent Party Jurisdiction Still A Valid Doctrine?, 39 Am.U.L.Rev. 811, 813, 837-38. Circuit courts have also balked at deciding whether any "principled differences" exist between pendent and ancillary jurisdiction. See King Fisher Marine Serv. v. 21st Phoenix Corp., 893 F.2d 1155, 1159 n. 3 (10th Cir.1990). Likewise, we find it unnecessary to resolve this question for the purposes of this case. The state law claims of defendants Eagle Properties and Branum against the Directors, TCB, InterFirst and Main Hurdman might have been ancillary, but since they would have necessitated jurisdiction over new parties not named in any claim independently cognizable by the federal court, we will consider the question raised as one involving pendent-party jurisdiction. See Finley v. U.S., 490 U.S. 545, 109 S.Ct. 2003, 2006, 104 L.Ed.2d 593 (1989); Federal Deposit Ins. Corp. v. Israel, 739 F.Supp. 1411, 1412 (C.D.Cal.1990).

[4] See, e.g., Iron Workers Pension Fund v. Terotechnology, 891 F.2d 548 (5th Cir.1990) (examining the Employee Retirement Income Security Act, 29 U.S.C. § 1132(e)); Stallworth v. City of Cleveland, 893 F.2d 830 (6th Cir.1990) (examining 42 U.S.C. § 1983); Lockard v. Missouri Pacific R.R., 894 F.2d 299 (8th Cir.1990) (examining the Federal Employers' Liability Act, 45 U.S.C. § 56); Flynn v. U.S., 902 F.2d 1524 (10th Cir.1990) (examining the Federal Tort Claims Act, 28 U.S.C. § 1346(b)). Cf. Roco Carriers, Ltd. v. M/V Nurnberg Express, 899 F.2d 1292 (2d Cir.1990) (finding pendent party jurisdiction available in admiralty cases, examining 28 U.S.C. § 1333(1)).

[5] See also Federal Deposit Ins. Corp. v. Ohara's, Inc., 713 F.Supp. 966 (N.D.Miss.1989) (holding

that in a suit brought by the FDIC in its corporate capacity, no pendent party jurisdiction can be exercised against the FDIC in its capacity as receiver for a state bank, because 12 U.S.C. § 1819 specifically excludes the FDIC as receiver from the exercise of subject matter jurisdiction in suits which involve only the rights or obligations of depositors, creditors, stockholders and the state bank under state law); Fair v. NCNB Texas Nat'l Bank, 733 F.Supp. 1099 (N.D.Tex.1990) (holding that the court would not exercise its ancillary or pendent-party jurisdiction because such would not serve the interests of judicial economy and convenience). Neither of these cases relies upon Finley, however.

[6] The "finding" of the Court regarding actual knowledge pertained only to defendants' claims that they were fraudulently induced to enter the sale-leaseback transaction and execute the promissory notes. The court did not consider the issue of FDIC's "actual knowledge" with respect to defendants' claim that First National Bank failed to disclose material facts with respect to the early funding of the letters of credit. 664 F.Supp. at 1048.

[7] The statutory fraud claim is based on TEX. BUS. & COM.CODE § 27.01.

---------

**695 S.W.2d 271 (Tex.App. —San Antonio 1985)**

**James HARRISON, Clyde Gentle, Larry DeHaven and Tom Polonis,**

**Appellants,**

**v.**

**The CITY OF SAN ANTONIO and the San Antonio Police Officers**

**Association, Appellees.**

**No. 04-83-00523-CV.**

**Court of Appeals of Texas, Fourth District, San Antonio**

**June 26, 1985**

Page 272

[Copyrighted Material Omitted]

Page 273

Mayo J. Galindo, San Antonio, for appellants.

Jake Talley, Joseph E. Scuro, San Antonio, for appellees.

Before ESQUIVEL, BUTTS and REEVES, JJ.

REEVES, Justice.

This appeal concerns the construction of a collective bargaining agreement between the City of San Antonio and the San Antonio Police Officers Association, and the authority of the president of the Association to amend the agreement without the approval of the membership or its board of directors.

The appellants, plaintiffs below, are four members of the San Antonio Police Department who took an examination for the position of sergeant in the police department. They assert the examination deviated from the criteria established in the collective bargaining agreement.

The case was tried to the court and the trial judge found for the City and the police officers association; the four members bring this appeal.

The City has adopted the State Civil Service Act applicable to firemen and policemen, TEX.REV.CIV.STAT.ANN. art. 1269m (Vernon Supp.1985) and TEX.REV.CIV.STAT.ANN. art. 5154c-1 (Vernon Supp.1985), The Fire and Police Employee Relations Act, which grants the City and the police department the right to negotiate collective bargaining agreements. When a contract has been negotiated by representatives of the City and the Association, it is then approved by the City, and submitted to the membership of the Association for its approval.

The parties entered into a two-year agreement. This agreement, for the first time, contains in its section dealing with examination for promotions "An Assessment Center Examination." This provision provides, in part:

B. Assessment Center Examination

The Assessment Center Board shall consist of three (3) members as follows: ...

The Assessment Center Examination will include exercises related to the duties and responsibilities of the job classification in question and shall include as a minimum an in-basket exercise, a leaderless group discussion and a structured interview....

Some months before the sergeant's examination, the City, the Association's president and several members of the board of directors of the Association met to consider the methods to be used in implementing the Assessment Center Examination. Dr. Terry Eisenburg, a psychologist, was retained to conduct the Assessment Center Examination. Dr. Eisenburg expressed dissatisfaction with the number of the members of the Assessment Center Board and the structured interview examination as provided for in the collective bargaining agreement. He felt that the number of assessors was inadequate and the structured interview was not as effective as an oral presentation.

After several conferences between the City and the president, they agreed to substitute the structured interview for the oral

Page 274

presentation. This change was reached approximately two weeks before the examination but was never reduced to writing.

While no action was requested or obtained modifying the agreement as to the structured interview, an instrument titled "Memorandum of Agreement and Understanding" was signed by the president of the Association and the city manager. This memorandum of agreement and understanding amended Article 11, section 1B by increasing the membership of the Assessment Center Board from three to five members. The city manager's authorization was based on an ordinance passed by the city council of San Antonio. The president did not obtain specific authorization from the board of directors nor the membership of the San Antonio Police Officers Association.

Approximately fifty-five police officers took the written examination for sergeant. Appellants were among the twenty who qualified for the second phase of the examination, the Assessment Center Examination. The examination was conducted in two days; ten candidates took the exam each day.

The Assessment Center Examination was conducted in the following manner: five assessors and ten candidates were present in the same room during the examination, but only two assessors graded each candidate on each part of the examination. However, since the examination consisted of three parts, each assessor graded a part of the examination of all ten candidates. After all the candidates had completed the examination, the five assessors collaborated in establishing a candidate's grade.

The eligibility list for sergeant is established by ranking applicants in the following manner: by adding fifty percent (50%) of the written exam score and fifty percent (50%) of the Assessment Center score, plus one point for each year of service in the police department up to a maximum of ten points. For example, using a candidate with ten years service:

```
Written Exam Score 96Assessment Center Exam Score 88Overall Exam
ScoreWritten 48Assessment Center 44Seniority Points 10 ___  Total 102
```

Appellants are located on the promotional eligibility list for police sergeant in the following numerical order: Tom R. Polonis (9), James M. Harrison (12), Clyde R. Gentle (13), Lawrence E. DeHaven (19).

Appellants allege fifteen points of error asserting there is no evidence or insufficient evidence:

1. To support a valid execution of the amendment changing the members of the Assessment Board from three to five and substituting the structured interview to an oral presentation because the president of the Association acted without the authority of the executive board or the Association's membership.

2. That there was legal consideration to support the amendment to the collective bargaining agreement.

3. That there was a written amendment to the collective bargaining agreement; this was in violation of the statute of frauds.

4. To prove compliance with the collective bargaining agreement, because the undisputed testimony evinces the five assessors failed to grade each of the twenty applicants on each phase of the oral Assessment Center Examination.

5. To prove compliance with the collective bargaining agreement because twenty applicants were examined in groups of ten, each group over a two day period in violation of TEX.REV.CIV.STAT.ANN. art. 1269m, § 14 D (Vernon Supp.1985), which requires all applicants to be given identical exams in the presence of each other.

ALTERATIONS OF THE COLLECTIVE BARGAINING AGREEMENT

The authority of a president to contract on behalf of a corporation must be found in the statutes, the corporate charter,

Page 275

express authority from its Board of Directors, or by implication from the nature of the president's position, custom or habit of doing business. *Robert Nanney Chevrolet Co. v. Evans and Moses,* 601 S.W.2d 411, 413 (Tex.Civ.App.--Beaumont 1980, no writ); *Capital Bank v. American Eyewear, Inc.,* 597 S.W.2d 17, 20 (Tex.Civ.App.--Dallas 1980, no writ); *Templeton v. Nocona Hills Owners Association, Inc.,* 555 S.W.2d 534, 537 (Tex.Civ.App.--Texarkana 1977, no writ). A president of a corporation, merely by virtue of the office, has no inherent power to bind the corporation except as to routine matters arising in the ordinary course of business. Templeton, supra, at 538.

TEX.REV.CIV.STAT.ANN. art. 5154c-1, § 7(c) (Vernon Supp.1985) provides the association or the public employer may designate any person or persons to negotiate or bargain in its behalf.

The San Antonio Police Officers Association By-Laws, article 1, section 1, provides: "The president ... shall preside at all meetings, ... and shall have subject to the control of the Board of Directors the general management and direction of the affairs of the Association. He shall perform such other duties as may be consistent with this office."

The San Antonio Police Officers Association is incorporated under the laws of the State of Texas. [1] TEX.REV.CIV.STAT.ANN. art. 1396--9.10(A) provides:

Any action required by this Act to be taken at a meeting of the members or directors of a corporation, or any action which may be taken at a meeting of the members or directors or of any committee, may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by all members entitled to vote with respect to the subject matter thereof, or all of the directors, or all of the members of the committee, as the case may be.

The president was not given written consent by the membership or the Board of Directors to

amend the agreement.

A structured interview is an examination where a candidate is given three or four questions in advance then appears before a Board of Examiners, outside of the presence of the other candidates. The candidate orally answers the questions; each question usually takes four or five minutes, and, during that time, the candidate might respond to other inquiries emanating from the response to the original question. In contrast, an oral presentation is where the candidate taking the examination is given, in advance and in writing, several topics to be discussed before the examiners, but in the presence of the other candidates. They are asked to discuss their educational background, experience in the department, qualifications and how these qualifications would relate to the position they seek, and things of like nature. The topics are given to them about one hour prior to the presentation. Each candidate speaks extemporaneously for not over ten minutes, without interruptions or questions; his audience are his peers and the assessors.

Although the two examinations might accomplish the same purpose, we are of the opinion that the tests are different. Certainly the professionals dealing in this type of testing recognized the difference; Eisenberg sought and got the change.

It might be argued that the increasing of the assessment from three to five was a routine matter left to the discretion of the president. *Capital Bank v. American Eyewear, Inc.,* 597 S.W.2d at 20; *Templeton v. Nocona Hills Owners Association, Inc.,* 555 S.W.2d at 537. However, appellants make the additional argument that the changes in the contract were not supported by consideration. It is not necessary for us to address these contentions because we are of the opinion that approving the modification in the contract by substituting the

Page 276

oral presentation for the structured interview was a deviation that required specific authority from the membership or, if authorized by the membership, the Board of Directors.

Appellees contend that Article XI, Section 1B of the agreement was intentionally drawn in order that amendments could be made without membership or board approval in the Assessment Center Examination. This section provides in pertinent part:

The City will consult with the Association on issues related to guidelines for administration of and evaluation of the Assessment Center procedure.

It is urged its purpose was to give flexibility to the agreement so that modifications could be made without formally amending the contract. Moreover, since the parties placed that interpretation on the agreement, we are urged to follow that interpretation. If the language in a contract is susceptible to different meanings, the court, to ascertain the true intentions of the parties, will consider the circumstances existing when the contract was executed, and would generally follow the interpretation of the parties to the contract. *Lone Star Gas Co. v. X-Ray Gas Co.,* 139 Tex. 546, 164 S.W.2d 504, 508 (Tex.1942). However, we note that not all parties to this suit adopt this interpretation--the appellants strenuously disagree.

The contract in question, before it was finalized, was submitted to the membership twice. The record is silent as to why the agreement was not approved the first time submitted, but it is an indication that the membership was exercising its right to be the ultimate authority as to the contents of the agreement. If the membership had intended to give authority to the president or the

Board to change the testing procedure, without its approval, it seems to us the parties would have used language more forceful than consult. Indeed, it would appear to us that the agreement would have specifically provided for discretion in the president or the board to change the tests or other procedures if they deemed it prudent.

The appellants contend that the agreement, as amended by the oral presentation, is unenforceable because it was not reduced to writing, in violation of the agreement and the statute of frauds. [2] We agree. Heretofore the contracts had been for one year, but the one under consideration is for a two-year period.

Article XXXIII, section 1, "Stability of Agreement," of the contract states:

No agreement, understanding, alteration or variation of the Agreement, terms of provisions herein contained shall bind the parties unless made and executed in writing by the parties hereto. The failure of the City or the employees to insist in any one or more instance, upon performance of any of the terms or conditions of this Agreement shall not be considered as a waiver or relinquishment of the right of the City or the employees to future performance of any such term or condition, and the obligations of the City and the employees to such future performance shall continue in full force and effect.

A written agreement coming within the provisions of the statute of frauds may not be orally modified. *Michael v. Busby,* 139 Tex. 278, 162 S.W.2d 662, 664 (Tex.1942); *Foster v. Mutual Savings Association,* 602 S.W.2d 98, 100 (Tex.Civ.App.--Fort Worth 1980, no writ).

Appellants also assert that the Assessment Center Examination was conducted in violation of the agreement. The contract provides:

A minimum score of 70% as determined by the Board as a whole on the composite factors evaluated by the Board on a consensus

Page 277

basis shall be required to pass the Assessment Center Examination.

As discussed, the oral examination was conducted over a two day period with all assessors present, two assessors grading a candidate on each phase but each grading at least a part of each candidate's examination. The "board as a whole" did consider each candidate and did collectively reach a decision as to the score of each candidate. We find no merit in this allegation by the appellants.

Lastly, appellants contend that the contract was conducted in violation of TEX.REV.CIV.STAT.ANN. art. 1269m, § 14 D (Vernon 1963) which provides: "All applicants shall be given an identical examination in the presence of each other...." It is uncontroverted that the examination was given over a period of two days, one-half of the class taking it one day and the other half taking it the next day. Appellees respond that this portion of the statute has no application since the parties specifically provided as follows:

In the event that any provision of this Agreement conflicts or is inconsistent with any provision of Article 1269M, Revised Civil Statutes of Texas, this Agreement shall prevail notwithstanding any such provision of Article 1269M.

TEX.REV.CIV.STAT.ANN. art. 5154c-1, § 20(b) (Vernon Supp.1985) provides that a collective bargaining agreement made in compliance to the Act takes precedence over state or local Civil

Service provisions whenever the collective bargaining contract so provides. Otherwise, article 1269m, section 14 D prevails. The fact that the contract calls for an oral Assessment Center Examination does not in and of itself mean that it should be conducted over an extended period of time. There is no specific provision in the agreement providing for the examination to be taken over a period of two days. Consequently, as article 1269m controls, we are of the opinion that the agreement is in violation of the provisions of the article.

CONTENTION OF RATIFICATION OR ESTOPPEL

Appellees contend the appellants, in submitting to the examination, ratified any changes in the agreement and are estopped to bring this action. They also contend that prior presidents executed contract modifications without approval of the membership or the Board of Directors.

Examinations for promotion in the San Antonio Police Department are not given at regular intervals; sometimes one-to-two years elapse between examinations. Appellants learned of the change in the examination procedures immediately before the examination was given. The evidence as to past presidents' executing modifications in the agreement came from the current president. He testified, over objection as to relevancy, to modifications he had made earlier and of modifications made by two prior presidents. In urging its admissibility appellees' attorney stated that it was being offered for the purpose of showing the president believed he had the power and authority.

Appellants contest these theories because they were not pled nor tried by implication. Appellees went to trial on a general denial. TEX.R.CIV.P. 67 provides, in pertinent part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. In such case, such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made by leave of court ... but failure so to amend shall not affect the result of the trial of these issues; ...

The doctrine of implied consent is invoked only where the issues have been fully developed. *Watts v. Watts,* 563 S.W.2d 314, 316 (Tex.Civ.App.--Dallas 1978, writ ref'd n.r.e.).

The purpose of Rule 67 is to require the pleader to inform the opposition of the specific grounds which will be relied

Page 278

upon at the time of the trial. As stated in Jay Fikes & Associates, d/b/a *King's Park Apartments v. Walton,* 578 S.W.2d 885, 889 (Tex.Civ.App.--Amarillo 1979, writ ref'd n.r.e.):

That rule does sanction an unpleaded issue to be treated as raised in the pleadings when it is tried by express or implied consent; but, the rule is intended to cover the exceptional case where it clearly appears from the record as a whole that the parties tried the unpleaded issue. It is not intended to establish a general rule of practice and should be applied with care and in no event in a doubtful situation.

We are of the opinion that these issues were not tried by implied consent.

The issues of ratification and estoppel were never fully developed. The testimony of the president which might conceivably be related to these issues was limited in its admission into evidence--it went only to the president's belief as to the extent of his authority. Thus, there could

be no trial by consent since that evidence was relevant to other issues that were raised by the pleadings. *Wendell v. Central Power and Light Co.,* 677 S.W.2d 610, 617 (Tex.App.--Corpus Christi 1984, writ ref'd n.r.e.). More important, the appellants were never alerted to these defenses by a request for a trial amendment.

The judgment of the trial court is reversed. We hold that the Assessment Center Examination was given in violation of the collective bargaining agreement. The examination is set aside. It is ordered that the Assessment Center Examination be given in accordance with the original agreement of the parties or an appropriately amended version of such.

BUTTS, Justice, dissenting.

I respectfully dissent.

Whether the president of the police association, after consulting with the City, could modify one-third of the second part of the two-part examination for promotion to sergeant [and lieutenant, captain, and deputy chief] without the written approval of the membership of the association is the real question.

The examination is divided into two parts: written and oral, the oral part consisting of review of responsibilities of the particular job classification (this part is not explained in detail and could consist of any number of "surprise" questions), a group discussion, and last, the portion which is under attack ... formerly a structured interview ... now changed to an extemporaneous presentation on a given subject assigned one hour before.

Thus, while presentation remained oral in the last one-third of the examination at the second phase, the manner of presentation was amended. No complaint is made of the written phase of the examination. The three-part second phase is not administered until after the first part. When a candidate passes the written test, that person may take the second test (oral). Five days after the written examination, the Assessment Center Examination date is posted. Each half is valued at fifty percent, and each year of service earns an additional one point up to ten years.

It is significant that a classroom orientation period concerning the Assessment Center process is given prior to the oral phase. All candidates are given the opportunity to attend the orientation.

It is my belief that under the circumstances as outlined above, the change in the manner of only one part of the oral examination may be termed "routine." See *Templeton v. Nocona Hills Owners Association, Inc.,* 555 S.W.2d 534, 538 (Tex.Civ.App.--Texarkana 1977, no writ).

The following provision appears in the examination procedures section of the collective bargaining agreement:

The City will consult with the Association on issues related to guidelines for administration of and evaluation of the Assessment Center procedure.

This is appropriate because the City has a great stake in assuring its citizens that its police officers meet certain high standards.

Page 279

I would find this provision means the president of the association, after consultation as in the present case, impliedly retains the power to modify testing procedure in a routine way.

The majority's disposition in this case would set aside the examination for all participants. What happens to those individuals who did pass the examination and were promoted? Because

this seems to me to be an act of the president which is authorized, I would affirm the judgment.

---------

Notes:

[1] The San Antonio Police Department was incorporated pursuant to TEX.REV.CIV.STAT.ANN. art. 1302, subd. 2. This article was repealed in 1961 and in its stead TEX.REV.CIV.STAT.ANN. art. 1396-1.01 et seq. (Vernon 1980) Texas Non-Profit Corporation Act was enacted and is applicable to this case.

[2] TEX.BUS. & COM.CODE ANN. § 26.01(a) (Vernon 1968):

A promise or agreement described in Subsection (b) [an agreement which is not to be performed within one year from the date of making the agreement] of this section is not enforceable unless the promise or agreement, or memorandum of it, is

(1) in writing; and

(2) signed by the person to be charged with the promise or agreement or by someone lawfully authorized to sign for him.

---------

**399 S.W.3d 532 (Tex. 2013)**

**56 Tex.Sup.Ct.J. 354**

**KOPPLOW DEVELOPMENT, INC., Petitioner,**

**v.**

**The CITY OF SAN ANTONIO, Respondent.**

**No. 11-0104.**

**Supreme Court of Texas.**

**March 8, 2013**

Argued Sept. 13, 2012.

Rehearing Denied June 21, 2013.

Dan W. Foster, John N. McClish, Sue Wall, Womack McClish Wall, Foster Brooks, PC, Austin TX, for Petitioner Kopplow Development, Inc.

Dan Pozza, Law Offices of Dan Pozza, Jose Ruben Hinojosa, Paul D. Barkhurst, Barkhurst & Hinojosa, P.C., L. Eric Friedland, Assistant City Attorney, Michael D. Bernard, City Attorney, Norbert J. Hart, Deputy City Attorney, San Antonio, TX, for Respondent The City of San Antonio.

**OPINION**

GUZMAN Justice.

In this case we determine whether an inverse condemnation claim is premature when premised on the owner's inability to develop its property as the city previously approved. The landowner purchased the property for the purpose of developing the land, obtained permits, and filled the portion of the property at issue in this proceeding to the 100-year flood level. The municipality then constructed a facility partly on the property that would detain storm water on the property in a significant flood, thus causing the property to again be below the 100-year flood level and undevelopable without additional fill. The landowner sought damages under statutory and inverse condemnation theories. The jury awarded damages of $694,600 and the trial court entered judgment on the verdict. The court of appeals reversed as to the inverse condemnation claim, holding the claim was premature because the property had not yet flooded. Because we conclude that the landowner's claim is for the present inability to develop the property as previously approved unless the property is filled, we hold the claim is not premature. Accordingly, we reverse the judgment of the court of appeals and

remand to the court of appeals for further proceedings.

**I. Background**

Kopplow Development, Inc. (Kopplow) purchased 18.451 acres of land adjoining Loop 410 in San Antonio in 1996 or early 1997.[1] After retaining an engineering firm, Kopplow filed a plat application on November 27, 1996 and obtained utility and construction easements on the adjoining tract south of its property to connect sewer service. Because Kopplow's property was below the 100-year floodplain elevation of 741 feet above mean sea level, as defined by the

Federal Emergency Management Agency (FEMA), Kopplow obtained a floodplain permit from the City of San Antonio (City) and filled most of the property to 741 feet in 2000. About one fourth of the property still fell within the 100-year floodplain, and Kopplow dedicated a drainage easement over this area. In 2004, the City granted Kopplow a vested rights permit, allowing it to develop the property under the rules in effect in November 1996 when Kopplow filed its plat application. A vested rights permit insulates pending development from most future ordinance changes. But certain floodplain regulation changes apply retroactively even against vested rights holders. *See* TEX. LOC. GOV'T CODEE §§ 245.002, 245.004(9).

San Antonio experienced 100-year floods in 1998 and 2002. The City then planned a regional storm water detention facility for the Leon Creek watershed south of Kopplow's property to mitigate downstream flooding. It determined in 2002 that the project would inundate portions of Kopplow's property and the tract south of Kopplow's property. The City asked Kopplow in late 2003 to donate an easement that the City planned to inundate as part of the project. Kopplow refused. The City obtained a 207-acre drainage easement from the owner of the property south of the Kopplow tract in January 2004 and then built a concrete in-flow wall on the portion of the adjoining tract that includes Kopplow's easements (where Kopplow's easements and the City's drainage easement overlap on the property south of the Kopplow tract). The City also built a large berm or dam south of the Kopplow property. The dam's peak elevation is 748 feet. Once Leon Creek reaches the height of the in-flow wall in a 10-year flood, the wall will guide storm water to be detained by the berm until storm water in Leon Creek subsides, allowing drainage pipes in the berm to open and slowly return the detained water into Leon Creek.

The parties agree the facility will cause increased inundation on Kopplow's property and that the FEMA 100-year floodplain is two feet higher on Kopplow's property because of the facility. But the City asserts that the in-flow wall does not cause the increased inundation because it is under water in a 100-year flood and instead that the berm causes the increased inundation.

The City also changed its regulatory 100-year floodplain to account for future, upstream development.[2] A City representative testified that, although Kopplow must file for a floodplain development permit

Page 535

to further develop its property, the City will permit Kopplow to develop its property if it fills the property to the new level of the 100-year floodplain. Ultimately, Kopplow must fill the portion of its property to be developed from the existing 741-foot level to 745.16 feet: two feet due to the detention facility and two feet due to the City's ordinance change.

Kopplow sued the City for a taking in May 2004 while it was constructing the facility. The City counterclaimed for condemnation of Kopplow's easement. Before trial, the trial court granted the City's motion that Kopplow's vested rights permit was not effective against subsequent floodplain ordinances and excluded Kopplow's evidence pertaining to two of the four feet of additional fill needed to develop the property.[3] The jury found that: (1) the value of the part taken was $4,600; (2) the City's use of the part taken proximately caused damages to the remainder; and (3) Kopplow's remainder damages were $690,000.

The City and Kopplow both appealed. The court of appeals affirmed the $4,600 damage

award for the part taken under the statutory takings claim. 335 S.W.3d 288, 296. It reversed the award of remainder damages under the statutory takings theory, holding that the inflow wall would not inundate Kopplow's property, even during a 100-year flood. *Id.* at 294-95. The court also held the remainder damages unrecoverable under Kopplow's inverse condemnation theory because the property had not yet flooded and the inverse condemnation claim was therefore premature. *Id.* at 296. In light of its holding, the court of appeals did not reach the City's factual sufficiency challenge or Kopplow's two cross-appeal points.[4] *Id.* at 296-97.

## II. Discussion

We have described the right to own private property as " fundamental, natural, inherent, inalienable, not derived from the legislature and as preexisting even constitutions." *Eggemeyer v. Eggemeyer,* 554 S.W.2d 137, 140 (Tex.1977). One of the most important purposes of our government is to protect private property rights. *Id.* The Texas Constitution resolves the tension between private property rights and the government's ability to take private property by requiring takings to be for public use, with the government paying the landowner just compensation. TEX. CONST. art. I, § 17 (" No person's property shall be taken, damaged, or destroyed for or applied to public use without adequate compensation being made...." ). The United States Supreme Court has stated that the rationale for compensating landowners for takings for public use is " to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960). When only part of a tract is taken, Texas law assures just compensation by entitling the landowner to the value of the part taken as well as the damage to the owner's remaining property. TEX. PROP.CODE § 21.042(c).

Page 536

Takings may be categorized as either statutory (if the government compensates the owner for the taking) or inverse (if the owner must file suit because the government took, damaged, or destroyed the property without paying compensation). *Westgate, Ltd. v. State,* 843 S.W.2d 448, 452 (Tex.1992). This proceeding has involved statutory and inverse claims. Initially, Kopplow sued because the City did not admit to damaging the property, which sounds in inverse condemnation. 335 S.W.3d at 291. The City later counterclaimed for a statutory taking, admitting it had taken Kopplow's easement. *Id.*

### A. Waiver

The City contends, and the court of appeals held, that Kopplow's inverse condemnation claim is not yet ripe. We disagree. As an initial matter, the City asserts that Kopplow did not plead or try an inverse condemnation claim. But Texas is a notice pleading jurisdiction, and a " petition is sufficient if it gives fair and adequate notice of the facts upon which the pleader bases his claim. The purpose of this rule is to give the opposing party information sufficient to enable him to prepare a defense." *Roark v. Allen,* 633 S.W.2d 804, 810 (Tex.1982). The City responded to Kopplow's pleading by asserting that Kopplow's claim was not yet ripe (a response to an inverse condemnation claim) and the inverse condemnation claim failed because there was no intentional taking. The City moved for summary judgment on Kopplow's claim, stating that Kopplow alleges that " the City has inversely condemned a portion of its ... property" but that " there is no evidence

to support Plaintiff's claim for inverse condemnation." The City's subsequent motion for summary judgment stated: " [t]his is an inverse condemnation case wherein Plaintiff's damages are based on the increase in the flood plain elevation on its property...." The City also specially excepted to the inverse condemnation claim, TEX.R. CIV. P. 90, but it failed to obtain a ruling before the case was submitted to the jury. In sum, the City understood Kopplow was pleading an inverse condemnation claim and prepared the defense that the claim was not yet ripe but failed to obtain a ruling on its special exception. *See Roark,* 633 S.W.2d at 810 (party waived pleading defect issue by failing to specially except).

Kopplow also pursued the claim at trial and on appeal. The City asserted at the pre-trial conference that Kopplow must decide whether to proceed on the statutory or inverse claim but failed to obtain a specific ruling from the trial court that Kopplow could not proceed on the inverse claim. In the court of appeals, Kopplow noted that, " [t]o the extent that Kopplow's damage claim could be correctly characterized as an inverse condemnation claim, the [trial] Court found as a matter of law that the claim was compensable." Kopplow maintained the position in this Court that its claim was both statutory and inverse in nature. We conclude Kopplow preserved its inverse condemnation claim.

## B. Ripeness

Substantively, the court of appeals held that, to the extent Kopplow's claim was for inverse condemnation, it was premature. 335 S.W.3d at 296. The court of appeals relied primarily on *Tarrant Regional Water District v. Gragg,* 151 S.W.3d 546, 555 (Tex.2004). *Gragg* involved a water supply reservoir that the Tarrant Regional Water District built. *Id.* at 550. Heavy rains caused the District to open the reservoir floodgates in 1990, extensively flooding the Gragg Ranch. *Id.* at 550. Gragg sued for inverse condemnation, and by the time the case was tried in 1998, the ranch had experienced a large number of floods. *Id.*

Page 537

The District argued that the reservoir did not add more downstream water than would naturally pass through, and if it did, it was mere negligence and there was not sufficient intent to support an inverse condemnation claim. *Id.* at 554.

We observed that mere negligence that eventually contributes to property damage will not qualify as a taking, primarily because the public would bear the burden of paying for damage for which it receives no benefit. *Id.* at 554-55. We also noted that, " [i]n the case of flood-water impacts, recurrence is a probative factor in determining the extent of the taking and whether it is necessarily incident to authorized government activity, and therefore substantially certain to occur." *Id.* at 555. We held that, " [w]hile nonrecurrent flooding may cause damage, a single flood event does not generally rise to the level of a taking" because " its benefit to the public, [is] too temporal or speculative to warrant compensation." *Id.*

In a companion case, we clarified that " the requisite intent is present when a governmental entity knows that a specific act is causing identifiable harm or knows that the harm is substantially certain to result." *Id.* (citing *City of Dallas v. Jennings,* 142 S.W.3d 310, 314 (Tex.2004)). With flood water impacts, recurrence is a probative factor in assessing intent and the extent of the taking. *Id.* We rejected the District's argument that it was, at most, only negligent and found some

evidence to support the taking because the reservoir changed the character of the flooding on the Gragg Ranch to make the flood waters arrive sooner, flow faster and more forcefully, and last longer. *Id.* We observed this could be attributable to the reservoir's ability to hold only eight percent excess storage, compared to twenty-five to one hundred percent for other reservoirs. *Id.* at 556.

In *Gragg,* we reaffirmed a statement we made over 50 years ago:
[g]overnmental agencies and authorities are necessities. They are capable of rendering great and beneficent public services. But any appeal to the tradition of our laws which omits a decent regard for private property rights is both inaccurate and distorted. It is because of this regard that our governmental agencies and authorities in acquiring properties for their public purposes are generally required to proceed under the power of eminent domain rather than under the police power. Such a policy has not resulted in a destruction of flood control and improvement agencies in the past and there is no reason to apprehend that the continuation of such policy will prove overly costly or inimical to the American way of life in the future.
*Id.* at 556 (quoting *Brazos River Auth. v. City of Graham,* 163 Tex. 167, 354 S.W.2d 99, 107 (1961)).

Our holding in *Gragg* does not, as the court of appeals concluded, compel a holding here that Kopplow's inverse condemnation claim is premature. The focus of *Gragg* is that the government's negligent acts that result in an occasional flood do not benefit the public and cannot qualify as a taking. *Id.* at 555. The governmental entity in *Gragg* intentionally constructed a reservoir with minimal overflow capacity, and the frequent flooding at the ranch indicated this was not mere negligence. *Id.* at 556. Here, we need not look to evidence of the frequency of flooding to deduce the government's intent: the City knew the project would inundate part of Kopplow's property before it ever began construction, prompting the City to seek a drainage easement from Kopplow. The project would only result in one tract other than Kopplow's being below the 100-year
Page 538
flood level, and the City obtained a drainage easement for the applicable portion of that tract. Based on these facts, there is little dispute that the City intended to take Kopplow's property for the project, and *Gragg* does not bar the inverse condemnation claim. *Id.* at 555; *Jennings,* 142 S.W.3d at 314.

The court of appeals also relied on *Howard v. City of Kerrville,* 75 S.W.3d 112 (Tex.App.-San Antonio 2002, pet. denied), to support its holding that Kopplow's inverse condemnation claim is not yet ripe. 335 S.W.3d at 296. In *Howard,* a flood destroyed a dam, which the city rebuilt with the same specifications. 75 S.W.3d at 115. But the earlier FEMA floodplain maps did not account for the impact of the dam or increased flow in the Guadalupe River. *Id.* The new flood level was above the level to which Howard had previously filled his property. *Id.* At various times during city regulation changes, Howard filed and withdrew applications to develop the property and later sued, in part, for a regulatory taking. *Id.* at 116. The court of appeals held that Howard's regulatory takings claim was not ripe because he had no application on file and the court could not determine what use he sought and what uses the city would or would not allow. *Id.* at 118. In contrast, here, there was undisputed testimony that Kopplow sought to develop its property pursuant to the

previously approved plat and that the City would require Kopplow to fill its property to 745.16 feet to so develop it. Unlike the record in *Howard,* on this record, we are able to determine whether the municipality will approve the use the landowner seeks.

The City further contends that Kopplow's inverse condemnation claim is not yet ripe under *Westgate,* 843 S.W.2d at 453. There, Westgate, Ltd. (Westgate) completed construction of commercial buildings shortly before the government announced plans to build a highway at a route directly through one of the new buildings. *Id.* at 450. Westgate was having difficulty leasing the space in light of the proposed roadway. *Id.* at 450-51. When the government brought statutory takings proceedings, Westgate counterclaimed for inverse condemnation to recover its lost profits accrued before the government acquired the property. *Id.* at 451. The trial court awarded Westgate $2,734,000 for the statutory takings claim as the difference in value of Westgate's entire tract before and after the taking. *Id.* It also awarded Westgate $633,000 in lost profits for its inverse condemnation claim. *Id.* We affirmed the reversal of the award of lost profits under the inverse condemnation claim because the government's proposed taking was not a direct restriction on Westgate's property before it actually acquired the property. *Id.* at 452-53.

We cited approvingly in *Westgate* two court of appeals cases where a future loss of property did not give rise to a present takings claim. *Id.* at 452-53. Both *Allen v. City of Texas City* [5] and *Hubler v. City of Corpus Christi* [6] involved city drainage systems that rendered the owners' properties more susceptible to flooding. *Westgate,* 843 S.W.2d at 453. In *Allen,* a class of plaintiffs affected by a levee pleaded an inverse condemnation claim, alleging the levee diminished the value of their land and made it more susceptible to flooding. 775 S.W.2d 863, 864 (Tex.App.-Houston [1st Dist.] 1989, writ denied). The *Allen* court disallowed the claim because no flooding had occurred and the government

Page 539

had not otherwise appropriated the property. *Id.* at 865. In *Hubler,* the plaintiff asserted that the combined effect of a current drainage project and several proposed others would increase the surface waters on his land and that the city should have taken a drainage easement. 564 S.W.2d 816, 821 (Tex.Civ.App.-Corpus Christi 1978, writ ref'd n.r.e.). The *Hubler* court disallowed the claim because no flooding had occurred as a result of the completed projects. *Id.*

Reliance on *Allen* and *Hubler* is misplaced because they address when an inverse condemnation claim for flooding is premature. Kopplow's claim is about development, not flooding. Kopplow purchased the property to develop it, obtained development permits (including a vested rights permit), and filled the property to the 100-year flood level to develop it before the City constructed the project that rendered the land undevelopable unless filled again. Even if the Kopplow property never actually floods, the property is nonetheless undevelopable unless filled because of the project. The direct, immediate restriction on Kopplow's property is that it can no longer develop the property as previously approved, and, on these facts, a lack of ripeness does not bar Kopplow's inverse condemnation claim.

We next address two remaining questions: (1) whether proximate cause affects the inverse condemnation claim, and (2) whether the damages awarded by the jury are recoverable under the inverse condemnation claim. Here, the charge asked the jury whether the use of the part taken

proximately caused damage to the remainder. The jury answered in the affirmative. The City challenged the sufficiency of the evidence supporting that answer on appeal, arguing that the use of the part taken was for the in-flow wall only and would not impound flood waters on Kopplow's remainder. 335 S.W.3d at 292. A proximate cause question is properly submitted in a partial statutory takings case where the parties dispute whether the use of the part taken damaged the remainder. *State v. Petropoulos,* 346 S.W.3d 525, 531 (Tex.2011). Moreover, causation is still relevant in an inverse condemnation claim: owners of inversely condemned property cannot recover damages the government did not cause. *See Gragg,* 151 S.W.3d at 555 (holding that the government need not pay even for negligent takings because they do not benefit the public). But while causation in a partial statutory taking focuses on whether the use of the part taken damaged the remainder, causation in an inverse condemnation focuses on the extent of the government's restriction on the property. *See Hearts Bluff Game Ranch, Inc. v. State,* 381 S.W.3d 468, 477 (Tex.2012).

Even if the City's challenge to the sufficiency of the evidence also applies to Kopplow's inverse condemnation claim, it would be legally insignificant as the parties agree that the berm will impound flood waters on Kopplow's property in a 100-year flood, causing the property to again be below the 100-year flood level. Likewise, the parties agree that Kopplow must fill its property to the new 100-year flood level in order to develop it as previously approved. Thus, there is no dispute as to causation for Kopplow's inverse condemnation claim.

Moreover, the damages the jury awarded are proper for Kopplow's inverse condemnation claim. The damages the jury found for the easement ($4,600) [7] and

Page 540

the remainder of Kopplow's property ($690,000) are recoverable under the inverse condemnation claim, and Kopplow submitted a single question that would have resulted in this amount. *See Westgate,* 843 S.W.2d at 457 (holding broad form condemnation charges should ask the difference in value of the property before and after the taking). Instead, the City requested, and the trial court approved, a separate question for damages for the easement and the remainder of the property. It was not harmful error under our Rules and precedent to charge the jury here separately as to the damages for the easement under the statutory takings claim and the remainder of the property under the inverse condemnation claim because the ultimate result was the same. *See id.* at 451 (damages to property and lost profits pled under separate theories), 457 (level of recovery for condemnation is the difference in value of the property before and after the taking). Accordingly, because Kopplow's inverse condemnation claim is ripe and was not waived, it supports the $690,000 damage award.

## III. Conclusion

Kopplow purchased the property to develop it, obtained floodplain and vested rights permits, and filled the property to the 100-year flood level before the City built a flood control project partly on its property to detain storm water on the property. That project prevents Kopplow from developing the property as planned unless it fills it to the new 100-year flood level. Kopplow's inverse condemnation claim sought damages for the fill. The fact that flooding has not yet occurred does not render the claim premature because the claim is based on the thwarting of

approved development, not flooding. We thus conclude the award of remainder damages is recoverable under Kopplow's inverse condemnation claim. In light of the court of appeals' ruling, it failed to reach Kopplow's cross-appeal point that the trial court erred in excluding some of the evidence of the cost of the fill. Accordingly, we reverse the judgment of the court of appeals and remand to the court of appeals for further proceedings consistent with this opinion.

---------

Notes:

[1] The record does not reflect when Kopplow acquired the property. Company president Edward Kopplow testified that Kopplow acquired the property " in 1996. It might have been early '97." Kopplow's plat application of November 27, 1996 lists it as the owner. Kopplow originally purchased a larger tract and sold two portions to develop as restaurants in early 1997.

[2] By contrast, FEMA's 100-year floodplain accounts for only existing conditions.

[3] *See* TEX. LOC. GOV'T CODEE § 245.004(9) (vested rights do not apply against " regulations to prevent imminent destruction of property or injury to persons from flooding that are effective only within a flood plain established by a federal flood control program and enacted to prevent the flooding of buildings intended for public occupancy" ).

[4] Kopplow asserted that: (1) Kopplow's vested right to develop the property meant that the trial court erred in excluding evidence of the value of the entire property; and (2) the trial court erred by including a proximate cause question. 335 S.W.3d at 296.

[5] 775 S.W.2d 863 (Tex.App.-Houston [1st Dist.] 1989, writ denied).

[6] 564 S.W.2d 816 (Tex.Civ.App.-Corpus Christi 1978, writ ref'd n.r.e.).

[7] The trial court entered judgment on this award, and the court of appeals affirmed. 335 S.W.3d at 297. Neither party challenges that ruling here.

---------



# Fourth Court of Appeals

## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-15-00085-CR

Ricardo O. **MORENO**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the County Court at Law No. 13, Bexar County, Texas
Trial Court No. 135229
Honorable Monica A. Gonzalez, Judge Presiding

PER CURIAM

Sitting:      Patricia O. Alvarez, Justice
              Luz Elena D. Chapa, Justice
              Jason Pulliam, Justice

Delivered and Filed:  April 15, 2015

DISMISSED FOR WANT OF JURISDICTION

In November 2013, Appellant Ricardo O. Moreno was convicted in San Antonio Municipal Court No. 3 of violation of a municipal ordinance.  He appealed his conviction to Bexar County Court at Law No. 13.  *See* TEX. GOV'T CODE ANN. § 30.00014 (West Supp. 2014) (appeal from municipal court).  On November 18, 2014, the county court dismissed the appeal for want of jurisdiction.  On December 16, 2014, Appellant filed a motion for new trial, and on February 13, 2015, Appellant filed a notice of appeal.

To perfect an appeal, a notice of appeal must be filed within thirty days of the date that the county court entered an appealable order. *See id.* § 30.00027 (authorizing appeal from a county court to a court of appeals under certain conditions); TEX. R. APP. P. 26.2(a)(1) (setting deadline to file a notice of appeal for criminal appeals); *Swain v. State*, 319 S.W.3d 878, 879 (Tex. App.—Fort Worth 2010, no pet.) (per curiam). A motion for new trial filed after an appeal from a municipal court of record to a county court does not extend the deadline to file the notice of appeal. *Swain*, 319 S.W.3d at 880. "If a notice of appeal is not timely filed, the court of appeals has no option but to dismiss the appeal for lack of jurisdiction." *Castillo v. State*, 369 S.W.3d 196, 198 (Tex. Crim. App. 2012).

On March 11, 2015, we ordered Appellant to show cause in writing why this appeal should not be dismissed for want of jurisdiction. Appellant timely responded, argued that the county court should not have dismissed his appeal, but did not address how this court has jurisdiction over his appeal from the county court's order.

The county court dismissed Appellant's appeal on November 18, 2014; Appellant's notice of appeal was due on December 18, 2014. *See* TEX. R. APP. P. 26.2(a)(1); *Swain*, 319 S.W.3d at 879. Appellant's motion for extension of time to file a notice of appeal was due on January 2, 2015. *See* TEX. R. APP. P. 26.3; *Olivo v. State*, 918 S.W.2d 519, 522 (Tex. Crim. App. 1996). Appellant did not file his notice of appeal until February 13, 2015. Appellant did not invoke this court's jurisdiction, and we may not consider his appeal. *See Olivo*, 918 S.W.2d at 522.

We reinstate the appellate deadlines and dismiss this appeal for want of jurisdiction. *See* TEX. R. APP. P. 26.2(a)(1); *Castillo*, 369 S.W.3d at 198; *Swain*, 319 S.W.3d at 879–80.

PER CURIAM

DO NOT PUBLISH

**846 S.W.2d 832 (Tex. 1993)**

**OLD REPUBLIC INSURANCE COMPANY, Petitioner,**

**v.**

**Lola SCOTT, Respondent.**

**No. D-2962.**

**Supreme Court of Texas.**

**February 3, 1993**

Rehearing Denied Feb. 3, 1993.

Page 833

Lawrence J. West, Houston, for petitioner.

William A. Badders, Nacogdoches, for respondent.

PER CURIAM.

Our prior opinion is withdrawn and the following substituted therefor. Our judgment remains unchanged.

This is a worker's compensation case in which a default judgment was granted against Old Republic on February 1, 1990. [1] Old Republic filed a motion to set aside and motion for new trial on March 1. The default judgment was first modified on April 16, by order granting Old Republic's motion for new trial in part, setting aside the damages finding, and granting a hearing on Scott's damages. A second order, on May 4, included language which provided "for the denial of the Motion for New Trial without providing for a new trial on the issue of damages."; however, it failed to state clearly whether the prior judgment was reinstated. On May 14, a third order finally removed all ambiguity and stated that the court's "ruling that a hearing be held on damages is hereby rescinded and withdrawn and that Defendant's Motion to Set Aside Default Judgment or in the Alternative, Motion for New Trial be and it is in all things overruled (emphasis added)." [2] On June 8, Old Republic filed a second motion for new trial, which the trial court purported to strike by order dated July 17.

Old Republic filed its appeal bond on August 9. On appeal, Old Republic complained that the trial court abused its discretion in not granting its motion to set aside the default judgment or alternative motion for new trial. Old Republic further complained that the trial court erroneously concluded that it did not have jurisdiction to hear its second motion for new trial. The court of appeals dismissed the appeal for want of jurisdiction, stating that the appeal bond had not been timely filed. 834 S.W.2d 608.

We hold that the May 14 order, which essentially reinstated the original default judgment, operated as an order modifying, correcting, or reforming the original default judgment, automatically beginning the appellate timetable anew from its date. TEX.R.CIV.P. 306a, 329b(h); *Check v. Mitchell,* 758 S.W.2d 755, 756 (Tex.1988); *Goff v. Tuchescherer,* 627 S.W.2d 397, 398 (Tex.1982). A motion for new trial extends the time for filing the appeal bond for ninety days after the modified judgment has been signed. TEX.R.APP.P. 41(a)(1).

The June 8 motion for new trial was improperly and ineffectively "stricken" by the trial court.

The filing of a motion for new trial in order to extend the appellate timetable is a matter of right, whether or not there is any sound or reasonable basis for the conclusion that a further motion is necessary. See generally, *Stoner v. Massey,* 586 S.W.2d 843, 846 (Tex.1979). Even so, when the trial court set aside the award of damages on April 16 and ordered a new trial on that issue, there was no longer a final judgment from which an appeal could be taken. There was no new final judgment until the May 14 judgment; therefore, there is no "second motion for new trial" problem. See *Mesa Agro v. R.C. Dove & Sons,* 584 S.W.2d 506, 508-10 (Tex.Civ.App.--El Paso 1979, writ ref'd n.r.e.).

Page 834

The deadline for the appeal bond was extended to August 12, ninety days after the May 14 order was signed, not May 3, as stated in the court of appeals opinion. Old Republic's August 9 appeal bond was timely filed. Dismissal by the court of appeals was improper.

We grant the application of Old Republic Insurance Company and, without hearing argument, a majority of the court reverses the judgment of the court of appeals and remands this cause to that court for further proceedings consistent with this opinion. TEX.R.APP.P. 170.

---------

Notes:

[1] All relevant dates are in 1990.

[2] The May 14 order amounts to something more than marking through the May 4 signing date and substituting another date on a final order. *Check v. Mitchell,* 758 S.W.2d 755, 756 (Tex.1988); cf. Anderson v. Casebolt, 493 S.W.2d 509, 510 (Tex.1973). This appeal, therefore, does not raise the issue of an attempt to extend appellate deadlines by signing the same judgment again.

---------

809 S.W.2d 201 (Tex. 1991), C-9731, Public Utility Com'n of Texas v. Gulf States Utilities Co.

Page 201

**809 S.W.2d 201 (Tex. 1991)**

**PUBLIC UTILITY COMMISSION OF TEXAS and Office of Public**

**Utility Counsel, Petitioners,**

**v.**

**GULF STATES UTILITIES COMPANY, Respondent.**

**No. C-9731.**

**Supreme Court of Texas.**

**April 3, 1991**

Rehearing Overruled June 19, 1991.

Page 202

Dan Morales, Susan D. Bergen, C. Kingsbery Ottmers and John L. Laakso, Austin, for petitioners.

Barry Bishop, John F. Williams, Austin, for respondent.

OPINION

PHILLIPS, Chief Justice.

This case is an administrative appeal from a final order of the Texas Public Utility Commission. Gulf States Utilities Company (GSU) sought the Commission's approval of the sale of two of GSU's generating units and of GSU's proposed rate treatment of certain revenues and expenses associated with that transaction. GSU proposed to sell the two plants to a joint venture comprised of GSU and three of its Louisiana industrial customers; GSU then planned to purchase the entire electrical output from the plants for distribution to its customers. GSU requested the Commission to rule that, in future rate proceedings, it be allowed to recover from its ratepayers its total purchase price for the electricity and furthermore that it be allowed to allocate the proceeds from the sale of the depreciated plants to its shareholders rather than to its ratepayers.

The Commission concluded that the proposed sale was generally in the public interest but imposed two conditions on GSU's treatment of the transaction in future rate proceedings. First, the Commission determined that it was not in the public interest for GSU's ratepayers "to pay in excess of GSU's avoided cost" for power purchased from the joint venture. Therefore, the Commission held that it would not allow GSU to recover from its Texas ratepayers payments for electricity from the joint venture in excess of GSU's avoided cost. Second, the Commission determined that GSU must divide the proceeds from the sale of the plants between the ratepayers and its shareholders in proportion to the amount each group contributed to the cost of the plants.

The district court affirmed the Commission's order. The court of appeals then reversed the judgment of the district court and remanded the case to the Commission. 784 S.W.2d 519. The Commission and the Office of Public Utility Counsel now appeal to this court. We must first determine whether the applicable state and federal regulations permit a utility purchasing power from a cogenerator to recover from its ratepayers payments in excess of its avoided cost. Second, we must determine whether the Commission's allocation of the utility's proceeds from the sale of its plants was proper. For the reasons that follow, we affirm the judgment of the court of appeals.

I

A

In 1978, in response to rising energy costs and recent fuel shortages, Congress sought ways to conserve energy to reduce

Page 203

the nation's dependence on foreign oil and on natural gas. See *Federal Energy Regulatory Comm'n v. Mississippi,* 456 U.S. 742, 745-46, 102 S.Ct. 2126, 2130, 72 L.Ed.2d 532, 538 (1982). One possible remedy was to increase the use of cogeneration. Cogeneration involves the simultaneous production of electrical power and thermal energy, such as heat or steam, usually at an industrial site. Id. at 750 & n. 11, 102 S.Ct. at 2132 & n. 11, 72 L.Ed.2d at 541 & n. 11. By making productive use of the "waste" heat produced in the generation of electricity, cogeneration can reduce fuel consumption by as much as one half. See C. PHILLIPS, THE REGULATION OF PUBLIC UTILITIES: THEORY AND PRACTICE 452 n. 92 (1988); see also 45 Fed.Reg. 12,215 (1980).

To encourage cogeneration, Congress enacted section 210 of the Public Utility Regulatory Policies Act of 1978 (PURPA). Pub.L. No. 95-617, 92 Stat. 3117 (1978) (codified as amended at 16 U.S.C. § 824a-3 (1988)). An obstacle to the development of cogeneration facilities in the past had been the reluctance of the traditional utilities to purchase excess power from, or sell backup power to, these nontraditional facilities. *FERC v. Mississippi,* 456 U.S. at 750-51, 102 S.Ct. at 2132-33, 72 L.Ed.2d at 541. Section 210 of PURPA attempts to remove this obstacle by requiring that electric utilities purchase electrical energy from qualifying cogenerating or small power production facilities [1] (QFs) and provide back-up power to QFs on a nondiscriminatory basis. [2]

In section 210, Congress directed the Federal Energy Regulatory Commission (FERC) to prescribe, within one year of the statute's enactment, rules requiring electric utilities to purchase power from and sell power to QFs. PURPA § 210(a), 16 U.S.C. § 824-3(a) (1988). Congress further provided that the rates established by FERC for the purchases of electricity by a utility (1) shall be just and reasonable to the utility's customers, and (2) shall not discriminate against QFs. PURPA § 210(b), 16 U.S.C. § 824-3(b) (1988). Section 210(b) also provides that "[n]o ... rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." Id. The "incremental cost of alternative electric energy" is defined as the cost the utility would have incurred if it had generated itself or purchased from another utility the same amount of power it purchased from the QF. PURPA § 210(d), 16 U.S.C. § 824a-3(d) (1988). By setting a ceiling of incremental cost on the amount a utility could be forced to pay for a QF's power, Congress intended to encourage cogeneration without requiring a utility's ratepayers to subsidize cogenerators. H.R.CONF.REP. NO. 1750, 95th Cong., 2d Sess. 98, reprinted in 1978 U.S.CODE CONG. & ADMIN.NEWS 7659, 7797, 7832.

Pursuant to this statutory authority, FERC has adopted regulations governing an electric utility's purchases from QFs. See 18 C.F.R. pt. 292 (1990). The regulations require that each electric utility "purchase, in accordance with § 292.304, any energy and capacity which is made available from a qualifying facility." Id. § 292.303. Section 292.304 sets the rate of payment for

such purchases equal to the utility's full avoided cost unless the state regulatory authority (or an unregulated utility) determines that a lower rate is in the public interest and is sufficient to encourage cogeneration. Id. § 292.304(b)(2). (The term "full avoided cost" is equivalent to PURPA's "incremental cost.") Finally, the regulations provide that "[n]othing in this subpart ... [l]imits the authority of any electric utility or any [QF] to agree to

Page 204

a rate for any purchase ... which differ[s] from the rate ... which would otherwise be required by this subpart." Id. § 292.301(b)(1).

Because Congress intended that state regulatory authorities be the primary enforcers of PURPA, section 210(f) of PURPA orders each state regulatory authority to implement FERC's rules. [3] 16 U.S.C. § 824-3(f) (1988). In 1981, the Texas legislature added a provision to the Texas Public Utility Regulatory Act (Texas PURA) to the effect that the Commission "shall make and enforce rules reasonably required to implement the rules and regulations of the Federal Energy Regulatory Commission pertaining to the production of electric energy by [QFs]." Act of Apr. 1, 1981, 67th Leg., R.S., ch. 31, § 2, 1981 Tex.Gen.Laws 70, 71. This provision was later amended to order the Commission to "make and enforce rules to encourage the economical production of electrical energy by [QFs]." Act of May 26, 1983, 68th Leg., R.S., ch. 274, § 1, 1983 Tex.Gen.Laws 1258, 1280 (codified at TEX.REV.CIV.STAT.ANN. art. 1446c, § 16(g) (Vernon Supp.1991)). Pursuant to these directives, the Commission has enacted its own rules governing a utility's purchases of power from a QF. Tex.Pub.Util.Comm'n, 16 TEX.ADMIN.CODE § 23.66 (West Sept. 1, 1988) ("Rule 23.66").

The Texas rules apply to FERC-certified QFs, id. § 23.66(a)(15), and are very similar to FERC's rules. Rule 23.66(d) of the Texas rules provides that "[i]n accordance with subsections (e)--(h) of this section, each electric utility shall purchase any energy and capacity that is made available from a qualifying facility...." Id. § 23.66(d)(1)(A). Rule 23.66(e) requires that rates for such purchases "shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against" QFs. Id. § 23.66(e)(1). The rates "shall not exceed avoided cost." Id. § 23.66(e)(2). "Avoided cost" has the same meaning as in FERC's regulations. Id. § 23.66(a)(2). Rates which equal avoided cost are deemed to be just and reasonable, id. § 23.66(e)(3), and such payments are considered "reasonable and necessary operating expenses of [the] utility." Id. § 23.66(e)(5). [4] Finally, as in FERC's rules, the Texas rules provide that nothing in the rules "shall limit the authority of any electric utility or any qualifying facility to agree to a rate for any

Page 205

purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions that would otherwise be required by this subsection." Id. § 23.66(b)(2)(A).

The first issue we must address in this case concerns the proper interpretation of the above federal and state regulations governing a utility's purchases of electricity from a QF. The questions presented are (1) whether the regulations prohibit a utility from contracting for and paying a rate in excess of its avoided cost and (2) whether, if a utility may pay more than avoided cost, the regulations impose a limitation on how much of these payments the utility can recover from its

ratepayers. The controversy arises because both sets of regulations expressly allow a utility and a QF to agree to any rate for purchased power, see 18 C.F.R. § 292.301(b)(1) (1990); 16 TEX.ADMIN.CODE § 23.66(b)(2)(A) (West Sept. 1, 1988), but in subsequent provisions limit purchased power payments to avoided cost. See 18 C.F.R. § 292.304(a)(2) (1990); 16 TEX.ADMIN.CODE § 23.66(e)(2) (West Sept. 1, 1988).

B

We consider these questions in light of the circumstances presented by this case. GSU is a public electric utility located in Texas near the Louisiana border. In 1984, two of GSU's largest industrial customers, both situated in Louisiana, notified GSU that they were planning to build a cogeneration facility, which would enable them eventually to withdraw from GSU's system. [5] Normally, the loss of such major customers from GSU's system would result in increases in the rates paid by the remaining customers. These increases would occur because the utility's fixed costs would have to be spread over a smaller number of ratepayers. As a way to keep the industrial customers in its system and thereby to prevent such rate increases, GSU proposed the formation of a joint cogeneration venture with the customers.

GSU and three of its Louisiana-based industrial customers eventually entered into an agreement to form the Nelson Industrial Steam Company Project (the Venture). Under the terms of this agreement, GSU agreed to sell two of its electrical generating plants to the Venture and to run the plants on behalf of the Venture. [6] GSU further agreed to purchase the entire electric output from the plants for its general power supply at a price calculated by a contractual formula. [7] In return for GSU's undertakings, the three industrial members of the Venture agreed to continue as GSU's customers. FERC later certified the Venture as a QF, contingent on the Venture's reaching certain milestones in converting the plants from natural gas to petroleum coke operation.

Completion of the agreement to form the Venture was made contingent on the Commission's approval of GSU's proposed rate treatment of certain revenues and expenses arising out of the sale. GSU requested such approval under section 63 of the Texas PURA. This section requires public utilities to report to the Commission any sale of a plant when the total consideration exceeds $100,000. The Commission then must determine if the transaction "is consistent with the public interest." TEX.REV.CIV.STAT.ANN. art. 1446c, § 63 (Vernon Supp.1991). If the Commission finds that the transaction is not in the public interest, the Commission "shall take the effect of the transaction into consideration in the rate-making proceedings" and "shall ... disallow the effect of such transaction if it will unreasonably affect rates or service." Id.
Page 206

Section 63 does not require a utility to obtain the Commission's approval prior to such sales. Furthermore, the Commission does not set electric utility rates in a section 63 proceeding. Nevertheless, the Commission must determine the effect of a transaction on future ratemaking proceedings in order to determine whether the transaction as proposed will be in the public interest. In their section 63 application, therefore, the parties to the Venture requested a prospective ruling on the future rate treatment that would be granted the transaction. Specifically, GSU requested a ruling from the Commission that GSU be allowed to pass on the full amount of

its payments to the Venture for electricity (the purchased power payments) to its ratepayers and that it be allowed to allocate the entire proceeds from the sale of the plant to its shareholders.

After a hearing, the Hearing Examiner determined that the sale of the plants to the Venture was generally in the public interest. The Examiner then found that GSU's purchased power payments might at times exceed GSU's avoided cost. The Examiner determined that avoided cost was the maximum rate that would be deemed just and reasonable and in the public interest under Rule 23.66(e). However, she concluded that GSU should be allowed to seek recovery of any purchased power payments in excess of its avoided cost in future rate or fuel-reconciliation proceedings. [8] In order to recover the payments, GSU would have to show that the costs were necessary as a means to keep its industrial load on the system, that the ratepayers benefited by the retention of the industrial load on the system, that the costs in excess of avoided costs were at a minimum, and that given these circumstances, its fuel costs were at their lowest reasonable level.

Tex.Pub.Util.Comm'n, Application of Gulf States Utils. Co. for Approval of a Joint Venture Cogeneration Project and Treatment of Revenues, Docket No. 7147, 14 TEX.P.U.C.BULL. 49, 66-67 (Mar. 21, 1988) [hereinafter Docket No. 7147]. The Examiner further determined that it would be unreasonable for the ratepayers to absorb all the costs associated with the purchased power payments. As to the allocation of the sale proceeds, the Examiner concluded that the ratepayers should be credited with 83 percent of the proceeds because they paid for 83 percent of the cost of the plants. The ratepayers' 83 percent share of the proceeds would be deemed "other electric utility income" and would be used to offset the amount of revenue otherwise required to be generated by the rates.

The Commission's final order deleted the Hearing Examiner's findings that GSU could seek recovery of the full amount of its purchased power payments and substituted findings that GSU could not recover anything above avoided cost. The final order thus stated that "[i]t is not in the public interest for GSU's Texas ratepayers to pay in excess of GSU's avoided cost for purchased power from a qualifying cogeneration project" and that "[i]n future rate proceedings, [GSU] is limited to recovering those purchased power payments to the Venture that do not exceed GSU's avoided costs." [9] Docket No. 7147, supra p. 10, at 98. The parties to the Venture later went ahead with the transaction despite the Commission's disallowance of the requested rate treatment.

GSU appealed to the district court, which affirmed the Commission's order. GSU then appealed to the court of appeals, which reversed the judgment of the district court and remanded to the Commission. The court of appeals held that the Commission's interpretation of Rule 23.66 as imposing a ceiling on negotiated purchased power payments was unreasonable under the text of the provision and contrary to the provisions and purposes of the Texas

Page 207

PURA. 784 S.W.2d at 528. The court of appeals also held that the Commission's allocation of the sale proceeds was not supported by substantial evidence in the record. 784 S.W.2d at 533.

II

We first address that part of the Commission's order holding that GSU cannot recover from its

ratepayers purchased power payments in excess of avoided cost. The Commission's ruling is based on its interpretation of the state regulations, in particular Rule 23.66. As described above, Rule 23.66(b)(2)(A) allows utilities and QFs to agree to any rate, while Rule 23.66(e) states that purchases of energy from QFs shall not exceed avoided cost. Thus, the two rules appear to conflict. The Commission attempts to harmonize the two rules by interpreting them to permit a utility and a QF to contract only for rates below avoided cost. The Commission also argues that, even if Rule 23.66(b) allows a utility to pay a rate above avoided cost, Rule 23.66(e) prohibits a utility from recovering from its ratepayers any payments, whether negotiated or compelled, in excess of avoided cost. According to the Commission, Rule 23.66(e) provides that only those payments that are equal to avoided cost are just, reasonable, and in the public interest. Therefore, it is not just, reasonable, or in the public interest for the ratepayers to pay more than avoided cost under any circumstances. Finally, the Commission argues that FERC's regulations also place a limit of avoided cost on purchased power payments.

The Commission's interpretation of its own regulations is entitled to deference by the courts. See *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625 (1965); *Lloyd A. Fry Roofing Co. v. State,* 541 S.W.2d 639, 644 (Tex.Civ.App.--Dallas 1976, writ ref'd n.r.e.). Our review is limited to determining whether the administrative interpretation "is plainly erroneous or inconsistent with the regulation." *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48, 56 (1977) (quoting *Bowles v. Seminole Rock Co.,* 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700, 1702 (1945)). However, if the Commission has failed to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. See *Sam Houston Elec. Coop., Inc. v. Public Util. Comm'n,* 733 S.W.2d 905, 913 (Tex.App.--Austin 1987, writ den'd); see also *Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976), and Ex parte Roloff, 510 S.W.2d 913, 915 (Tex.1974). [10]

We hold that the Commission acted arbitrarily in adopting an interpretation contrary to the plain language of its regulation. Rules 23.66(b)(2)(A) and 23.66(e) can be harmonized, but not in the manner suggested by the Commission. We read Rule 23.66(e) as operating solely to set the rates that the Commission can compel a utility to pay for a QF's power if the utility and the QF are unable to reach a voluntary agreement. Rule 23.66(e) does not impose a ceiling on the amount a utility can contract to pay for a QF's power, nor does it limit the amount a utility can recover from its ratepayers under such voluntary arrangements.

Our interpretation is based on the interaction between Rule 23.66(e) and Rules 23.66(d) and 23.66(b). Rule 23.66(d) obligates a utility to purchase power from a QF if the QF makes such power available. Subsection (d) also provides that the rates for purchases made under that subsection are governed by Rule 23.66(e). See 16 TEX.ADMIN.CODE § 23.66(d)(1)(A) (West Sept. 1, 1988) ("In accordance with subsection[ ] (e) ... of this section, each electric utility shall purchase any energy and capacity that is made available from a [QF]...."). Rule 23.66(e)'s avoided-cost rules therefore do

Page 208

not apply to voluntary contracts arranged outside the requirements of Rule 23.66(d). This interpretation of subsections (d) and (e) is in harmony with the plain language of Rule 23.66(b),

which permits a utility and a QF "to agree to a rate which differ[s] from the rate that would otherwise be required" whether above, below, or equal to avoided cost. We find no justification in the language of Rule 23.66(b) to support the Commission's interpretation that subsection (b) allows a utility to contract for any price below avoided cost but not for a price above avoided cost. Finally, because Rule 23.66(e) does not apply to contractual arrangements between utilities and QFs, it does not impose any limitation on the amount a utility can recover from its customers for such contractual payments. The provision that payments equal to avoided cost "shall be considered reasonable and necessary operating expenses of that utility" merely ensures that a utility can recover the full amount of the payments it is compelled to make by the Commission. Subsection (e)(5) does not provide that contractual payments above avoided cost can never be considered reasonable and necessary operating expenses of the utility.

We must also consider the application of PURPA and the federal regulations because the transaction between GSU and the Venture is governed by federal law as well as by Texas law. The interstate activities of GSU clearly bring it within the reach of the federal regulations. *FERC v. Mississippi,* 456 U.S. 742, 757, 102 S.Ct. 2126, 2136, 72 L.Ed.2d 532, 545 (1982). In addition, to the extent that the state regulations implement PURPA, the federal regulations serve as a guideline to and may control the scope of the state regulations.

We hold that the federal regulations do not grant the Commission any more authority to regulate negotiated purchases than do the state regulations. [11] Like the Texas regulations, the federal regulations do not authorize the Commission to alter the terms of a purchased power contract between a utility and a QF. Neither do they set a limit of avoided cost on the amount of such payments a utility can recover from its ratepayers. Thus, section 292.303(a) of the federal regulations provides that a utility is obligated to purchase any energy and capacity made available from a QF. Such purchases must be made in accordance with section 292.304, which sets the rate for purchases at avoided cost. Because section 292.304 is applied through section 292.303, the avoided-cost limit applies only to compelled purchases. This interpretation of sections 292.303 and 292.304 is in harmony with the language of section 292.301(b)(1), which provides that nothing is to limit the authority of a utility or QF "to agree to a rate for any purchase ... which differ[s] from the rate ... which would otherwise be required by this subpart."

Page 209

[12] 18 C.F.R. § 292.301(b)(1) (1990). See *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 416, 103 S.Ct. 1921, 1930, 76 L.Ed.2d 22, 35 (1983) ("The Commission's [full-avoided-cost] rule simply establishes the rate that applies in the absence of a waiver or a specific contractual agreement."); [13] see also *In re Vicon Recovery Sys.,* 153 Vt. 539, 572 A.2d 1355, 1358 (1990) ("The rate provisions of § 292 apply only ... in a situation where the electric utility is forced to purchase power from the small producer. The regulations make clear that utilities and [QFs] can agree to a rate different than would otherwise be mandated."); *Barasch v. Public Util. Comm'n,* 119 Pa.Cmwlth. 81, 546 A.2d 1296, 1300 ("privately negotiated contracts setting rates for QF power are essentially outside the federal and state rules"), modified, 119 Pa.Cmwlth. 81, 550 A.2d 257 (1988) (holding that previous opinion was to have prospective effect only); *Bates Fabrics Inc. v. Public Utils. Comm'n,* 447 A.2d 1211, 1214 (Me.1982) ("We conclude

that the federal scheme expressly excludes from its reach all otherwise binding contracts between utilities and" QFs.). Finally, the regulations say nothing about how much of its purchased power payments a utility can recover from its ratepayers.

Our holding that the state and federal regulations governing a utility's purchases of power from a QF do not apply to voluntary arrangements between a utility and a QF does not deprive the Commission of its regulatory authority over the amount of such contractual payments that a utility may recover from its customers. GSU may contract for any purchase price it wishes; however, whether such cost will be fully recoverable from the ratepayers will be subject to the Commission's ordinary ratemaking powers. GSU's purchase of electricity from the Venture is a fuel cost, see 16 TEX.ADMIN.CODE § 23.23(b)(2)(B) (West Sept. 1, 1988), which, like any other expense, is subject to disallowance by the Commission upon a finding that the expense is unreasonable, unnecessary, or not in the public interest. [14] See TEX.REV.CIV.STAT.ANN. art. 1446c, §§ 38, 39(a), 41(c)(3)(D) (Vernon Supp.1991); [15] 16 TEX.

Page 210

ADMIN.CODE § 23.23(b) (West Sept. 1, 1988) (utility must show that contract negotiations for purchased power have produced the lowest reasonable cost of fuel to ratepayers); see also *Suburban Util. Corp. v. Public Util. Comm'n,* 652 S.W.2d 358, 362 (Tex.1983) ("The PUC's ratemaking power includes the discretion to disallow improper expenses."). In fact, section 63, under which this proceeding was brought, expressly orders the Commission to disallow any effect of the transaction that will unreasonably affect rates.

The Commission suggests that it would never be fair to the ratepayers for a utility to pay in excess of its avoided costs for power since by definition the utility could obtain the same amount of power elsewhere by paying avoided cost. But using this argument to set an absolute ceiling on purchased power payments ignores the plain language of the Commission's own rules, which do not authorize the Commission to impose a ceiling of avoided cost on such payments. Under the rules, the Commission must conduct an independent, factual inquiry in each case to determine whether payments in excess of avoided cost are reasonable and necessary, considering the effects of the transaction as a whole. [16]

Because the Commission was not called upon to set rates in the section 63 proceeding from which this case arose, we do not remand this part of the case to the Commission. Instead, we order the Commission to allow GSU to recover purchased power payments in excess of its avoided cost in future rate proceedings if GSU establishes to the Commission's satisfaction that the payments are reasonable and necessary expenses. The Commission contends that, since GSU and the industrial customers have already gone ahead with the Venture, GSU can no longer justify the payments on the grounds that they are necessary to retain the customers in the system. However, we believe that it may still be possible for GSU to establish the necessity of the Venture and the contractual rates. GSU should be allowed to show that, absent the Venture, the industrial customers would have left its system because independent cogeneration was economically more attractive than remaining in the system, that the contractual rates are necessary to make the Venture more attractive than independent cogeneration, and that such rates are at the minimum level. If GSU is able to satisfy the Commission that payments above avoided cost are justified,

then the Commission should determine what portion of the costs of the Venture it is reasonable and necessary for the ratepayers to bear, given the distribution of benefits from the Venture to the ratepayers and to the shareholders. [17]

III

The second issue we must resolve is whether the Commission properly allocated the gains from the sale of the plants between GSU's ratepayers and its shareholders. Under the agreement, the Venture is to pay for the plants in twenty annual installments of $6.35 million each (the fixed asset payments), for a total income stream of $127 million. GSU requested that it be allowed to allocate the entire amount of each fixed asset payment, i.e., the entire proceeds of the sale, to its shareholders. The Commission instead ordered that GSU allocate 83 percent of each fixed asset payment, or 83 percent of the total sale proceeds, to its ratepayers, thereby reducing the amount the utility was entitled to recover through its rates by that amount.

We must reverse the Commission's allocation of the profits if it is not

Page 211

reasonably supported by substantial evidence in the record or if the Commission's action was arbitrary, capricious, or an abuse of discretion. Administrative Procedure and Texas Register Act, TEX.REV.CIV.STAT.ANN. art. 6252-13a, § 19(e)(5), (6) (Vernon Supp.1991); *Railroad Comm'n v. Continental Bus Sys.,* 616 S.W.2d 179, 181 (Tex.1981). Our inquiry is whether the Commission's decision is reasonably supported by substantial evidence in view of the reliable and probative evidence in the record as a whole. *Texas Health Facilities Comm'n v. Charter Medical-Dallas, Inc.,* 665 S.W.2d 446, 452 (Tex.1984). Agency decisions that are not supported by substantial evidence are deemed arbitrary and capricious. Id. at 454. In applying this test, we may not, however, substitute our judgment as to the weight of the evidence for that of the agency. Id. at 452.

The Commission's decision to allocate 83 percent of the fixed asset payments to the ratepayers is based on the testimony of the Office of Public Utility Counsel's witness Dr. Steven Anderson and of the Commission's staff accountant Paul Bellon. GSU has indirectly recovered 83 percent of the cost of the plants from the ratepayers through depreciation expense allowed for the plants and figured into the rate base. Both Anderson and Bellon testified that "because the Company and the shareholders have recovered 83 percent of the costs related to [the generating facilities], the ratepayers should receive 83 percent of the fixed asset payment GSU receives from the sale of the units." Docket No. 7147, supra p. 10, at 56.

We hold that the Commission's decision is not reasonably supported by substantial evidence in the record. The Commission based its decision solely on conclusory testimony that cites only the evidence of the ratepayers' contribution to depreciation. The Commission did not consider any other factors that would be relevant to allocation of a utility's proceeds from the sale of assets. The issue of the proper allocation of such proceeds is a complicated one that cannot be resolved simply by reference to who paid for the property. See *Washington Pub. Interest Org. v. Public Serv. Comm'n,* 393 A.2d 71, 72 (D.C.1978); see also *Democratic Cent. Comm. v. Washington Metro. Area Transit Comm'n,* 485 F.2d 786 (D.C.Cir.1973); *Kansas Power & Light Co. v. State Corp. Comm'n,* 5 Kan.App.2d 514, 620 P.2d 329 (1980). A proper allocation of proceeds can be determined only by an analysis of all the equities involved. See, e.g., Democratic Cent. Comm.,

485 F.2d at 821; Kansas Power & Light Co., 620 P.2d at 340.

The equitable principles commonly used to resolve allocation problems are that "benefits should follow burdens" and that "gain should follow risk of loss." Democratic Cent. Comm., 485 F.2d at 806; Washington Pub. Interest Org., 393 A.2d at 92. In other words, in the general case, the gain should be allocated to that group (as between shareholders and ratepayers) that has borne the financial burdens (e.g., depreciation, maintenance, taxes) and risks of the asset sold. In addition to these two general equitable factors, courts have also considered numerous other factors, including whether the asset sold had been included in the rate base over the years, whether the asset was depreciable property, nondepreciable property, or a combination of the two types, the impact of the proposed allocation on the financial strength of the utility, the reason for the asset's appreciation (e.g., inflation, a general increase in property values in the area), any advantages enjoyed by the shareholders because of favored treatment accorded the asset, the dividends paid out to the shareholders over the years, and any extraordinary burdens borne by the ratepayers in connection with that asset. See Democratic Cent. Comm., 485 F.2d at 791-92, 821-22; id. at 831-32, 841-44 (MacKinnon, J., concurring in part and dissenting in part); Washington Pub. Interest Org., 393 A.2d at 89, 91-92; Kansas Power & Light Co., 620 P.2d at 341.

In the present case, the Commission allocated the sale proceeds in direct proportion to the amount the shareholders and the ratepayers contributed to the cost of the plants. This formula is based on only one of the above principles, that benefits should follow burdens. In addition to ignoring the

Page 212

other considerations outlined above, [18] the Commission did not articulate its reasons for concluding that the ratepayers are entitled to a percentage of the proceeds exactly equal to the percentage of the cost they have paid. The Commission cited only the testimony of witnesses Anderson and Bellon but there is no evidence in the record to explain how they reached their conclusions. We therefore hold that the Commission's allocation is not supported by substantial evidence because we find that the evidence the Commission cited does not support its decision and because the Commission failed to consider evidence relating to other relevant factors. We remand the case to the Commission for it to recalculate the allocation of the fixed asset payments along the lines of the analysis suggested above, although we do not require the Commission to consider all of the above factors nor forbid it from considering others. However, the Commission should set forth the factors it considers relevant and should explain how these factors are evaluated in the present case.

IV

For the reasons stated above, we affirm the judgment of the court of appeals. This case is therefore remanded to the Commission for it to determine the proper allocation between the shareholders and ratepayers of the fixed asset payments after consideration of the factors the Commission determines are appropriate. The Commission is further ordered to allow GSU to recover its purchased price payments in future rate proceedings if GSU shows that the payments are reasonable and necessary expenses.

MAUZY, Justice, concurring and dissenting.

This utility case presents two issues involving the respective burdens of shareholders and ratepayers. In disposing of both issues, the majority heeds the complaints of the utility company, but fails to recognize the burdens borne by the ratepayers. I dissent from part II of the majority opinion, and concur only in the result of part III.

As to the first issue, I agree with Justice Gonzalez that Rule 23.66(e) prohibits a utility from recovering purchased power payments in excess of the utility's avoided cost. Nothing in either the language or the history of that rule suggests that its terms are inapplicable to negotiated contracts. Certainly, a utility may contract for a rate which is lower than its incremental cost; but the governing federal statute explicitly prohibits the adoption of a rate which exceeds the utility's incremental cost. 16 U.S.C. § 824a-3(b)(1988). Thus, Rule 23.66(e)(2) should be read to mean exactly what it says: that a utility's purchase rate "shall not exceed avoided cost." See *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 416, 103 S.Ct. 1921, 1930, 76 L.Ed.2d 22, 35 (1983) ("[A] qualifying facility and a utility may negotiate a contract setting a price that is lower than a full avoided cost rate.") (emphasis added).

As to the allocation of proceeds from asset sales, I agree that the Commission should have considered factors other than the relative contributions to depreciation. I would emphasize, however, that the Commission's discretion in this context is sharply limited. By shouldering the main financial burdens associated with utilities, and by assuming the risk of loss, ratepayers establish valid interests in utility assets. Those interests must be taken into account whenever such assets are sold; any failure to do so will necessarily rise to an abuse of discretion.

GONZALEZ, Justice, concurring and dissenting.

I concur with the court that PUC's allocation of the fixed asset payments is not supported by the record. However, I disagree with the court's conclusion that PUC's interpretation of its own rule was erroneous or arbitrary. In my opinion, PUC correctly interpreted its own Rule 23.66 to hold that GSU cannot recover from its ratepayers an amount exceeding its "avoided costs." [1] For this reason, I dissent from part II of the court's opinion.

FEDERAL LAW--THE AVOIDED COST RULE

In 1978, the United States Congress enacted the Public Utility Regulatory Policies Act of 1978 (PURPA). PURPA established the utility's incremental cost of alternative electric energy as the ceiling on payments to cogenerators. The term incremental cost is defined in the Act as the cost of the energy which, but for the purchase from the cogenerator, such utility would generate or purchase from another source. 16 U.S.C. § 824a-3(d) (1988). Incremental cost is referred to as "avoided cost" in the Texas Public Utility Regulatory Act (PURA). TEX.REV.CIV.STAT.ANN. art. 1446c (Vernon Supp.1991). With respect to rates for purchases of electricity from qualifying facilities (QFs), Congress provided that the rate

(1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and

(2) shall not discriminate against qualifying cogenerators or qualifying small power producers.

Page 213

No such rule prescribed under subsection (a) of this section shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy.

16 U.S.C. § 824a-3(b) (1988). In enacting PURPA, Congress was mindful to maintain the balance between encouraging cogeneration and not shifting the burden of cost to the ratepayer. The congressional intent for the incremental cost limitation "was to ensure that PURPA did not become a utility-funded welfare program for QFs, since such 'funding' would essentially come from the pockets of electric consumers." *Greensboro Lumber Co. v. Georgia Power Co.,* 643 F.Supp. 1345, 1369 n. 30 (N.D.Ga.1986), aff'd, 844 F.2d 1538 (11th Cir.1988). The concept of limiting purchased power payments to QFs at or below avoided cost maintains that balance. Pursuant to the authority granted to it by PURPA, the Federal Energy Regulatory Commission (FERC) adopted rules and regulations pertaining to cogeneration and small power production. 18 C.F.R. Part 292 (1990). These regulations require the rates for the purchase of electricity from federal qualifying cogeneration facilities to be based on avoided cost and establish avoided cost as the maximum rate. 18 C.F.R. § 292.304(b)(3) (1990). The United States Supreme Court has found that FERC has the authority to adopt a full avoided cost rule, and to set full avoided cost as the maximum rate. *American Paper Inst., Inc. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983). [2] FERC has done so. Thus, federal law sets avoided cost as the maximum rate. [3]

THE PUBLIC UTILITY REGULATORY ACT

In section 41A of the Public Utility Regulatory Act, the Texas legislature enacted similar provisions controlling transactions between electric utilities and qualifying cogenerators. Section 41A states in pertinent part:

(b) If an electric utility and a qualifying facility enter into an agreement providing for the purchase of capacity ... the commission shall determine whether:

(1) the payments provided for in the agreement over the contract term are equal to or less than the utility's avoided costs as established by the commission and in effect at the time the agreement was signed....

PURA, § 41A(b)(1) (emphasis added). Section 41A of PURA requires an automatic determination that prices paid for power from a qualifying facility that are at or below avoided cost are just and reasonable. [4] The PUC's prohibition on prices in

Page 214

excess of avoided cost conforms to the requirement of PURA § 41A which obligates the PUC to approve an agreement between a QF and a utility so long as it determines that payments "are equal to or less than the utility's avoided cost."

RULE 23.66(e)(2)--THE AVOIDED COST LIMITATION

Pursuant to its obligation under PURA § 16(g), the PUC enacted rules governing the recovery of fuel costs and agreements between electric utilities and QFs. The PUC limited a utility's recovery of purchased power payments to a QF to that utility's "avoided cost." Tex.Pub.Util.Comm'n, 16 TEX.ADMIN.CODE §§ 23.23(b)(4)(A), 23.66(e) (West Sept. 1, 1988). In pertinent part, section 23.66(e) states:

(1) Rates for purchases of energy and capacity from any qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogeneration and small power production facilities.

(2) Rates for purchases of energy and capacity from any qualifying facility shall not exceed avoided cost; ....

(3) Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.

The PUC interprets this rule to mean that only if a utility's purchased power payments to the QF equal avoided costs or are lower than the avoided costs may those rates be deemed just and reasonable and in the public interest. Because GSU's purchased power payments to the QF were not tied to its avoided cost but rather to a contractual rate, the PUC rejected GSU's request for an automatic pass-through under section 63 of PURA and limited GSU's recovery for those payments from its Texas ratepayers to its avoided cost.

GSU contends that section 23.66(b)(2)(A) allows it to contractually agree to a rate in excess of its avoided cost. Section 23.66(b)(2)(A) provides:

Nothing in this subsection:

(A) shall limit the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions that would otherwise be required by this subsection.

GSU argues that pursuant to section 23.66(b)(2)(A), the avoided cost ceiling in Rule 23.66(e) applies only to contracts that are initiated under the mandatory terms of the rule, as opposed to voluntarily negotiated contracts between electric utilities like GSU and QFs. The PUC rejected this argument. I agree with the PUC.

In a seemingly innocuous statement purporting to interpret Rule 23.66(d), the majority states that "Rule 23.66(e)'s avoided-cost rules ... do not apply to voluntary contracts arranged outside the requirements of Rule 23.66(d)." at 207-08. Although Rule 23.66(d) does require utilities to purchase power when a QF makes it available, the language of the rule does not support the majority's contention that "the avoided-cost limit applies only to compelled purchases." Id. at 208. The conclusion that the avoided-cost rules do not apply to voluntary contracts is without foundation. PURA simply does not distinguish between voluntary and involuntary agreements. Subsection 23.66(b)(2) in no way provides that rule 23.66 does not apply to a "negotiated" rate. It merely makes clear that the parties can negotiate a rate other than the avoided cost. See, e.g., 16 TEX.ADMIN.CODE § 23.66(d)(1)(F)(iv) (West Sept. 1, 1988) (when purchasing capacity parties can negotiate for price lower than avoided cost). Nothing in rule 23.66 provides that the utility may recover an amount greater than the avoided cost from the ratepayers.

Further, the court's construction would effectively destroy the avoided cost rule. The court's interpretation allows the utility and QF freedom to agree on a rate as provided for in section 23.66(b)(2)(A) to trump the rule that rates for purchases shall not exceed avoided costs (Rule 23.66(e)(2)), yet still requires the agreed rate to "be just and reasonable," as is required
Page 215
in Rule 23.66(e)(1). There is no logical reason to interpret Rule 23.66(2)(a) to trump Rule 23.66(e)(2), yet be subject to the requirement of Rule 23.66(e)(1). Further, the very avoided cost limitation of Section 23.66(e)(2) which GSU asserts to be inapplicable to "negotiated contracts" contains explanatory language referring to "estimates of avoided costs over the specific term of

the contract or other legally enforceable obligation." Thus, the drafters of section 23.66 envisioned the application of an avoided cost standard to negotiated contracts.

To allow GSU to pass on the costs of production from the venture even if they exceed the avoided cost rule allows utilities to make a complete end run around the rule and in the process completely eviscerate it. In other words, GSU is restricted from raising its rates by the avoided cost rule so it sells its plants to a joint venture in which it maintains an ownership interest. GSU then repurchases the electricity at a higher rate than its avoided cost and, because of the majority's opinion, is allowed to pass through that extra expense to its Texas ratepayers while creating windfall earnings for GSU's investors. GSU is having its cake and eating it too. It receives management fees, a percentage of the price that is paid to the venture, and it receives a profit when that very same energy is sold at higher rates as a result of the production costs that are passed through to ratepayers even though those costs are in excess of the avoided cost rule. This is exactly the type of activity that is prohibited by the avoided cost rule.

An agency's interpretation of its own regulations should be given deference by the courts. See *United States v. Larionoff,* 431 U.S. 864, 872-73, 97 S.Ct. 2150, 2155-56, 53 L.Ed.2d 48 (1977); *Calvert v. Kadane,* 427 S.W.2d 605, 608 (Tex.1968); *Lloyd A. Fry Roofing Co. v. State,* 541 S.W.2d 639, 644 (Tex.Civ.App.--Dallas 1976, writ ref'd n.r.e.). In my opinion, the PUC's interpretation of its rules is not arbitrary, capricious nor plainly erroneous. Accordingly, I would hold that the PUC correctly interpreted Rule 23.66 to limit GSU's recovery to its avoided costs.

---------

Notes:

[1] Small power production facilities are those which use biomass, waste, geothermal resources, or renewable resources such as wind, water, or solar energy to produce electrical power.

[2] A further obstacle to cogeneration had been the risk that a cogenerator would be considered a public utility and thus be subject to burdensome state and federal regulation. *FERC v. Mississippi,* 456 U.S. at 750-51, 102 S.Ct. at 2133, 72 L.Ed.2d at 541. PURPA directs FERC to prescribe rules exempting QFs from certain state and federal laws governing conventional electric utilities. PURPA § 210(e), 16 U.S.C. § 824a-3(e) (1988).

[3] The U.S. Supreme Court has held that the federal government may constitutionally order the states to implement FERC's regulations through state courts or agencies. *FERC v. Mississippi,* 456 U.S. at 760-61, 102 S.Ct. at 2138, 72 L.Ed.2d at 547-48. Under this federal command, states have the authority to promulgate regulations mirroring the federal regulations. 45 Fed.Reg. 12,216 (1980). However, it is unclear whether, under PURPA, a state may promulgate additional regulations in the field of cogeneration. In general, a state may enact its own laws or regulations as long as the federal authority has not preempted all state efforts to regulate in the area and as long as the state laws or regulations do not conflict with federal laws or regulations. *City of New York v. FCC,* 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48, 57 (1988). Whether PURPA and the FERC regulations completely preempt state regulation in the area of cogeneration is an open question. The issue of preemption is discussed at *infra* note 11.

[4] In full, Rule 23.66(e) provides:

(e) Rates for purchases from a qualifying facility.

(1) Rates for purchases of energy and capacity from any qualifying facility shall be just and reasonable to the consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogeneration and small power production facilities.

(2) Rates for purchases of energy and capacity from any qualifying facility shall not exceed avoided costs; however, in the case in which the rates for purchase are based upon estimates of avoided costs over the specific term of the contract or their legally enforceable obligation, the rates for such purchases do not violate this subsection if the rates for such purchases differ from avoided costs at the time of delivery.

(3) Rates for purchases satisfy the requirements of paragraph (1) of this subsection if they equal avoided cost.

(4) Rates for purchases from qualifying facilities shall be in accordance with paragraph (1)-(3) of this subsection, regardless of whether the electric utility making such purchases is simultaneously making sales to the qualifying facility.

(5) Payments by a utility to any qualifying facility, if in accordance with paragraphs (1)-(3) of this subsection, shall be considered reasonable and necessary operating expenses by that utility.

16 TEX.ADMIN.CODE § 23.66(e) (West Sept. 1, 1988).

[5] The customers' desire to withdraw was motivated in part by rate increases produced by an expensive nuclear power plant that GSU had recently brought on line.

[6] GSU would have a 1% interest in the Venture.

[7] The contractual formula is based on the current Louisiana tariff for large industrial customers and on the Venture's production costs, rather than on GSU's avoided cost. Depending on the values for the factors in the formula, the purchased power rate may be less than or greater than avoided cost. If the rate exceeds avoided cost, the industrial customers are required to purchase additional amounts of electricity to partially offset GSU's increased cost.

[8] At reconciliation proceedings, a utility's fuel costs over a period are reconciled with the projected costs for that period and a credit or charge is assessed to the ratepayers accordingly. *See* 16 Tex.Admin.Code § 23.23(b)(2)(H) (West Sept. 1, 1988).

[9] One of the Commissioners dissented from the part of the final order limiting GSU's recovery to avoided cost.

[10] The standard for reviewing the Commission's interpretation of its regulations that were promulgated to implement *federal* law, as well as for reviewing the Commission's interpretation of *federal* regulations, might well be less deferential. However, in the absence of any requests from the parties to use a different standard, we apply the deferential standard enunciated in the text to all of the Commission's interpretations in the present case.

[11] Because we find that the federal and state regulations are identical in this regard, we do not reach the issue of whether the federal law preempts state regulation in the area of cogeneration. To the extent that the Texas regulations imposed different requirements than did the federal regulations, it would be necessary to determine whether the federal law preempted Texas regulation. The answer is unclear. As discussed *supra* note 3, PURPA directs states to implement FERC's rules; however, neither PURPA nor the federal regulations expressly state whether additional state regulation is preempted.

The preemption issue has previously arisen in situations where states have tried to impose a compelled rate that is higher than FERC's avoided cost ceiling. FERC originally stated that "the States are free ... to enact laws or regulations providing for rates which would result in even greater encouragement of these technologies," i.e., rates above avoided cost. 45 Fed.Reg. 12,221 (1980). In 1988, FERC proposed changes to the regulations that would prohibit states from setting a compelled rate higher than avoided cost. 53 Fed.Reg. 9331 (1988); see Occidental Chem. Corp. v. FERC, 869 F.2d 127, 128 (2d Cir.1989). These changes are still pending. Prior to these recent developments, the lower federal courts had disagreed on whether PURPA preempts state regulations that set a price above avoided cost. Compare Consolidated Edison Co. v. Public Serv. Comm'n, 63 N.Y.2d 424, 436 n. 8, 483 N.Y.S.2d 153, 157 n. 8, 472 N.E.2d 981, 985 n. 8 (1984) with Kansas City Power & Light Co. v. State Corp. Comm'n, 234 Kan. 1052, 1057-58, 676 P.2d 764, 767-68 (1984). The Supreme Court has declined to address the issue. See Consolidated Edison Co. v. Public Serv. Comm'n, 470 U.S. 1075, 105 S.Ct. 1831, 85 L.Ed.2d 132 (1985) (dismissing the appeal from the Court of Appeals of New York for want of a substantial federal question).

[12] FERC's comments accompanying the federal regulations adopt this interpretation: Paragraph (b)(1) [allowing utilities and QFs to agree to any rate] reflects the Commission's view that the rate provisions of section 210 of PURPA apply only if a [QF] chooses to avail itself of that section. Agreements between an electric utility and a [QF] for purchases at rates different than rates required by these rules ... do not violate the Commission's rules under section 210 of PURPA. The Commission recognizes that the ability of a [QF] to negotiate with an electric utility is buttressed by the existence of the rights and protections of these rules.
45 Fed.Reg. 12,217 (1980).

[13] We disagree with the Commission's interpretation of the Supreme Court's comment that "a qualifying facility and a utility may negotiate a contract setting a price that is lower than a full avoided cost rate." American Paper Inst., 461 U.S. at 416, 103 S.Ct. at 1930, 76 L.Ed.2d at 35. We do not read this statement to mean that a utility may not negotiate for a price above avoided cost because the Court was not asked to consider the status of prices above avoided cost.

[14] Allowing the Commission to examine the fairness and reasonableness of GSU's payments to the Venture will not result in the improper application of ratemaking principles to cogenerators, as the Commission warns. Congress intended that cogenerators not be subject to the "type of examination that is traditionally given to electric utility rate applications to determine what is the just and reasonable rate that they should receive for their electric power." H.R.Conf.Rep. No. 1750, 95th Cong., 2d Sess. 97, reprinted in 1978 U.S.Code Cong. & Admin.News 7797, 7831. However, the Commissioner's task in this case is to analyze the purchased power rate in terms of its fairness to GSU's ratepayers, not its fairness to the Venture, and the former inquiry will not involve application of ratemaking principles to the Venture.

[15] We do not agree with the court of appeals that Texas PURA section 41A is applicable here. Under section 41A, a voluntary purchased power agreement between a utility and a QF may be certified by the Commission if "the payments provided for in the agreement over the contract term are equal to or less than the utility's avoided costs as established by the commission and in effect

at the time the agreement was signed...." Once certified, the payments under the agreement are presumed to be reasonable and necessary expenses of the utility in any future rate proceedings. In the present case, however, section 41A does not apply because GSU has not requested section 41A certification. Furthermore, we do not think this specific certification procedure was meant to deprive a utility of its Rule 23.66(b) power to contract for a rate above avoided cost.

[16] We reject the Office of Public Utility Counsel's alternative argument that the Commission's holding was based on its independent determination that, on the facts of this case, payments in excess of avoided cost were unreasonable expenses under the general standards for allowability of expenses or fuel costs. It is clear from the Commission's Final Order, as well as from the Commission's own position in this appeal, that the Commission's interpretation of Rule 23.66 formed the only basis for its decision.

[17] In conducting this latter inquiry, the Commission should consider the benefits accruing to GSU's shareholders because of GSU's 1% share in the Venture, as well as any other income earned by GSU as a result of its operation of the plants on behalf of the Venture.

[18] The Commission itself had previously recommended that some of these factors be considered in allocation of gain cases. *See* Tex.Pub.Util.Comm'n, *Application of Gulf States Utils. Co. for Authority to Change Rates and Inquiry of the Public Util. Comm'n of Tex. into the Prudence and Efficiency of the Planning and Management of the River Bend Nuclear Generating Station,* Docket Nos. 7195 & 6755, 14 TEX.P.U.C.BULL. 1943, 2217 (May 16, 1988) (suggesting that the analysis described in Judge MacKinnon's concurring and dissenting opinion in *Democratic Cent. Comm.* be used in future allocation cases). While we do not necessarily endorse these precise factors, we do endorse the general approach of considering various equitable factors, such as those discussed in the text, in allocation determinations.

[1] "Avoided costs" is defined by the substantive rules of the PUC as:

The incremental costs to an electric utility of electric energy or capacity or both, which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source.

Tex.Pub.Util.Comm'n, 16 TEX.ADMIN.CODE § 23.66(a)(2) (West Sept. 1, 1988) (Arrangements Between Qualifying Facilities and Electric Utilities).

[2] In referring to contractual agreements, the Court cited 18 C.F.R. § 292.301(b)(1), which is identical to § 23.66(b)(2)(A), for the principle that "a qualifying facility and a utility may negotiate a contract setting a price that is *lower* than a full-avoided-cost rate." 461 U.S. at 416, 103 S.Ct. at 1930 (emphasis added). Thus, the full-avoided-cost rule sets the maximum rate that applies in the absence of a FERC waiver. Nowhere in *American Paper* is there any indication that a utility and a QF may negotiate a rate that is above avoided cost.

[3] All parties agree that the FERC regulations preempt a contrary interpretation by the PUC. The PUC and the Office of Public Utility Counsel (OPC) contend that the PUC has no authority under federal law to approve a rate in excess of avoided cost. GSU argues that the PUC is misinterpreting the FERC regulation. GSU's interpretation is contrary to the stated purpose of PURPA. If GSU is given free rein to charge the public for QF purchases in excess of avoided cost, the revenue collected from the utility's customers will exceed the revenues that would have been

collected if the utility had procured power from other sources. Such a free rein would permit a utility and willing cogenerator to circumvent the rule's protection of the general public by simply converting the transaction into contractual form. So long as the utility may freely pass-through excessive QF prices to the general public, there is no inherent motivation for either the utility or the cogenerator to protect ratepayers from rapidly escalating revenue requirements. This result is inconsistent with the congressional intent behind PURPA.

[4] Section 41A(c) requires the PUC to certify that the agreement meets the avoided cost limitation of subsection (b)(1). Subsection (c) provides that "[i]n setting the electric utility's rates for a period during which the certification is effective, the regulatory authority shall consider payments made under the agreement to be reasonable and necessary operating expenses of the electric utility."

---------

**319 S.W.3d 878 (Tex.App.-Fort Worth 2010)**

**Darren SWAIN, Appellant**

**v.**

**The STATE of Texas, State.**

**No. 2-10-024-CR.**

**Court of Appeals of Texas, Second District, Fort Worth**

**July 8, 2010**

Publication Ordered Aug. 12, 2010.

Darren Swain, Bedford, TX, pro se.

Jay Doegey, City Atty., David S. Johnson, Linda R. Frank, Asst. City Attys., Arlington, for The State of Texas.

PANEL: MEIER, J.; LIVINGSTON, C.J.; and DAUPHINOT, J.

**MEMORANDUM OPINION**[1]

PER CURIAM.

In July 2008, a jury convicted Appellant Darren Swain in a municipal court of record of itinerant vending without a license, and the trial court assessed a fine against him in the amount of $550. After the trial court denied Swain's motion for new trial, he appealed to the county criminal court. *See* Tex. Gov't Code Ann. § 30.00014(a)

(Vernon Supp.2009). On November 3, 2009, the county criminal court delivered a written opinion affirming the municipal court's judgment. *See id.* § 30.00024(a)(1), (c). On November 19, 2009, Swain filed a " Motion for Rehearing or, in the Alternative, Motion for New Trial." [2] On January 20, 2010, seventy-eight days after the county criminal court had affirmed the municipal court's judgment, Swain filed his notice of appeal from the county criminal court's judgment. *See id.* § 30.00027(a) (Vernon 2004).

The State filed a motion to dismiss Swain's appeal.[3] It argues that Swain failed to timely perfect this appeal because (1) under rule of appellate procedure 26.2(a)(1), he did not file his notice of appeal within thirty days of the county criminal court's judgment affirming the municipal court's judgment and (2) even though Swain filed a motion for new trial after the county criminal court had affirmed the municipal court's judgment, rule 26.2(a)(2)'s ninety-day deadline for filing a notice of appeal when a motion for new trial is filed does not apply in this case because Swain was convicted after a jury trial in a municipal court of record and thereafter appealed to the county criminal court, which did not conduct a trial de novo. According to the State, rule 26.2(a)(2) does " not apply to an appeal from a municipal court of record to a county court, and then to a court of appeals." Therefore, " [t]here is no reason for [Swain] to file a motion for new trial at the county level since the trial was held in the municipal court." We agree with the State.

A person convicted of an offense in a municipal court of record may appeal that conviction to a county criminal court. *Id.* § 30.00014(a). The county criminal court may not retry the case; instead, it must determine the appeal on the basis of the errors shown in the municipal court

record. *Id.* § 30.00014(b) (" An appeal from the municipal court of record *may not be by trial de novo.* " ) (emphasis added). The county criminal court may affirm, reverse, or reform the municipal court's judgment. *Id.* § 30.00024(a); *Alexander v. State,* 240 S.W.3d 72, 74 (Tex.App.-Austin 2007, no pet.). The defendant may then appeal to the court of appeals if the county criminal court affirms the municipal court's judgment and if the fine assessed against the defendant exceeds $100. Tex. Gov't Code Ann. § 30.00027(a).

Under rule of appellate procedure 26.2(a)(1), a defendant's notice of appeal must be filed within thirty days after the court enters an appealable order. Tex.R.App. P. 26.2(a)(1); *see Garza v. State,* Nos. 14-06-00595-CR, 14-06-00596-CR, 2006 WL 2075147, at *1 (Tex.App.-Houston [14th Dist.] July 27, 2006, no pet.) (mem. op., not designated for publication); *Croes v. State,* No. 14-06-00361-CR, 2006 WL 1458485, at *1 (Tex.App.-Houston [14th Dist.] May 25, 2006, no pet.) (mem. op., not designated for publication); *Sharp v. State,* No. 05-04-00022-CR, 2004 WL 60770, at *1 (Tex.App.-Dallas Jan. 14, 2004, no pet.) (not designated for publication); *see also* Tex. Gov't Code Ann. § 30.00023(b) (Vernon 2004) (" The appellate courts may make and enforce all rules of practice and procedure that are not inconsistent with law and that are necessary to expedite the dispatch of appeals from the municipal courts of record." ). Rule 26.2(a)(2) provides that a notice of appeal must be filed " within 90 days after

Page 880

the day sentence is imposed or suspended in open court if the defendant timely files a motion for new trial." Tex.R.App. P. 26.2(a)(2). A notice of appeal that complies with the requirements of rule 26 is essential to vest the court of appeals with jurisdiction. *Slaton v. State,* 981 S.W.2d 208, 210 (Tex.Crim.App.1998). Without a timely filed notice of appeal, we lack jurisdiction over the appeal. *Id.*

Here, Swain filed his notice of appeal seventy-eight days after the county criminal court had affirmed the municipal court's judgment. Because Swain did not file the notice of appeal within thirty days of the county criminal court's judgment, we lack jurisdiction over this appeal unless rule 26.2(a)(2) applies to extend the deadline for filing the notice of appeal. *See id.*

It is well established that the granting or denying of a motion for new trial lies within the discretion of the *trial court. Lewis v. State,* 911 S.W.2d 1, 7 (Tex.Crim.App.1995). " A plain reading of [rule of appellate procedure 26.2(a) ] reveals that a timely-filed motion for new trial can only extend the deadline for filing an appeal from the imposition or suspension of a sentence; it cannot extend the deadline for filing an appeal from a mere ' appealable order.' " *Martin v. State,* No. 02-06-00272-CR, 2007 WL 529905, at *1 (Tex.App.-Fort Worth Feb. 22, 2007, no pet.) (mem. op., not designated for publication); *see* Tex.R.App. P. 26.2(a).

In this case, the municipal court of record conducted Swain's jury trial and imposed the $550 fine. The county criminal court did not impose or suspend Swain's sentence. Swain's appeal to the county criminal court was not a trial de novo; instead, the county criminal court exercised criminal appellate jurisdiction under government code section 30.00014(a). *See* Tex. Gov't Code Ann. § 30.00002(1)(A) (Vernon 2004) (defining " [a]ppellate court" to mean, among other things, the county criminal court), § 30.00014(a) (providing that the county criminal courts have jurisdiction over appeals from a municipal court of record), § 30.00014(b) (providing that " [a]n appeal from

the municipal court of record *may not be by trial de novo* " ) (emphasis added). Accordingly, Swain's motion for new trial challenging the county criminal court's judgment that affirmed the municipal court's judgment did not operate to extend the deadline for filing the notice of appeal under rule 26.2(a)(2).

Swain's notice of appeal was untimely. Accordingly, we grant the State's motion to dismiss and dismiss the appeal for want of jurisdiction. *See* Tex.R.App. P. 42.3(a), 43.2(f).

---------

Notes:

[1] *See* Tex.R.App. P. 47.4.

[2] The record does not demonstrate that the county criminal court ever ruled on this motion.

[3] Swain filed a response to the State's motion to dismiss.

---------

989 S.W.2d 135 (Tex.App. —San Antonio 1999), 04-98-00656, Texas Dept. of Public Safety v. Fecci

Page 135

**989 S.W.2d 135 (Tex.App. —San Antonio 1999)**

**TEXAS DEPARTMENT OF PUBLIC SAFETY, Appellant,**

**v.**

**Eugene FECCI, Appellee.**

**No. 04-98-00656-CV.**

**Court of Appeals of Texas, Fourth District, San Antonio**

**January 29, 1999**

Page 136

Rehearing Overruled March 9, 1999.

Page 137

J. Frank Davis, Andres Cedillos, Texas Dept. of Public Safety, San Antonio, for Appellant.

Kristin Fiacco Dow, Jeffrey J. Pokorak, Laurence A. Dunne, III, Center for Legal and Social Justice, San Antonio, for Appellee.

Before: CATHERINE STONE, Justice PAUL W. GREEN, Justice KAREN ANGELINI, Justice.

OPINION

CATHERINE STONE, Justice.

This appeal involves a license revocation resulting from a DWI arrest. In two points of error, the Texas Department of Public Safety (TDPS) challenges the trial court's reversal of the finding against Eugene Fecci by the administrative court. Fecci contends that this court does not have jurisdiction, claiming that TDPS failed to timely file a notice of appeal. Because our jurisdiction has been properly invoked, and because there is substantial evidence to suspend Fecci's license, we reinstate the order of the administrative court.

FACTUAL AND PROCEDURAL BACKGROUND

On October 27, 1997, Officer Broihier observed a pickup truck change lanes four times without using a turn signal. Upon stopping the vehicle, Broihier approached the driver, Eugene Fecci, and noticed the strong odor of alcohol on his breath, slurred speech, and bloodshot eyes. Broihier requested assistance from an officer certified in examining persons for horizontal gaze nystagmus and Officer Furgason responded. Fecci admitted to spending the evening drinking in a bar watching a football game. Officer Furgason had Fecci perform three field sobriety tests: the walk and turn; the one-legged stand; and the horizontal gaze nystagmus. Fecci's unsatisfactory performance caused Officer Furgason to conclude that Fecci had an alcohol level at or above 0.10.

Fecci was placed under arrest and taken to the police station. Officer Furgason read the DWI statutory warning to Fecci and requested a breath specimen. Fecci responded by asking that an attorney be present. Fecci was taken to the video room and read his Miranda rights. Fecci again requested that an attorney be present before performing sobriety exercises on video or submitting a breath specimen. The officer informed Fecci that only police officers and detained persons were allowed in the intoxilyzer and video rooms. Fecci suggested leaving the room. The officer asked

Fecci several times to take the breath test and Fecci responded each time that he wanted to speak to an attorney. Fecci indicated that he was not refusing to take the test, but that he just wanted to talk to his attorney. The interview was finally terminated.

TDPS thereafter requested that Fecci's license be suspended under TEX. TRANS. CODE ANN. § 724.035 (Vernon Pamph.1999). At the administrative hearing, the judge granted TDPS' request. Fecci appealed the order to County Court at Law No. 8. The county court entered a judgment in favor of Fecci on April 30, 1998. On June 1, 1998, TDPS filed a "Motion for New Trial/Appellee's Motion for Rehearing." Fecci filed a Motion to Strike the Untimely Pleadings on June 18. On June 19, TDPS filed a Response to the Motion to Strike the Pleading. That same day the county court heard the matter characterized by TDPS as "appellee's motion for rehearing" or "defendant's motion for new trial" and found in favor of Fecci. On July 27, 1998, TDPS filed a notice of appeal from the county court's decision with this court.

JURISDICTIONAL REQUIREMENTS

Fecci contends that TDPS either improperly filed a motion for new trial or untimely filed a motion for rehearing by filing a "motion for new trial/motion for rehearing." While Fecci asserts that this was really a motion for rehearing because a motion for new trial would only have been proper at the administrative court level where the finding of fact occurred, he argues that under either designation this court lacks jurisdiction. According to Fecci, if it were a motion for new

Page 138

trial, TDPS sought inappropriate relief because a motion for new trial could not have been granted at the county court level as the county court was acting in an "appellate" capacity and had not held a trial. Additionally, Fecci notes that TDPS was not entitled to a rehearing because such a motion would have been untimely. The only rules providing for the appropriate timetables to file a motion for rehearing are contained in the Rules of Appellate Procedure. According to TEX.R.APP. P. 49.1, an appellant must file a motion for rehearing within 15 days of the reviewing court's decision. TDPS filed its motion 30 days after the county court's decision.

Fecci also contends that because this motion was in actuality a motion for rehearing, TDPS only had 30 days to file its notice of appeal since a motion for rehearing would not augment the timetables of this court. See TEX.R.APP. P. 26.1(a)(1) (providing that motion for new trial will extend the deadline to file notice of appeal from 30 to 90 days). Because TDPS filed its notice of appeal more than 30 days after the judgment was entered, Fecci contends that this court does not have jurisdiction to consider the case.

The Texas Rules of Appellate Procedure govern procedure in appellate courts. See TEX.R.APP. P. 1. Rule 3.1(b) defines an appellate court as the courts of appeals, the Court of Criminal Appeals, and the Supreme Court. Consequently, even though the county court at law may have been acting in an appellate or reviewing capacity, the Texas Rules of Appellate Procedure are not applicable. See Texas Dept. of Public Safety v. Story, 1998 WL 116304, * 9 (Tex.App.--Waco 1998, no writ). The Texas Rules of Civil Procedure control procedure in the county courts. See TEX.R. CIV. P. 2.

The primary purpose of a motion for new trial is to give the trial judge an opportunity to cure any errors by granting a new trial, while the purpose of a motion for rehearing is to provide the

court an opportunity to correct any errors on issues already presented and decided. See *Wentworth v. Meyer,* 839 S.W.2d 766, 778 (Tex.1992) (Cornyn, J., concurring); *D/FW Commercial Roofing Co., Inc. v. Mehra,* 854 S.W.2d 182, 189 (Tex.App.--Dallas 1993, no writ). Arguably, a motion for new trial and a motion for rehearing can be treated similarly in certain situations. See *El Paso Elec. Co. v. Public Utility Comm'n,* 715 S.W.2d 734, 737-38 (Tex.App.--Austin 1986, writ ref'd n.r.e.) (analogizing Texas Administrative Procedure and Texas Register Act motion for rehearing to motion for new trial in civil practice for purposes of determining whether motion was prematurely filed). Similarly here, TDPS' "Motion for New Trial/Motion for Rehearing" was, for purposes of filing deadlines, a post-judgment motion. As such, TDPS complied with TEX.R. CIV. P. 329b, which allows such a motion to be filed within 30 days of the judgment being signed.

Additionally, while the Rules of Appellate Procedure do not apply to the county court's deadlines, those rules come into play when determining timetables applicable to this court. This post-judgment motion made in the lower court extended the time to file a notice of appeal in this court from 30 to 90 days. See TEX.R.APP. P. 26(a). TDPS subsequently filed its notice of appeal within 90 days. As a result, we have jurisdiction over the present case.

SUBSTANTIAL EVIDENCE REVIEW

The county court's review of an administrative drivers' license suspension is based on the substantial evidence rule. See 1 TEX. ADMIN. CODE § 159.37(a) (West 1998); *Texas Dept. of Public Safety v. Guajardo,* 970 S.W.2d 602, 604 (Tex.App.--Houston [14th Dist.] 1998, no pet.). The reviewing court shall reverse or remand the administrative court's decision if:

substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusion, or decisions are:

(A) unconstitutional or in violation of a statutory provision;

(B) beyond the agency's statutory authority;

(C) made through unlawful procedure;

(D) affected by other error of law;

(E) not reasonably supported by substantial evidence considering the reliable and

Page 139

probative evidence in the record as a whole; or

(F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

TEX. GOVT.CODE ANN. § 2001.174(2) (Vernon Pamph.1999). TDPS argues that Fecci did not prove to the county court that the administrative law judge's decision was arbitrary or capricious or not supported by substantial evidence. See id. § 2001.174(2)(E-F). Pursuant to section 2001.174, we review a legal determination by the ALJ de novo and review any findings of fact for support by substantial evidence. *Martin v. Dept. of Public Safety,* 964 S.W.2d 772, 774-775 (Tex.App.--Austin 1998, no pet.).

Fecci's license was suspended under TEX. TRANSP. CODE ANN. § 724.035 (Vernon Pamph.1999), putting four fact issues in question at the administrative hearing: (1) whether probable cause existed to stop or arrest the person; (2) whether probable cause existed to believe that the person was operating a motor vehicle in a public place while intoxicated; (3) whether the

person was placed under arrest by the officer and was requested to submit to the taking of a specimen; and (4) whether the person refused to submit to the taking of a specimen on request of the officer. TEX. TRANS. CODE ANN. § 724.042 (Vernon Pamph.1999). The ALJ must find in the affirmative on each issue in order to suspend the defendant's license. See id. § 724.043.

In considering whether the decision of the ALJ was not reasonably supported by substantial evidence, we are governed by the following principles:

(1) the court will hear and consider evidence to determine whether reasonable support for the agency's order exists, but the agency remains the primary fact finding body, and the question for the trial court is strictly one of law; (2) the trial court may not substitute its own judgment for that of the state agency on controverted issues of fact; (3) if the agency heard substantial evidence that would support either an affirmative or a negative finding, the trial court must allow the agency's order to stand, even if the court would have differed with the result; (4) the trial court may not set aside the agency's ruling merely because there was conflicting or disputed testimony; and (5) the trial court is concerned only with the reasonableness of the agency's order, not its correctness. *Texas Dept. of Public Safety v. Wilson,* 969 S.W.2d 438, 439-40 (Tex.App.--Fort Worth 1997, no pet.). See also *Firemen's & Policemen's Civil Serv. Comm'n v. Brinkmeyer,* 662 S.W.2d 953, 956 (Tex.1984). Substantial evidence review presents a question of law. See Brinkmeyer, 662 S.W.2d at 956. Consequently, this court reviews the trial court's conclusion that evidence did not support the ALJ's findings de novo. See *In re Humphreys,* 880 S.W.2d 402, 404 (Tex.1994). "Substantial evidence" exists if reasonable minds could have reached the same conclusion. See Wilson, 969 S.W.2d at 439.

While the county court did not specify which issues it did not believe were proven at the administrative hearing, only two of the four factors are contested: refusal to submit a breath specimen and probable cause to believe Fecci operated a motor vehicle while intoxicated. Fecci does not dispute that probable cause existed to stop him, or that he was placed under arrest and requested to submit to the taking of a breath specimen.

Refusal to Submit a Breath Specimen

Fecci contends that the video demonstrates that he never refused the request for a breath specimen and that the officer never informed Fecci that speaking with an attorney was not an option. When Officer Serna asked Fecci if he would take the breath test, Fecci replied that he wanted to talk to his attorney. Fecci did not tell the officer that he would not take the test. When Fecci requested an attorney, he was informed that no one other than police personnel and detained persons were allowed in the room. TDPS argues that by refusing to answer the question or by answering with a request for an attorney, Fecci refused the breath specimen.

In *Texas Dept. of Public Safety v. Raffaelli,* 905 S.W.2d 773 (Tex.App.--Texarkana 1995, no writ), Raffaelli was stopped by an officer after swerving his vehicle. The officer

Page 140

smelled alcohol on his breath and Raffaelli performed poorly on several field sobriety tests. Raffaelli, 905 S.W.2d at 776. Raffaelli was arrested, taken to the police station, and informed of his Miranda rights. Id. at 777. He was placed in a room containing a video camera and asked to perform additional field sobriety tests. Id. The officer read Raffaelli the statutory warnings

regarding refusal to give a breath specimen. Id. When asked to give the specimen, Raffaelli asked for an attorney. Id. When asked again, Raffaelli continued to ask for an attorney. Id. The record reflected that the officer who requested the specimen informed Raffaelli that the presence of his attorney was not an option, but Raffaelli continued to insist on having an attorney present and did not consent to providing a breath specimen. Id. The administrative court suspended his license and the trial court reversed. Id. at 778. The Texarkana court of appeals set aside the trial court's reversal because it concluded that "[a]ny conflict in the evidence regarding Raffaelli's refusal to provide a breath specimen was a matter for the administrative law judge." Id. The court refused to substitute its judgment regarding the weight of the evidence for that of the state agency. Id. The court also noted that "although substantial evidence is more than a scintilla, the evidence in the record may preponderate against the decision of the agency but still amount to substantial evidence." Id.

In the present case, it is true, as Fecci asserts, that the officer did not inform Fecci that the presence of his attorney was not an option. Nevertheless, as the Raffaelli decision reflects, a defendant need not give the officer a definite "no" about whether or not he will take the test. Moreover, any conflict in the evidence concerning a defendant's refusal to provide a breath specimen is a matter for the administrative law judge to resolve. See *Texas Dept. of Public Safety v. Latimer,* 939 S.W.2d 240, 245 (Tex.App.--Austin 1997, no writ). Accordingly, the question before this court is whether reasonable minds could have concluded from the evidence that Fecci refused to submit a specimen. In light of all the evidence, we find that reasonable minds could conclude that Fecci did so refuse.

Operating a Motor Vehicle in a Public Place While Intoxicated

Fecci also argues that the video shows that he was not intoxicated, and thus, no probable cause existed to suspend his license for driving while intoxicated. Fecci was pulled over at approximately 10:30 p.m. and the video was made at 12:20 a.m. The video is inconclusive; Fecci slightly sways and exhibits halting speech patterns, but is able to carry on a conversation with the officer. However, regardless of the video, testimony was introduced supporting the finding that probable cause existed that Fecci was driving while intoxicated. Officer Broihier testified that Fecci was unsteady and exhibited a strong odor of alcohol on his breath, slurred speech, and bloodshot eyes. Officer Furgason also testified that Fecci performed poorly on all three sobriety tests. Even where evidence exists to support both propositions, this court must simply determine whether reasonable minds could have reached the conclusion of the factfinder. See Latimer, 939 S.W.2d at 244. In this case, the administrative law judge determined that probable cause existed to believe that Fecci was intoxicated while operating a motor vehicle in a public place. See *Held v. State,* 948 S.W.2d 45, 51 (Tex.App.--Houston [14th Dist.] 1997, pet. ref'd) (holding that smelling of alcohol, slurred speech, glossy, bloodshot eyes, leaning on car for support, and failing field sobriety tests constituted probable cause to arrest). Officer Furgason and Broihier's testimony amply support this conclusion. Consequently, substantial evidence indicates that probable cause existed to believe that Fecci was operating a motor vehicle in a public place while intoxicated. TDPS' first point of error is sustained. [1]

Page 141

The judgment of the county court is reversed and the order of the administrative court is reinstated.

---------

Notes:

[1] In TDPS' second point of error, which we need not address, TDPS supplements its argument that Fecci refused to submit to a breath test by trying to refute the possible reasoning of the county court or perhaps the reason behind Fecci's confusion. We note this issue only to point out that preventing the collection of a breath sample because a defendant has requested counsel "would severely restrict police officers in the pursuit of lawfully collecting evidence of intoxication and ... would do nothing to further protect the privilege against self-incrimination." McCambridge v. State, 712 S.W.2d 499, 506 (Tex.Crim.App.1986). By reading the required statutory and Miranda warnings, the officers did all that was necessary under the law. Under the relevant statutes, police officers are not required to inform arrested persons that having an attorney present is not an option in deciding whether or not to submit to a breath test, even where a defendant becomes confused after being told that one has a right to an attorney but is at the same time not allowed access to one. Like the McCambridge court, we recognize that while the Legislature is free to modify the required statutory warnings, "it would inappropriate for this Court to make such an expansion of statutory warnings absent legislative authority." Id. at 507 n. 18.

---------

961 S.W.2d 6 (Tex.App. —Amarillo 1996), 07-96-0205, Thomley v. Southwood-Driftwood Apartments Ltd.

Page 6

**961 S.W.2d 6 (Tex.App. —Amarillo 1996)**

**Violet Emelene THOMLEY, Appellant,**

**v.**

**SOUTHWOOD-DRIFTWOOD APARTMENTS, LTD., d/b/a Driftwood**

**Apartments, and Hiw, Inc., Appellees.**

**No. 07-96-0205-CV.**

**Court of Appeals of Texas, Seventh District, Amarillo**

**August 27, 1996**

Page 7

Joe L. Lovell, Channy F. Wood, Garner, Stone & Lovell, Amarillo, for appellant.

Michael J. Sharpee, Peterson, Farris, Doores & Jones, Amarillo, Andrew L. Pickens, Fulbright & Jaworski, Houston, Ben Taylor, Fulbright & Jaworski, Dallas, for appellees.

Before BOYD and QUINN, JJ., and REYNOLDS, Senior Justice. [*]

PER CURIAM.

Appellees Southwood-Driftwood Apartments, Ltd., d/b/a Driftwood Apartments, and HIW, Inc., (Southwood), seek the dismissal of appellant Violet Emelene Thomley's (Thomley) appeal from a summary judgment in favor of Southwood. Subject to their motion to dismiss, Southwood has also filed a Motion for Leave to File Supplemental Transcript and a First Motion for Extension of Time in Which to File Brief. We deny Southwood's motion to dismiss but grant its motions for leave to file the supplemental transcript and for extension of time within which to file its brief.

The thrust of Southwood's motion to dismiss is that Thomley's appeal was not timely perfected; therefore, this court lacks jurisdiction to consider the appeal. Specifically, Southwood contends Thomley failed to file an appeal bond or affidavit in lieu of bond within 30 days after the summary judgment was signed, and did not timely file a motion with this court seeking an extension of time for late filing.

The summary judgment was granted March 4, 1996. Absent a filing that extends the deadline, a party has 30 days from the date a judgment is signed within which to file a cost bond to perfect an appeal. Tex.R.App. P. 41(a)(1). Thus, absent an extension, the deadline for perfecting this appeal was April 3, 1996. Counsel for Thomley filed a request for findings of fact and conclusions of law on March 22, 1996, and a motion for new trial on April 2, 1996, but the certificate of deposit in lieu of appeal bond was not filed until May 31, 1996.

With respect to when ordinary appeals are perfected, the Texas Rules of Appellate Procedure provides, in pertinent part:

When security for costs is required, the bond or affidavit in lieu thereof shall be filed with the clerk within thirty days after the judgment is signed, or, within ninety days after the judgment is signed if a timely motion for new trial has been filed by any party or if any party has timely filed a request for findings of fact and conclusions of law in a case tried without a jury.

Tex.R.App. P. 41(a)(1).

When a trial court grants a summary judgment, it makes a determination that no material issues of fact exist. *Besing v. Moffitt,* 882 S.W.2d 79, 82 (Tex.App.--Amarillo 1994, no writ). When a trial court denies such a judgment, it holds that such issues exist; however, it does not decide the issues. Id. As a result, a summary judgment proceeding has not been "tried" for the purpose of requesting findings of fact and conclusions of law. Id., citing *Zimmerman v. Robinson,* 862 S.W.2d 162, 164 (Tex.App.--Amarillo 1993, no writ).

Because findings of fact and conclusions of law have no place in a summary judgment proceeding, the appellate timetable was not extended by the requests for such findings and conclusions in this case. *Linwood v. NCNB Texas,* 885 S.W.2d 102 (Tex.1994). Southwood recognizes that the Texas Supreme Court in Torres v. Western Casualty & Surety Co., 457 S.W.2d 50 (Tex.1970)

Page 8

held the filing of a motion for new trial in a summary judgment proceeding extended the appellate timetable. However, it argues that since Torres, in the Linwood case, the court held that because a summary judgment proceeding does not constitute a "trial," requests for findings of fact and conclusions of law are not appropriate to extend the appellate timetable; hence, "the same reasoning should be used in regard to a motion for new trial."

In support of that argument, Southwood cites and relies upon a footnote observation in *Chavez v. Housing Auth. of El Paso,* 897 S.W.2d 523 (Tex.App.--El Paso 1995, writ denied). In that case, after noting the Linwood holding, the El Paso court made the following footnote observation:

It is logical to note that based upon the definition of "trial" as contained in Linwood ..., a summary judgment proceeding has not been "tried" for purposes of a motion for new trial, either. Although the Supreme Court has noted that a motion for new trial is not necessarily inappropriate following entry of a summary judgment despite the fact that no "trial" was actually had, *Torres v. Western Casualty and Surety Company,* 457 S.W.2d 50 (Tex.1970), that case and its progeny pre-date Linwood. If findings of fact and conclusions of law are inappropriate to extend the appellate timetable because a summary judgment does not constitute a "trial", we are hard-pressed to understand how a motion for new trial is any more appropriate. We are left, then, with the question of whether the appellate timetable may ever be extended following summary judgment.

Id. at 526, n. 1.

We do not agree that the question as to whether the appellate timetable may ever be extended following summary judgment is open. In the Torres case, and in referring to the summary judgment before it, the court specifically noted that although "no 'trial' was actually had," a motion for new trial "is not necessarily inappropriate following entry of a summary judgment." The court held the intermediate appellate court "correctly held that the time for taking the appeal steps began to run from the overruling of the motion for new trial." Thus, the Linwood holding that a summary judgment hearing is not a "trial" of such a nature to make appropriate requests for findings of fact and conclusions of law, is not inapposite to the similar holding by the Torres court.

Additionally, in Padilla v. LaFrance, 907 S.W.2d 454, 458 (Tex.1995), by holding a transcript was timely filed 82 days after a summary judgment in which a motion for new trial had been filed,

the supreme court, inferentially if not explicitly, again recognized that the filing of a motion for new trial extended the appellate timetable. Moreover, various courts of appeal have recognized that the appellate timetable in a summary judgment appeal is extended by the filing of a motion for new trial. See *Stafford v. O'Neill,* 902 S.W.2d 67, 67 (Tex.App.--Houston [1st Dist.] 1995, no writ); *Sewell v. Adams,* 854 S.W.2d 257, 260 (Tex.App.--Houston [14th Dist.] 1993, no writ); *Mitre v. Brooks Fashion Stores, Inc.,* 818 S.W.2d 154, 156 (Tex.App.--Corpus Christi 1991, no writ); *Krchnak v. Fulton,* 759 S.W.2d 524, 528 (Tex.App.--Amarillo 1988, writ denied).

Furthermore, the plain meaning of Rule 41 extends the filing deadline in two separate instances: 1) if any party files a timely motion for new trial; or 2) in a case tried without a jury, if any party timely files a request for findings of fact and conclusions of law. Tex.R.App. P. 41(a)(1); *West Columbia Nat'l Bank v. Griffith,* 902 S.W.2d 201 (Tex.App.--Houston [1st Dist.] 1995, writ denied).

As we have noted, because the granting of a summary judgment itself exemplifies a trial court holding that as a matter of law the prevailing party is entitled to the relief sought, it is not a "trial" before the court within the purview of the rule pertaining to findings of fact and conclusions of law. However, as in any other case, a losing party is certainly entitled to point out reasons why the judgment was wrongly entered with the possibility that the expense and delay of an appeal might be obviated. We do not perceive any logical reason why the rule extending the appellate timetable in cases where a motion for new trial is filed should not apply in summary judgment proceedings as it does in other cases.

Page 9

We hold that Thomley's timely filing of a motion for new trial extended the appellate timetable; therefore, her appeal was timely perfected and Southwood's motion to dismiss is overruled. However, Southwood's motions for leave to file a supplemental transcript and first motion for extension of time within which to file its brief are granted.

It is so ordered.

---------

Notes:

[*] Charles L. Reynolds, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't Code Ann. § 75.002(a)(1) (Vernon Supp.1996).

---------